**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

STEVEN M. POWELL, BRIAN JORDAN, JAMES V. )
MORGAN, JOHN DOUGHERTY, KENNETH R. BOYD, )
TERRY KRAMER, as Trustees on behalf of UNITED )
FOOD AND COMMERCIAL WORKERS UNIONS AND )    Case No.
EMPLOYERS MIDWEST HEALTH BENEFITS FUND, )
and RONALD E. POWELL, KENNETH R. BOYD, D. )
TROY PRUITT, BRIAN JORDAN, JAMES V. MORGAN, )    **FILED: JUNE 10, 2008**
JOHN DOUGHERTY, as Trustees on behalf of UNITED )    **08CV3342**
FOOD AND COMMERCIAL WORKERS UNIONS AND )    **JUDGE HIBBLER**
EMPLOYERS MIDWEST PENSION FUND, )    **MAGISTRATE JUDGE COLE**
)
              **Plaintiffs,** )
   **v.** )    **AEE**
)
DON'S FINEST FOODS, INC., )
)
              **Defendant.** )

## COMPLAINT

NOW COME Plaintiffs, STEVEN M. POWELL, BRIAN JORDAN, JAMES V. MORGAN,

JOHN DOUGHERTY, KENNETH R. BOYD, TERRY KRAMER, as Trustees on behalf of

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST

HEALTH BENEFITS FUND, and Plaintiffs, RONALD E. POWELL, KENNETH R. BOYD, D.

TROY PRUITT, BRIAN JORDAN, JAMES V. MORGAN, JOHN DOUGHERTY, as Trustees on

behalf of UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS

MIDWEST PENSION FUND, by and through their attorneys, THE KARMEL LAW FIRM, and for

their causes of action against Defendant, DON'S FINEST FOODS, INC., allege as follows:

### JURISDICTION AND VENUE

1.      This action is brought by Plaintiffs, STEVEN M. POWELL, BRIAN JORDAN,

JAMES V. MORGAN, JOHN DOUGHERTY, KENNETH R. BOYD, TERRY KRAMER, (hereinafter "HEALTH FUND TRUSTEES"), as Trustees on behalf of the UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND (hereinafter, "MIDWEST HEALTH BENEFITS FUND"), for the purpose of securing the payment of contributions from DON'S FINEST FOODS, INC., pursuant to the terms of the following Collective Bargaining Agreements ("CBAs"): (1) a Collective Bargaining Agreement, entered into between DON'S FINEST FOODS and UFCW Local 1546, dated from September 8, 2006 through September 7, 2009, covering the independent meat cutters ("Meat Contract").  A copy of the Meat Contract is attached hereto as Exhibit "A"; and (2) a Collective Bargaining Agreement, entered into between DON'S FINEST FOODS and UFCW Local 1546, dated from January 2, 2006 through March 28, 2009, covering the grocery department ("Clerks' Contract").  A copy of the Clerks' Contract is attached hereto as Exhibit "B."

2.      This action is brought by Plaintiffs RONALD E. POWELL, KENNETH R. BOYD, D. TROY PRUITT, BRIAN JORDAN, JAMES V. MORGAN,  JOHN DOUGHERTY (hereinafter "PENSION FUND TRUSTEES"), as Trustees on behalf of the UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST PENSION FUND (hereinafter "MIDWEST PENSION FUND"), for the purpose of securing payment of contributions from Defendant  pursuant to the terms of the following Collective Bargaining Agreements ("CBAs"):  (1) a Collective Bargaining Agreement, entered into between DON'S FINEST FOODS and UFCW Local 1546, dated from September 8, 2006 through September 7, 2009, covering the independent meat cutters ("Meat Contract"); and (2) a Collective Bargaining Agreement, entered into between DON'S FINEST FOODS and UFCW Local 1546, dated from January 2, 2006 through

March 28, 2009, covering the grocery department ("Clerks' Contract").

3.      This action is governed by the Employee Retirement Income Security Act of 1974 as amended (hereinafter, "ERISA"), 29 U.S.C. §1001 et seq., particularly sections 502 and 515 of ERISA, 29 U.S.C. §§1132 and 1145, and Section 301(a) of the Labor Management Relations Act (hereinafter, "LMRA"), 29 U.S.C. §185(a).

4.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(f) and 29 U.S.C. § 185, as well as general federal question jurisdiction pursuant to 28 U.S.C. §1331.

5.      Venue is established within the geographic jurisdiction of this Court pursuant to Section 502(e) of ERISA, 29 U.S.C. §1132(e)(2), as this is the district in which the MIDWEST PENSION FUND and the MIDWEST HEALTH BENEFITS FUND are administered.

## THE PARTIES

6.      Plaintiffs, STEVEN M. POWELL, BRIAN JORDAN, JAMES V. MORGAN, JOHN DOUGHERTY, KENNETH R. BOYD, TERRY KRAMER, are Trustees of the MIDWEST HEALTH BENEFITS FUND.

7.      Plaintiffs RONALD E. POWELL, KENNETH R. BOYD, D. TROY PRUITT, BRIAN JORDAN, JAMES V. MORGAN,  JOHN DOUGHERTY, are Trustees of the MIDWEST PENSION FUND.

8.      The MIDWEST HEALTH BENEFITS FUND is established and operates pursuant to an Agreement and Declaration of Trust (hereinafter, "Health Trust Agreement") for the purpose of providing health benefits for employees.  The MIDWEST HEALTH BENEFITS FUND is a multi-employer benefits fund within the meaning of ERISA, 29 U.S.C. §1001 et seq. The MIDWEST HEALTH BENEFITS FUND has its principal office at 1300 West Higgins Road, Park Ridge, Illinois and is administered from that location.  The Health Trust Agreement is attached

hereto as Exhibit "C."

9.      The MIDWEST PENSION FUND is established and operates pursuant to an Agreement and Declaration of Trust (hereinafter, "Pension Trust Agreement") for the purpose of providing pension benefits for employees.  The MIDWEST PENSION FUND is a multi-employer benefits fund within the meaning of ERISA, 29 U.S.C. §1001 et seq.  The MIDWEST PENSION FUND has its principal office at 1300 West Higgins Road, Park Ridge, Illinois, and is administered from that location.  The Pension Trust Agreement is attached hereto as Exhibit "D."

10.     At all times material hereto, Defendant, DON'S FINEST FOODS, INC., engaged in interstate commerce or in an industry or activity affecting commerce within the meaning of ERISA, 29 U.S.C. §1002(11) and (12).  At all times material hereto, DON'S FINEST FOODS, INC. was located at 850 North Western Avenue, Lake Forest, Illinois.

## COUNT I

**Action by Health Fund Trustees**
**to Collect Unpaid Contributions**
**and Liquidated Damages**
**Against Don's Finest Foods, Inc.**

11.     Plaintiffs, Health Fund Trustees, repeat, reallege and incorporate herein by reference Paragraphs 1 through 10 of the Complaint.

12.     Pursuant to Section 502 of ERISA, 29 U.S.C. § 1132(g), the CBAs, and the Health Trust Agreement, Plaintiffs are empowered to take all necessary action to recover all contributions due, together with interest, liquidated damages, reasonable attorneys' fees, and court costs.

13.    Article VI  of the Health Trust Agreement requires the payment of liquidated damages by DON'S FINEST FOODS, INC. to the Fund for each month a delinquency exists. Such liquidated damages have been established at 10% of the amount of contributions due for the first month of the delinquency and, in addition thereto, 1½% for each additional month such delinquency remains outstanding. The article also provides that the Employer shall be liable for the cost of filing suit and reasonable attorneys' fees.

14.     MIDWEST HEALTH BENEFITS FUND is third-party beneficiary to the CBA because it is designated by the CBA to receive contributions to be used to provide benefits for employees covered by the CBA.

15.    Plaintiffs have performed all the conditions required to be performed pursuant to the terms of the CBA and the Health Trust Agreement.

16.    DON'S FINEST FOODS, INC. has failed (1) to make health contributions to the Health Benefits Fund for the February 2008 and March 2008 billing months for the Clerks' Contract in the amount of $54,664.28, (2) has failed to make health contributions to the Health Benefits Fund for the February 2008 and March 2008 billing months for the Meat Contract; and (3) has failed to make "store closing" contributions under the Clerks' Contract for the period April 2008 through June 2008 in the amount of $95,662.48.

17.    In view of the foregoing, DON'S FINEST FOODS owes the MIDWEST HEALTH BENEFITS FUND health contributions, including "store closing" contributions which have not been paid in an amount approximating $150,326.76, or a portion thereof, as well as liquidated damages, interest, and attorneys' fees.

**Don's Finest Foods Complaint**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court grant relief, as follows:

a.      Enter an Order requiring Defendant, DON'S FINEST FOODS, INC., to specifically perform under the terms of the CBAs and the Health Trust Agreement, by paying to Plaintiffs the unpaid principal owed on all delinquent contributions.

b.      Enter an Order requiring Defendant, DON'S FINEST FOODS, INC., to pay to Plaintiffs liquidated damages on all delinquent contributions, together with Plaintiffs' attorneys' fees and costs.

c.      Enter an Order requiring Defendant, DON'S FINEST FOODS, INC., to pay to Plaintiffs an amount equal to the interest on the unpaid contributions at the rate prescribed under Section 6621 of the Internal Revenue Code of 1985; and

d.      For such other relief as this Court deems just and equitable.

## COUNT V

### Action by Pension Fund Trustees
### to Collect Unpaid Contributions
### and Liquidated Damages
### Against Don's Finest Foods, Inc.

18.      Plaintiffs, Pension Fund Trustees, repeat, reallege and incorporate herein by reference Paragraphs 1 through 10 of the Complaint.

19.      Pursuant to Section 502 of ERISA, 29 U.S.C. §1132(g), the CBAs, and the Pension Trust Agreement, Plaintiffs, Pension Fund Trustees, are empowered to take all necessary action to recover all contributions due, together with interest, liquidated damages, reasonable attorneys' fees and court costs.

20.      Article V of the Pension Trust Agreement requires the payment of liquidated damages

by DON'S FINEST FOODS, INC. to the Fund for each month a delinquency exists. Such liquidated damages have been established at 10% of the amount of contributions due for the first month of the delinquency and, in addition thereto, 1½% for each additional month such delinquency remains outstanding. This article also provides that the Employer shall be liable for the cost of filing suit and reasonable attorneys' fees.

21.    MIDWEST PENSION FUND is a third-party beneficiary to the CBA because it is designated by the CBA to receive contributions to be used to provide benefits for employees covered by the CBA.

22.    Plaintiffs have performed all the conditions required to be performed pursuant to the terms of said Agreements.

23.    DON'S FINEST FOODS, INC. has failed to make pension contributions to the Pension Fund for the February 2008 and March 2008 billing months in an amount approximating $8,779.68, or a portion thereof.

24.    In view of the foregoing, DON'S FINEST FOODS, INC. owes the MIDWEST PENSION FUND contributions which have not yet been paid, as well as liquidated damages, interest, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court grant relief, as follows:

a.    Enter an Order requiring Defendant, DON'S FINEST FOODS, INC., to specifically perform under the terms of the Clerks' CBA and the Pension Trust Agreement, by paying to Plaintiffs the unpaid principal owed on all delinquent contributions.

b.      Enter an Order requiring Defendant, DON'S FINEST FOODS, INC., to pay to Plaintiffs liquidated damages on all delinquent contributions, together with Plaintiffs' attorneys' fees and costs.

c.      Enter an Order requiring Defendant, DON'S FINEST FOODS, INC., to pay to Plaintiffs an amount equal to the interest on the unpaid contributions at the rate prescribed under Section 6621 of the Internal Revenue Code of 1985; and

d.      For such other relief as this Court deems just and equitable.

Respectfully submitted,

/s/ Mindy Kallus
Mindy Kallus
One of the Attorneys for Plaintiffs, Steven M. Powell, Brian Jordan, James V. Morgan, John Dougherty, Kenneth R. Boyd, Terry Kramer, as Trustees on behalf of United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund and Plaintiffs Ronald E. Powell, Kenneth R. Boyd, D. Troy Pruitt, Brian Jordan, James V. Morgan and John Dougherty, as Trustees on behalf of United Food and Commercial Workers Unions and Employers Midwest Pension Fund

Jonathan D. Karmel
Mindy Kallus
THE KARMEL LAW FIRM
221 North LaSalle Street - Suite 1414
Chicago, IL 60601
(312) 641-2910

**Don's Finest Foods Complaint**

COPY

# AGREEMENT

### Between

## UNITED FOOD & COMMERCIAL WORKERS
## INTERNATIONAL UNION
## LOCAL 1546

### And

## DON'S FINEST FOODS

## (MEAT DEPARTMENT)

**September 8, 2006 – September 7, 2009**



2006-2009

**INDEPENDENT
RETAIL MEAT CUTTERS
CONTRACT**

**LOCAL 1546 UNITED FOOD &
COMMERCIAL WORKERS INTERNATIONAL UNION**

Term:  September 8, 2006 - September 7, 2009

ARTICLES OF AGREEMENT governing Retail Meat Markets in Groups I, II, and III, entered into between

## DON'S FINEST FOODS (MEAT DEPARTMENT)

hereinafter called the "Employer" and

**LOCAL 1546, UNITED FOOD &
COMMERCIAL WORKERS INTERNATIONAL UNION**

hereinafter sometimes referred to as the "Union," acting as the exclusive collective bargaining agent for all employees covered by this Agreement.

**ARTICLE I
GENERAL**

### Section 1.1 - Scope of Contract

It is agreed that this Contract shall govern the hours, wages and other conditions of employment of Employer's meat department employees in Retail Meat Markets, within the geographical jurisdiction of Local 1546.

### Section 1.2 - Definitions

(a)    Apprentices.  Apprentices may be full-time or part-time but a maximum one part-time Apprentice per store.  An Apprentice is an employee who is in training to become a Journeyman Meat Cutter.  Apprentices must be at least eighteen (18) years of age.  The Employer agrees to rotate all Apprentices in his markets so as to give them sufficient, well rounded experience to qualify them as Journeymen at the end of the 84-month apprenticeship period.

A part-time Apprentice shall work a minimum of four (4) hours per scheduled day and sixteen (16) hours per week.  Any part-time new entry Apprentice who works forty (40) hours a week for twelve (12) consecutive weeks would be considered full time.  No restrictions on starting time will apply.

An Apprentice promoted to Head Meat Cutter shall be paid the current Head Meat Cutter rate of pay.

(b)     Journeymen.  After serving the apprenticeship, an employee shall be classified as a Journeyman Meat Cutter and shall be paid the Journeyman rate of pay.

Part-time Journeymen may be employed on the following basis:

(1)     They shall be scheduled a minimum of 16 hours per week and a maximum of 30 hours per week.

(2)     They may have a flexible starting time but all work performed between 10:00 p.m. and 6:00 a.m. will be paid for at a premium of $.50 per hour.

(3)     Part-time Journeymen will receive the same benefits as other part-time employees in this contract.

(4)     When a full-time Journeyman is needed in a given store, the Employer will endeavor to fill said position by selecting the applicant whose skill and ability are the greatest; provided, however, that when skill and ability are equal, preference shall be given to the senior Part-time Journeyman applicant.  Any dispute regarding the Employer's determination of skill and ability shall be subject to the grievance/arbitration provisions.

(5)     All part-time Journeymen in the seniority area must be laid off before the layoff of a full-time Head Meat Cutter, Journeyman or Apprentice can occur.

(6)     There will be only one (1) part-time Journeyman per store unless a store has four (4) full-time employees (Journeyman, Head Meat Cutter, Apprentices, Wrappers) working in the store.  In that case the Company will be allowed to have two (2) part-time Journeymen in the store.

(c)     Head Meat Cutter.  The term "Head Meat Cutter" means a Journeyman Meat Cutter who is responsible for the efficient management of the market.

(d)     Wrappers.  Full-time Wrappers may be employed and their duties shall be confined to slicing luncheon meats and sausage; clean-up work in the market; stocking cases; checking in merchandise and wrapping, scaling and pricing.  Wrappers shall not use knives, saws, grinders, cube machines or other mechanical equipment used in the preparation or processing of fresh meats or poultry other than as specified above, with the exception that Wrappers may perform all market functions excluding the use of power saws in servicing individual customer requests.  The duties of Wrappers may also include seafood assignments; provided, however, that the scheduled hours of any Fish Handler employed as of August 29, 2002, shall not be reduced as a result of a Wrapper performing any seafood duties.

Wrappers desirous of transfer to Apprentice Meat Cutter status shall make their desire known to the Company, in writing, and such employee shall be given equal consideration for

- 2 -

such vacancy along with other Apprentice applicants. There shall be no reduction in pay to any Wrapper as a result of entering this Apprenticeship Program, e.g., Wrapper's rate of pay shall apply until such time as the Apprentice Meat Cutter rate exceeds the Wrapper rate, at which time the Apprentice Meat Cutter rate shall apply.

Wrappers commencing the Apprenticeship Program shall have a ninety (90) day trial period. Such trial period shall not jeopardize the employee's former classification or seniority. Wrappers transferred to the Apprenticeship classification will have seniority for purposes of layoff and recall from the date of such transfer.

Part-time Wrappers may be employed on the following basis:

(1)     No more than three (3) part-time Wrappers per store.

(2)     When a full-time Wrapper is needed in a given store, the Employer will endeavor to fill said position by selecting from all applications, the applicant whose qualifications, ability and availability for work are the greatest; provided, however, that where qualifications are equal, preference shall be given to part-time Wrappers employed in that given store. The determination of the relative qualifications of all applicants is expressly reserved to the Employer.

(3)     Part-time Wrappers shall be scheduled for a minimum of four (4) hours in any one (1) day and sixteen (16) hours in any one (1) week. Part-time Wrappers shall not be scheduled for more than thirty (30) hours in any one (1) week. Work in excess of thirty (30) hours per week or work performed after 10:00 PM shall be paid for at the full-time rate of pay for such hours only.

(4)     All part-time Wrappers must be laid off before the layoff of any full-time Wrappers.

(5)     All part-time Wrappers in a given store must be laid off before any Journeymen are laid off in that same given store.

(e)     <u>Fish Handlers</u>. A Fish Handler is a full or part-time employee whose primary duties are handling of seafood items in the service fish department and frozen seafood items in the freezer. If there is no service fish department, such employee may not be used. Fish Handler's duties may include wrapper assignments; provided, however, that the scheduled hours of any Wrapper employed as of August 29, 2002, shall not be reduced as a result of a Fish Handler performing any Wrapper duties.

(f)     <u>Clean-Up Personnel</u>. The Employer may employ personnel in the market who will not be subject to the Collective Bargaining Agreement to do clean-up work only.

(g)     <u>Service Clerks</u>. A Service Store Employer who operates service markets or separate service counters may use Service Clerks as follows:

- 3 -

(1)    Employers may employ two (2) service counter clerks per store. Such employees shall work a minimum of three (3) hours per day and sixteen (16) hours per week. There will be a four (4) hour minimum requirement if work is performed on Sundays and holidays.

(2)    The service counter clerk may perform all job requirements on meat and delicatessen products after they have been fabricated. He/she may use tools of the trade to portion cut, trim and/or grind meat items after they have been purchased by the customer. They may also strip the case and return product to the refrigerated storage area and do general clean up work in their immediate work area. Service counter clerk duties will not include production work but may involve helping in other meat department assignments as needed.

The parties agree that any willful proven violation of the above may mean a loss of the privilege of having a service counter clerk employed for the remainder of the term of the collective bargaining agreement.

(3)    Service clerk employees will have seniority only in their own classification. All service clerks shall be laid off before any Journeyman and Apprentice.

## Section 1.3 - Notices

All notices required under this Contract shall be deemed to be properly served if delivered in writing personally or sent by certified or registered mail to the offices of the Union, or to the Employer at the address designated below, or to an employee at his home or residence address, or to any subsequent address which the Union, the employee, or the Employer may designate in writing for such purpose. Date of service of a notice served by mail shall be the date on which such notice is postmarked by a post office of the United States Post Office Department.

## Section 1.4 - Partial Invalidity

Nothing contained in this Agreement is intended to violate any Law, Rule, or Regulation made pursuant thereto. If any part of this Agreement is construed by a court or board of competent jurisdiction to be in such violation, then that part shall be made null and void, the remainder of the Contract shall continue in full force and the parties will immediately begin negotiations to replace the void part with a valid provision.

## Section 1.5 - Authority of Signing Parties

The parties hereto certify that they are empowered and duly authorized to sign this Agreement.

## Section 1.6 - Successors and Assigns

This Agreement and the conditions and covenants contained herein shall be binding upon the successors and assigns of the parties hereto and none of the provisions, terms, conditions,

- 4 -

covenants, or obligations herein contained shall be affected, modified, altered or changed in any respect whatsoever.

## Section 1.7 - Effective Date

Unless the context of a provision indicates otherwise, all provisions of the Contract become effective upon the date of execution of the Contract.

## ARTICLE II
## RECOGNITION AND JURISDICTION

## Section 2.1 - Recognition

The Employer recognizes and agrees that said Union is and shall be the sole and exclusive collective bargaining agency for and on behalf of all employees in the meat department of said Employer who process, pack, wrap, handle, price and sell frozen and fresh meats on Employer's premises, and that it will not negotiate with any but the duly elected officers of the Union nor contract with anyone not affiliated with the Union.

## Section 2.2 - Processing

In retail markets employees covered by this contract shall perform the cutting, preparing, fabricating, handling, pricing and packaging into retail cuts of all fresh fish and rabbits and all fresh and frozen beef, veal, pork, lamb, and mutton, it being understood and agreed, however, that the Employer (in consideration of all of the terms and conditions of this Agreement) may receive into and utilize within the retail markets prefabricated primal and sub-primal beef cuts as such terms are generally understood within the meat packing and processing industry. It is also understood and agreed that the Employer, in consideration of all of the terms and conditions of this Agreement, may receive into, and utilize within the retail markets prefabricated primal and sub-primal veal, pork, lamb and mutton. Furthermore, the Employer may receive into and utilize, within the retail markets, any available market technology as it relates to case and/or counter ready product.

## Section 2.3 - Job Security

It is the intent of the parties that the utilization of pre-fabricated product, pre-priced poultry, and counter ready product as described herein shall not result in or cause the loss of employment of certain employees.

Therefore, all full-time employees and extra journeymen in the Meat Department, including Journeyman Meat Cutters assigned to the Delicatessen Department, who were on the Employer's payroll as of September 16, 1979, will have for the duration of this Agreement the following:

Full-time employees will have full-time employment which is defined for the purposes of this Section as forty (40) straight-time hours during a regular work week and thirty-two (32) hours during a holiday workweek.

Extra Journeymen on the Employer's payroll as of September 16, 1979, will also have, for the duration of this Agreement, the number of weekly hours that they worked on a regular basis prior to September 16, 1979.

The Employer shall provide the Union with a list of its employed Meat Department Personnel, including regular extra Journeymen and Journeymen assigned to the Delicatessen Department as of September 16, 1979. Such a list shall include the employee's name, job classification, seniority date and number of regular hours worked per week. Employees temporarily off work due to sick leave, vacation or other approved leave of absence shall be included on the list.

The Employer shall be under no obligation to replace employees protected hereunder if their employment is terminated due to quit, discharge for cause, retirement, death or for any voluntary reason, except, however, it is agreed that employees who are on layoff and who have recall rights as of the execution date of this Agreement and protected employees who may be laid off thereafter shall have the right, during the term of this Agreement to be recalled to replace such terminated employees at the time of termination and returned to protected status.

These job security provisions may change subject to situations not under the control of the Employer, such as, but not limited to, new competition, fire, flood, snow, power failure, proven decline in sales, proven decline in tonnage, labor dispute or unavailability of meat products. The parties agree to discuss any impact of new competition concerning the provisions of this job security section. In the event no agreement can be reached, the issue will be submitted to arbitration in accordance with the provisions of Article XI.

## Section 2.4 - Hiring Hall

When the Employer needs additional employees he shall give the Union equal opportunity with all other sources to provide suitable applicants. Therefore, when openings occur the Employer shall first notify the Union that a vacancy exists. The Union shall refer applicants to the Employer from their records of available and qualified members who are seeking employment. The Employer shall give such applicants equal consideration but, shall not necessarily be required to hire those persons referred by this process.

## Section 2.5 - Total Agreement

It is specifically understood and agreed that the above provisions of this Article II enabling the introduction into and utilization within the retail markets of prefabricated primal and sub-primal beef cuts, veal, pork, lamb and mutton are conditioned upon the total agreement of the parties including, but not necessarily limited to Section 2.2 - Processing, Section 2.3 - Job Security and Section 2.4 - Hiring Hall.

It is understood and agreed that the Employer and the Union have entered into a total agreement, including concessions and understandings, which have altered the prior agreements between the parties. The inclusion of Section 2.2, 2.3 and 2.4 in this Collective Bargaining Agreement has been conditioned upon the resolution of all items bargained with respect to this Agreement.

- 6 -

**Section 2.6 - Sale**

In self-service markets, employees covered by this Contract shall have the exclusive jurisdiction over the sales of all fish, poultry, rabbits and meat, whether frozen fresh or fresh, and delicatessen meats, except sliced packaged bacon, sliced packaged Canadian bacon, canned and glassed meats of all kinds and all meats not for human consumption.

## ARTICLE III
## WAGE RATES

**Section 3.1 - Wage Rates  -  Weekly, Hourly and Overtime**

CLASSIFICATION:

| Head Meat Cutter | | Current | 9/9/07 | 9/14/08 |
|---|---|---|---|---|
| | B STORE | $19.95 | $20.30 | $20.55 |

| Journeyman | | Current | 9/9/07 | 9/14/08 |
|---|---|---|---|---|
| | B STORE | $19.62 | $19.97 | $20.25 |

Part-time Journeyman - All stores will receive $0.50 an hour less than full-time journeyman rate.

All Employees Hired On or After
1/13/92, Excluding Head Meat Cutter, Journeymen & Apprentices

| | | Current | 9/9/07 | 9/14/08 |
|---|---|---|---|---|
| B STORE | 0-12 Months | $6.85 | $7.25 | $7.50 |
| | 13-24 Months | $7.35 | $7.75 | $8.00 |
| | 25-35 Months | $7.90 | $8.30 | $8.55 |
| | 37-48 Months | $8.45 | $8.85 | $9.10 |
| | 49-60 Months* | $9.25 | $9.65 | $9.90 |
| | 61-72 Months | $9.75 | $10.15 | $10.40 |
| | Over 72 Months | $10.50 | $10.90 | $11.15 |

Apprentices
Journeyman hired after DOR

|  |  | Current | 9/9/07 | 9/14/08 |
|---|---|---|---|---|
| B STORE | 0-6 Months | $8.10 | $8.50 | $8.75 |
|  | 7-12 Months | $8.60 | $9.00 | $9.25 |
|  | 13-24 Months | $9.10 | $9.50 | $9.75 |
|  | 25-36 Months | $9.85 | $10.25 | $10.50 |
|  | 37-48 Months | $10.85 | $11.25 | $11.50 |
|  | 49-60 Months | $12.10 | $12.50 | $12.75 |
|  | 61-72 Months | $13.85 | $14.25 | $14.50 |
|  | 73-84 Months | $15.85 | $16.25 | $16.50 |
|  | Over 84 Months | $17.10 | $17.50 | $17.75 |

Any employee receiving above the minimum shall not be increased in hours nor decreased in wages or working conditions.

The definition of sales volume categories in stores with combined meat and grocery operations shall be as follows:

A  Store - Average Sales in excess of $200,000 per week
B  Store - Average Sales from $100,001 to $200,000 per week
C  Store - Average Sales from $50,001 to $100,000 per week
D  Store - Average Sales under $50,000 per week

The definition of sales volume categories in stores with meat market only operations shall be as follows:

A  Store - Average Sales over $30,001 per week
B  Store - Average Sales $20,001 to $30,000 per week
C  Store - Average Sales $15,001 to $20,000 per week
D  Store - Average Sales under $15,000 per week

Currently employed employees will suffer no reduction in pay as a result of a store reclassification in accordance with the above sales volumes.

**Section 3.2**

All employees excluding wrappers will receive a Lump sum bonus of Two Hundred and Fifty Dollars ($250.00) upon ratification. All wrappers will receive a Lump sum bonus of One Hundred and Fifty Dollars ($150.00) upon ratification. This will be paid within thirty (30) days ratification.

- 8 -

**Section 3.3**

In addition to the bonus above, a forty (.40) cent per hour retro bonus will be paid, on all hours paid from, January 1,2007 to April 28, 2007.

**Section 3.4**

Also in addition to the bonus above, a forty (.40) cent per hour retro bonus will be paid, on all hours paid from, April 29, 2007 to September 8, 2007.

PYRAMIDING OF OVERTIME & PREMIUM HOURS PROHIBITED:  Overtime and premium hours shall not be paid twice for the same hours worked.  Thus, in calculating the overtime due on a weekly basis, any hours for which overtime or premium is payable on a daily, Sunday, holiday or other basis shall be excluded in determining the overtime due, if any, on a weekly basis."

# ARTICLE IV
## WORKING HOURS AND OTHER CONDITIONS OF EMPLOYMENT

### Section 4.1 - Basic Workday

For full-time employees, eight (8) hours shall constitute the basic workday, exclusive of the meal period. The basic workday may be scheduled to begin no earlier than 6:00 AM and no later than 1:00 PM.

Work starting after 9:00 AM shall be worked on a voluntary basis.  If there are no volunteers, then it will be assigned by reverse seniority, by rotation, for all employees in the meat department.

One (1) hour shall be allowed for lunch in all markets whether manned by one (1) or more employees, said lunch hour to begin no earlier than 11:00 AM and to end no later than 6:00 PM.  Where mutually agreed between the Employer and its employees, one-half (½) hour shall be allowed for lunch.  No employee shall be required to work more than five (5) continuous hours without a lunch period.  Employees must be dressed and ready for work at the scheduled starting time.

An Employer may schedule a start time of 6:00 AM.  If used, 6:00 AM start shall be scheduled no less than two times a week.  The 6:00 AM starting time shall be rotated among the Meat Cutters in the market by seniority with the understanding that in the event that any Employer avails itself of the 6:00 AM start and no employee wishes to start at that time, the employees would be assigned by reverse seniority.

### Section 4.2 - Basic Workweek

For full-time employees five (5) basic workdays (40 hours) shall constitute the basic workweek, which for employees hired prior to August 29, 2002, shall be worked Monday

through Saturday. One (1) full day off within the week of Monday through Saturday inclusive shall be allowed each full-time employee in each shop. The day off shall be at the Employer's discretion except that it may be rotated or changed in accordance with the mutual agreement of the Employer and its employees.

Sunday shall be part of the regularly scheduled workweek for all employees entering the department after July 25, 1999, excluding Head Meat Cutters and Journeymen. Sunday shall be part of the regularly scheduled workweek for Head Meat Cutters and Journeymen entering the department after August 29, 2002.

To avoid full-time layoffs of employees for whom Sunday is not part of the regular workweek, by mutual agreement between the store and the Union, the Employer may count Sunday hours as part of the regular workweek at 1-1/2 times the hourly rate of pay.

Work schedules showing the day off for full-time and part-time employees shall be posted, in ink or computer printout, in all markets and departments by 3:00 PM on the Friday preceding the week in which the schedule is to be effective. The schedule shall include Sunday through Saturday and be posted in an area accessible to all employees.

In the event the Employer's operations cannot begin or continue due to the recommendation of civil authorities, or public or private utilities fail or are unable to supply electricity, water or other such services as required, or the interruption of work is caused by an Act of God or other emergency beyond the control of the Employer, the employees shall receive pay only for hours actually worked and shall not be governed by the daily or weekly minimum pay requirements of this Agreement.

## Section 4.3 - Sixth Day Guarantee

Any employee called to work on the sixth (6th) day in any regular workweek shall be guaranteed four (4) hours (½ day) of work. Reporting time on the sixth (6th) day shall be no earlier than 6:00 AM for a full day or morning half day, and no earlier than 1:00 PM for an afternoon half day. It is agreed that the Head Meat Cutters and Journeymen shall be given preference over Apprentices for work on the sixth (6th) full or half day during a regular workweek and on the fifth (5th) full or half day during a holiday week.

## Section 4.4 - Overtime

At the Employer's discretion overtime at overtime rates may be worked after eight (8) hours in any one (1) day.

## Section 4.5 - Inventory

Employees may take inventory on a voluntary basis outside of regular working hours.

## Section 4.6 - Laundry, Tools & Equipment

Laundry, tools and sharpening of tools shall be furnished free of cost by the Employer. The kinds of saws, power saws, conveyors, sealing plates, staplers, recording and printing sealers

for weighing, vacuum sealing equipment, packaging equipment and other tools which the Employee may use shall be determined by the Employer.

The Company agrees that each store covered by this Agreement shall have a first aid kit as part of its equipment.

### Section 4.7 - Rest Periods

Employees working a full eight (8) hour shift in any given workday shall receive two (2) fifteen (15) minute rest periods without loss of pay. The rest periods shall be scheduled as near to the employee's half shifts as practical. Employees working more than four (4) hours, but less than eight (8) hours in any given workday shall receive one (1) fifteen (15) minute rest period scheduled as near the middle of the employee's shift as practical.

### Section 4.8 - Transfers

Transfer of employees shall not be handled in a capricious or arbitrary manner; but the Employer may transfer employees temporarily to meet the necessities of the business. Where required, permanent transfers will be made on the basis of seniority. There are the following limitations and conditions:

- (1)  No employee shall involuntarily be transferred out side of their "seniority area."

- (2)  In the event a transfer is required outside of the "seniority area," the Employer will first seek volunteers. If no volunteers apply for a transfer the Employer will make the transfer in accordance with inverse seniority.

- (3)  Should an employee be temporarily transferred from his regularly assigned store to another store and such transfer results in additional transportation expense the employee will be reimbursed for such additional transportation expense as computed on the basis of current Federal Travel Expense Standards. It is specifically understood and agreed that this provision will not apply in cases where an employee works between two stores in order to maintain his regular schedule of hours.

- (4)  An employee desiring a transfer to a store closer to home shall notify the Employer in writing of such desire to transfer to a specific store. In the event of an opening in the specific store, the Employer will transfer the employee in accordance with his request. The Employer agrees to discuss any questions raised by the Union with reference to transfers of employees.

### Section 4.9 - Loading or Unloading Vehicles

Employees shall not be required to load or unload vehicles other than from the tailgate except in case of emergency. The Union shall be notified in such emergency situations.

**Section 4.10 - Employer Meetings: Required Attendance**

When an employee is required to attend a meeting by the Employer he shall be paid for all time in attendance at the meeting.

# ARTICLE V
## MARKET OPERATING HOURS

### Section 5.1 - Market Operating Hours

The Employer may sell fresh meat and fresh fish at any time the store is open for business with or without a member of the bargaining unit on duty. The Employer may require a meat cutter on duty until 10:00 PM. In markets where additional help is required, the second and third persons can be wrappers and/or apprentices.

### Section 5.2 - Market Operating Hours: Sunday and Holidays

All work performed by employees on Sunday and holidays shall be considered as premium work, and such work shall be paid at the rate of time and one-half (1½) the employee's regular rate of hourly pay. The starting time for Sunday or holiday work shall be no earlier than 8:00 AM and no later than 9:00 AM.; provided, however, that the Employer may post for a voluntary start time of not later than 11:00 AM. Employees working on Sunday or a holiday shall be guaranteed a minimum of four (4) hours of work. Sunday and holiday work shall be scheduled by the Employer and for those employees for whom Sunday is not part of the regular workweek shall be rotated among all employees who volunteer for Sunday or holiday work. Should an insufficient number of employees volunteer, the Employer shall have the right to schedule from the least senior inverse order on a rotating basis within the required job classification, it being understood that no employee for whom Sunday is not part of the regular workweek will be required to work more than two consecutive Sundays or two consecutive holidays.

The parties will enter into a letter of understanding that if the Union grants to the major chain operators Sunday work as part of the basic workweek, such condition will automatically apply to the Employers covered under the Illinois Food Retailers Association Independent Contract.

# ARTICLE VI
## HOLIDAYS, VACATIONS AND OTHER COMPENSABLE ABSENCES

### Section 6.1 - Holidays

All employees shall be entitled to the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Holidays shall be celebrated on the day that they are nationally observed. Employees who are absent the regularly scheduled workday before or after a holiday, or both, except in the case of proven illness or unavoidable absence shall not receive holiday pay, but shall be paid only for the hours actually worked.

Any employee who volunteers and signs a waiver form furnished by the Union may work at straight time on the fifth (5th) full or half day in a holiday week provided that the fifth (5th) day is not a Sunday or holiday. If no employee signs the waiver form work performed on the fifth (5th) day will be paid for at time and one-half (1-1/2) the employee's regular rate of pay.

Part-time employees who qualify shall receive holiday pay equal to the product of five percent (5%) of the number of straight-time hours worked during the four (4) week accounting period preceding the period in which the holiday falls (including paid vacation hours) times his/her straight-time hourly rate in effect in the week in which the holiday falls it being further understood that in no event will such employee receive less than four (4) straight-time hours of pay.

No employee shall be required to work on Christmas Day but the Employer may request volunteers through the use of a posted volunteer sign-up sheet. An Employer soliciting through other means shall lose the right to post for volunteers.

## Section 6.2 - Employee's Birthday

All regular employees shall be scheduled off the Monday of the workweek in which the employee's birthday occurs or the Monday in the following workweek as mutually agreed upon by the employee and the Employer. The employee shall receive eight (8) hours' straight-time pay for the day off observed as his/her birthday, or in the event a day off is not scheduled, the employee shall receive eight (8) hours' straight-time pay in addition to his/her regular pay for all hours worked. Work on the fifth (5th) day of a birthday workweek shall be paid at the applicable straight-time hourly rate for the basic eight (8) hour day. Every eligible employee shall be entitled to one (1) birthday holiday each year. A part-time employee shall receive pay based on the formula set out in Section 6.1. Employees hired after August 29, 2002 shall qualify for the birthday holiday after one (1) year of employment.

## Section 6.3 - Sick Days

All regular employees hired before 7/25/99 and who have completed their probationary period shall be entitled to two (2) paid sick days within the calendar year, with the understanding that in the event an employee's service is terminated prior to his/her utilizing such sick days, he/she will not be entitled to receive payment for sick days upon his/her termination, except that in the event an employee terminates after July 1 of any calendar year he/she shall receive pay for one (1) such day, if not taken.

All regular employees hired after 7/25/99 and who have completed ninety (90) days of service shall be entitled to two (2) paid sick days within the calendar year with provisions as listed above.

All regular employees hired after August 29, 2002 shall be entitled to the first paid sick day after six (6) months of employment and the second after one (1) year of employment.

Sick days must be taken within the calendar year they were earned, and will not be paid out or will not carry over from year to year.

**Section 6.4 - Vacations**

(A)    Length of Vacations

Each regular employee covered by this Contract who qualifies shall be entitled to a vacation with pay for each year of employment in accordance with the following schedule:

| Number of Successive Years of Employment | Number of Weeks of Vacation with Pay |
|---|---|
| 1 year | 1 |
| 2 through 7 years, inclusive | 2 |
| 8 through 14 years, inclusive | 3 |
| 15 years and over | 4 |

Any employee who has earned five (5) weeks vacation prior to 7/31/88, will continue to earn five (5) weeks vacation.

(B)    Definitions

The term "year of employment" means the period beginning on the date of most recent employment (or, after the first year, on the anniversary date of such employment) and ending on the day prior to said date twelve (12) months later.

The term "successive" used in connection with employment means employment uninterrupted by separation from service.

(C)    Administration of Vacation Provisions

1.    All vacations shall be subject to necessary scheduling by the Employer, who may limit the number of employees who may be on vacation at any one time.

Vacations may be scheduled at any time during the calendar year provided that the employer has sufficient employees within the necessary classifications to adequately staff his/her store.

Vacations must be taken during the anniversary year that they are earned and will not carry over from year to year unless mutually agreed upon between Employer and the Employee.

2.    Selection of vacations will be by seniority by rotation in two week or one full week segments until all vacation weeks are selected within the department.

The vacation schedule shall be posted in all markets by April 1st of each year and a copy furnished to the Union.  When a change in vacation

- 14 -

becomes necessary, the Employer and the employee involved shall be given reasonable advance notice of such change.

Notwithstanding the foregoing, it is further understood and the parties hereby stipulate and agree that once an employee has picked his/her vacation it shall become permanent, absent agreement by the employee to the contrary.

3.  All vacations shall be for calendar weeks. Where mutually agreed between the Employer and the employee, the employee may take a maximum of one (1) week vacation in daily segments.

4.  Whenever a holiday recognized under this Contract falls within an employee's vacation period, the employee shall receive an extra day's pay or subsequent day off at the Employer's option.

5.  A week's vacation pay for full-time employees shall be calculated by multiplying forty (40) times the employee's regular straight-time hourly rate for the classification to which he/she is assigned at the time of taking his/her vacation. Part-time employees shall be entitled to a pro rata vacation upon completion of each anniversary year of employment in the amount of 1/52nd of their anniversary year's earnings for each week of vacation entitlement.

6.  No employee shall be entitled to more than one (1) vacation for any employment year.

7.  An employee who has qualified for his/her first (1st) vacation and who terminates after having worked six (6) months or more since his/her last anniversary date, such employee shall receive pro rata vacation pay in accordance with the following schedule except where termination of service is due to proven dishonesty, drunkenness or use, possession or sale of controlled substances:

| Completed Months of Service Since Last Service Anniversary | Vacation Pay* |
|---|---|
| Less than 6 months | None |
| 6 Months | 6/12ths |
| 7 Months | 7/12ths |
| 8 Months | 8/12ths |
| 9 Months | 9/12ths |
| 10 Months | 10/12ths |
| 11 Months | 11/12ths |
| 12 Months | Full Vacation Pay |

- 15 -

*Vacation pay shall be calculated on the basis of the vacation to which the employee was entitled at his/her last previous service anniversary.

If an employee has received his/her vacation with pay for such year of employment, he/she shall refund the difference, if any, between the vacation pay paid and the vacation pay to which he/she is entitled under the above schedule. It is understood that it shall not be the obligation of the Union to assist in the collection of such refunds.

A Journeyman relieving a Head Meat Cutter on vacation shall receive the Contract rate of pay for Head Meat Cutters.

8.  In the event an employee's absence due to illness or injury exceeds ninety (90) calendar days he/she shall receive a pro rata vacation for that anniversary year only, consisting of one-twelfth (1-12th) for each month in excess of ninety (90) days. The first ninety (90) days shall be considered as time worked for computing such pro rata vacation.

## Section 6.5 - Absences Due to Injuries

Any regular employee unable to work because of injuries received during the regularly scheduled workweek and whose injuries arose out of or during the course of his/her employment shall be entitled to a full day's pay for each day lost because of such injuries, but not in excess of three (3) days' pay, including pay for the day of the injury, in the first seven (7) calendar days following the accident; provided, however, that the employee shall report upon receipt of the injury to the Employer's physician whose decision with respect to the length of time required off shall be controlling; provided further, that nothing in this provision shall affect any rights accrued to either party under the State Workmen's Compensation Act, and that the Employer shall receive credit for any payment made under this provision should compensation be awarded by the Industrial Commission of Illinois.

## Section 6.6 - Funeral Leave

The Employer agrees to pay full-time employees for necessary absence on account of death in the immediate family up to and including a maximum of three scheduled work days at straight-time, provided the employee attends the funeral. Except where an acceptable and demonstrated need for travel time is clear, funeral leave shall end on the day of the funeral but, in no event shall it exceed three (3) scheduled workdays.

The term "immediate family" shall mean spouse, parent, child, brother, sister, father-in-law, mother-in-law, grandparents, son-in-law, daughter-in-law, and grandchildren of the employee. This also includes grandparents, grandchildren, brother and sister of the present spouse, or any relative residing with the employee or with whom the employee is residing.

Part-time employees will be eligible for up to three (3) days off for necessary absence to attend the funeral of a member of the immediate family as defined above, provided they are scheduled for work on those days.

## Section 6.7 - Jury Pay

When any full-time employee, or part-time employee after one (1) year of service, who is covered by this Agreement is summoned for jury service, he/she shall be excused from work for the day on which he/she reports for jury service and/or serves. He/she shall receive for each such day on which he/she so reports and/or serves and on which he/she otherwise would have worked the difference between his/her regular hourly rate of pay and hours scheduled against the payment he/she receives for jury service, if any; provided, however, that no payment shall be made under the provisions of this Section to any employee summoned for jury service unless he/she shall have advised the Employer of the receipt by him/her of such jury summons not later than the next regularly scheduled workday after receipt of said summons. Before any payment shall be made to any employee hereunder, he/she shall present to the Employer proof of his/her summons for service, and of the time served and the amount of pay received therefor, if he/she shall have served as juror. The provisions of this Section shall apply only when an employee is summoned for jury duty and shall not apply if any employee volunteers to serve as a juror. When an employee is released for a day or part of a day during any period of jury service, he/she shall report to his/her store for work.

Any full-time employee who reports for jury service for five (5) days, Monday through Friday, shall not be scheduled to work on Saturday during that week. If, however, an employee volunteers to work on Saturday at the request of the Employer, the employee shall receive the appropriate hourly rate of pay for said day, such pay shall not be set off against or deducted from the forty (40) hours' jury pay; provided further that hours worked on Saturday shall not be considered as hours in excess of forty (40) for overtime purposes.

In no case shall the Employer's obligation for jury pay exceed one (1) panel per calendar year. One (1) "panel" per year means the number of days that the Court would assign you.

## Section 6.8 - Leave of Absence

Any employee desiring a leave of absence shall make such request in writing to the Personnel Department of the Employer. The Union shall be notified by the Employer when an employee is granted a leave of absence, indicating the date the leave becomes effective and the date it will terminate, as well as the reasons for such granted leave.

The Employer will use reasonable and fair judgment in determining whether or not an employee shall be granted a leave of absence.

## Section 6.9 - Pregnancy Leave of Absence

Leaves of absence shall be granted for pregnancy leaves in accord with applicable laws. Certification in writing of pregnancy shall be made in the written request for leave prior to the termination of active work.

## Section 6.10 - Family Illness Leave

An employee with one (1) year of service may request a personal leave of absence, not to exceed ninety (90) days, for a catastrophic or terminal illness of a family member requiring full time care. Such request for leave must be in writing and approved by the store manager or owner.

## Section 6.11 - Effect of Leaves on Contract Benefits

Employees on leave will not be entitled to holiday pay, jury pay or funeral pay, nor shall time be counted toward vacation eligibility.

Time spent on leave of absence will not be counted toward wage progression increases.

## ARTICLE VII
## HEALTH AND WELFARE

## Section 7.1 - Health and Welfare Fund

Pursuant to provisions contained in a previous Collective Bargaining Agreement there has been established a Health and Welfare Fund known as the "United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund"; said Fund is hereinafter referred to as the "Health and Welfare Fund."

The Employer shall contribute by no later than the tenth (10th) day of each month into the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund D05 plan on all straight time hours for eligible employees covered by this Agreement. The contribution shall also be made on hours for which employees receive holiday pay, personal days, sick days, funeral days, jury service and vacation pay and hours worked on Sunday, except that no contribution shall be made on hours in excess of eight (8) per day or forty (40) per week.

Employees hired prior to July 2, 2007, shall become eligible for contributions to the Fund as per the previous contract, (Employees shall become eligible for contributions the first month following completion of ninety (90) days of continuous service).

Employees hired on or after July 2, 2007, shall become eligible for Employer contributions to the Fund for Plan B benefits the Sunday after fifteen (15) months service from their date of hire.

Contribution rates for employees hired prior to July 2, 2007, who are or become eligible for Plan A contributions to the Fund shall be as follows:

Effective the first Sunday following July 2, 2007, $3.99 per eligible contribution hour.

Effective October 1, 2007, $4.39 per eligible contribution hour.

Effective October 1, 2008, rate as determined by the Trustees.

- 18 -

Contribution rates for employees hired after July 2, 2007, who become eligible for Plan B contributions to the Fund shall be seventy-five percent (75%) of the Plan A contribution rates specified above from the date an employee becomes eligible for contributions as set forth above until the conclusion of sixty (60) months of service from the employee's date of hire, after which employees shall become eligible for Plan A contributions and for Plan A benefits, subject to the eligibility requirements of the Fund.

Effective approximately two (2) months after July 2, 2007, but not to exceed three (3) months, all employees who are eligible for benefits from the Fund, or who become eligible for benefits from the Fund, shall make Employee Contributions to a Section 125 Plan ('the Plan") established by the Employer in order to become and remain eligible for benefit coverage from the Fund. The contributions received by the Plan shall be remitted to the Employer to offset the Employer Contributions set forth in Section 7.1 above as follows:

| | |
|---|---|
| Single Coverage | $5.00 per week |
| Dependent Coverage | $15.00 per week |

An employee who fails to elect single or dependent coverage and to pay the above Employee Contributions in accordance with the rules of the Fund shall not receive benefits from the Fund.

The Employer Contributions required to be made by this Section 7.1 shall be made for all employees who are eligible for contributions to the Fund under the terms of this Section 7.1, regardless of whether an employee pays the Employee Contribution specified in Section 7.1 above and receives benefits from the Fund, or does not make the Employee Contribution so specified and does not receive benefits from the Fund.

## Section 7.2 - Eligible Employee Defined

As used herein, an "eligible employee" is an employee:

1. Who is covered by this Contract.
2. Who has completed a "Qualification Period" as defined above.
3. Who has worked one hundred (100) or more hours in a calendar month following the completion of his/her qualification period. (Part-time employees must work sixty-four (64) or more hours in a calendar month following the completion of their qualification period).

## Section 7.3 - Employer Contributions

The Employer contribution shall be due on or before the 10th day of the month following the calendar month in which the work was performed. Payment shall be made at such location as the trustees of the Health and Welfare Fund shall from time to time designate.

**Section 7.7 - Termination of Contributions**

Contributions on behalf of an Eligible Employee shall continue until terminated in accordance herewith. Unless otherwise herein provided, contributions shall be discontinued as of the first day of the month following:

1.    Termination of employment.

2.    A layoff or leave of absence of thirty (30) calendar days.

3.    The Employee's ceasing to be an Eligible Employee as set forth above.

4.    Expiration of the period of continued contribution for lay-off, occupational injury, non-occupational injury and illness provided above.

**Section 7.8 - Employee Option of Coverage**

The parties have agreed that during the life of this Agreement, the employees of any Employer who are covered by that Employer's Health and Welfare Plan shall have the option of coverage in the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, if a majority of the employees so elect.

**Section 7.9 - Trust Agreement**

The Employer adopts and agrees to be bound by all of the terms and provisions of the Agreement and Declaration of Trust creating the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, as the same may be amended from time to time [the "Trust Agreement"], as fully as if the Employer was an original party thereto, a copy of which Trust Agreement has been made available to the Employer. The Employer hereby designates as its representatives on the Board of Trustees of the Fund, the Employer Trustees serving at the time of the execution of this Agreement, together with their successors selected in the manner provided in the Trust Agreement. The Employer agrees to be bound by all actions taken by said Trustees pursuant to the powers granted to them by the Trust Agreement.

**Section 7.10 - Payroll Audits**

The Employer agrees to make available to the Trustees or their designee during normal business hours, all payroll records and other employment records necessary to ascertain that their contributions required under this Agreement have been paid correctly and in full.

**Section 7.11 - Trustees' Limitations**

Nothing in this Agreement shall authorize the Board of Trustees to increase the amount of contributions required to be paid by the Employers pursuant to this Agreement, to extend the period for which the contributions shall be made or to authorize the Board of Trustees to bind the Employer in any manner inconsistent with the terms of this Agreement or the Trust Agreement.

## Section 7.12 - Termination of Participation

If for any reason, the Employer's participation in the Health and Welfare Fund fails to commence or, having commenced, is terminated, then the Employer shall pay the contributions herein required to a qualified health and welfare plan upon which the Employer and the Union shall agree, or, in the event the agreement is not reached, the disposition of such payment shall be determined in accordance with the grievance procedures contained in this Agreement.

## Section 7.13

The employer will not deduct Health and Welfare Co-Pay contributions until September 9, 2007. At that time the employer will then implement the co-pay contribution as per Article 7 section 7.1.

## Section 7.14

However, if the contribution rate increases by more than 10% from the previous year's rate, this Agreement shall reopen for the sole purpose of negotiating the amount of the increase the Company shall pay. The Union shall have the right to strike in the event that no agreement is reached concerning the amount of the increase the Company pays in this year.

## ARTICLE VIII
## PENSION

## Section 8.1 - Pension Fund

By agreement with Employers, the International Union with which this Local Union is affiliated has established a Pension Fund designated as the United Food and Commercial Workers International Union-Industry Pension Fund (the "Pension Fund").

## Section 8.2 - Employer's Contributions and Definitions of Eligible Employee

As used in this Article, an "Eligible Employee" is an employee:

(1)     Who is covered by this Contract;

(2)     Who has completed a "Qualification Period" as defined below;

(3)     Who has worked one-hundred (100) or more hours in a calendar month following the completion of their qualification period.

"Qualification Period" means a calendar month in which an employee has worked one-hundred twenty-eight (128) or more hours for his/her Employer. Hours worked during an employee's probationary period shall be counted toward completion of his/her Qualification Period. An Employee becomes eligible the first of the month following completion of 90 days of continuous service during which the employee worked a minimum of one hundred and twenty-

- 22 -

eight (128) hours per month during each month of employment. Once qualified, the full-time contribution rate shall continue to be paid for each succeeding calendar month during which the employee works a minimum of one-hundred (100) hours.

An employee's hours must be reduced below 100 hours per month for three (3) consecutive months before an Employer is no longer required to pay Full-Time Pension contributions on such employee.

When an Eligible Employee's seniority has been terminated under this Agreement, that employee shall no longer be an eligible employee until he/she shall have completed another Qualification Period. If an employee has not lost seniority, only one hundred (100) hours are required.

For each employee who is covered by this Agreement, who has completed their probationary period and who is an "Eligible Employee", the Employer shall pay to the Pension Fund the sum of $185.65 per month during each calendar month provided the "Eligible Employee" maintains their eligibility as defined herein.

Effective October 1, 2007 the Employer shall contribute $27.30 per month on behalf of "eligible part-time employees" to the United Food & Commercial Workers International Union-Industry Pension Fund. "Eligible part-time employee" shall be defined on the same basis as currently provided for part-time coverage in the Health & Welfare Fund.

The Employer shall contribute on behalf of said "Eligible Employees" on or before the tenth (10th) day of the month following the month in which the work determining the contribution was performed.

## Section 8.3 - Commencement of Contributions

The commencement of contributions to the Pension Fund is contingent upon acceptance of the employees covered hereunder in the Pension Fund. The Employer shall make contributions as provided in this Agreement upon receiving written notice of the Trustees' acceptance. Thereafter, this Agreement shall remain in effect during the terms set forth in Article XIII hereof and any extensions, renewals or modifications thereof and the terms hereof shall not be amended without the express written consent of the Trustees of the Pension Fund, the Local Union, and the Employer, provided, however, that nothing herein contained shall limit the right of the Trustees to terminate participation of the employees covered hereunder in the Pension Fund on account of the Employer's failure to make contributions or as otherwise provided in the Trust Agreement or Pension Plan, and, further provided, that nothing herein contained shall limit the right of the Employer and the Local Union to terminate participation in the Pension Fund, subject to the terms of the then existing Trust Agreement and Pension Plan.

## Section 8.4 - Termination of Contributions

Contributions to the Pension Fund shall be discontinued as of the first of the month following:

(a)    Termination of employment.

(b)    A lay-off or leave of absence of thirty (30) calendar days or more.

(c)    The employee's ceasing to be an Eligible Employee, as set forth above.

## Section 8.5 - Total Hours Worked

For the purpose of determining the obligation to contribute to the Pension Fund, paid holidays, vacations and other absences for which wages are paid shall be considered to be time worked.

## Section 8.6 - Employer's Rights

The obligation to pay contributions to the Pension Fund shall in no way affect any rights to discharge an employee granted the Employer under this Agreement.

## Section 8.7 - Benefit Level

Employer contributions to the Pension Fund shall be used to provide the retirement benefits for eligible employees in accordance with the Pension Plan adopted from time to time by the Trustees of said Pension Fund (the "Trustees").

## Section 8.8 - Trustees' Remedies

The Employer's obligation hereunder to contribute to the Pension Fund shall not be subject to any implied bargaining agreement.

In addition to any other remedy which may otherwise be available to them, the Trustees of the Pension Fund shall have the right to sue in any court of competent jurisdiction to secure the payment of any monies due hereunder without the necessity of first utilizing any other remedy provided, however, that if the Employer's obligation to contribute is contingent upon the resolution of an existing dispute between the Employer, Union or employee, which is the subject of a grievance or arbitration pursuant to Article XI hereof, the right of the Trustees to sue shall be stayed until the grievance and/or arbitration procedure is exhausted, but not more than 190 days after the Trustees' initial demand for the Employer's contribution. The Trustees shall be bound by the final disposition of the grievance or the findings of the arbitrator in determining the Employer's obligation to contribute hereunder.

## Section 8.9 - Trust Agreement

The Employer adopts and agrees to be bound by all of the terms and provisions of the United Food and Commercial Workers International Union-Industry Pension Fund Agreement and Declaration of Trust, as amended from time to time, (the "Trust Agreement") as fully as if the Employer was an original party thereto, a copy of which Trust Agreement the Employer has received. The Employer hereby designates as its representatives on the Board of Trustees of the Fund, the Employer Trustees named in said Trust Agreement, together with their successors

- 24 -

**Section 9.2 - Union Shop**

It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the date on which this Agreement is signed shall remain members in good standing, and those who are not members on the date which this Agreement is signed shall, on the thirty-first (31st) day following the date on which this Agreement is signed, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which this Agreement is signed, shall, on the thirty-first (31st) day following the beginning of such employment become and remain members in good standing in the Union.

**Section 9.3 - Dues/Fees Check Off and Notification**

The Employer agrees to deduct Union dues and fees upon written authorization by an employee, in accordance with the provisions of the Labor Management Relations Act of 1947, and remit the same to the Union along with a list of individuals for whom the deductions were made. Dues will be checked off on a monthly basis in advance. The Employer agrees to notify the Local Union when new employees are hired.

**Section 9.4 - Business Representatives**

Union Business Representatives shall be admitted to the Employer's market premises during the hours Meat Department employees are working for the purpose of ascertaining whether or not this Agreement is being observed and for the collecting of dues. Such activities shall be conducted in such a manner as not to interfere with the orderly operation of Employer's business. Business Representatives shall have full authority to request the immediate discharge of any employee who has voluntarily agreed with his/her Employer to receive wages below the wage scale fixed herein.

**Section 9.5 - Discharge**

During an employee's probationary period, that is, during his/her first sixty (60) days of employment, an employee may be discharged for any reason at the sole discretion of the Employer. After an employee has completed the probationary period, such employee shall not be discharged or otherwise disciplined without just cause. Drunkenness, dishonesty, incompetency, or incivility will be sufficient cause for dismissal.

**Section 9.6 - Display of Contract and Union Shop Cards**

This Agreement is to be kept posted in the place of employment so that every employee may have equal and easy access to same.

It will be the duty of the Employer to prominently display Union Shop Cards in all establishments wherein Union employees are employed. These cards shall remain the property of the Union, and the Employer shall have their usage only until such time as the Union shall request their return. The Employer agrees to surrender same immediately upon demand by the Union.

**Section 9.7 - Active Ballot Club (A.B.C.)**

The Employer agrees to honor and transmit to the Union, contribution deductions to the United Food & Commercial Workers International Union Active Ballot Club from employees who are union members and who sign deduction authorization cards. The deductions shall be in the amounts and with the frequency specified on the political contribution authorization cards; however, such deductions shall be remitted in conjunction with regular monthly dues deductions. While the deductions will be remitted at the same time of the regular monthly dues deductions, such payment shall be in the form of a separate check from the regular monthly dues deductions. When the Employer remits the deduction to the United Food & Commercial Workers International Union Active Ballot Club the Employer shall include a list of individuals for whom the deductions were made.

# ARTICLE X
# SENIORITY

**Section 10.1 - Seniority Defined**

Seniority means the rights defined herein secured by employees by length of continuous employment with the Employer, that is, employment uninterrupted by termination of service.

Seniority starts from the last date when the employee starts work as a regular employee, provided, however, that new employees shall not acquire any seniority rights until they have completed the probationary period of sixty (60) days after which their seniority shall date back to the date the employee started to work.

When two or more employees start work the same day, the date of birth shall determine their relative seniority. It being understood that the older employee shall be deemed to be more senior.

An employee's seniority shall be terminated if he/she: [1] quits; [2] retires; [3] is discharged; [4] fails to report after a layoff within seven (7) calendar days after the Employer sends to the last address known to the Employer a written notification to return to work (with a copy to the Union); [5] fails to return to work upon expiration of an authorized leave of absence; [6] refuses, as an alternative to being laid off, to accept work in his/her classification in another store within the seniority area; [7] refuses, after having been laid off, to accept work in his/her job classification in any store in the seniority area; or [8] has been laid off by the Employer for a period of one year.

The "in-service" date of an employee who progresses from Apprentice to Journeyman, or who is demoted from Head Meat Cutter to Journeyman, shall not be affected by such change in classification.

An employee's seniority shall not be affected as a result of a transfer.

A complete seniority list of the Company's employees working within a Local Union's jurisdiction will be furnished the Union each calendar year.

## Section 10.2 - Layoffs and Recalls after Layoffs

Seniority shall control the order of layoffs and recalls after layoff within the affected "seniority areas" within the following job classifications:

(1)    Head Meat Cutter

(2)    Journeymen and Apprentices

(3)    Wrappers

(4)    Fish Handlers

The Employer shall give a two (2) weeks notice when it becomes necessary to layoff an employee or two (2) weeks pay in lieu of notice.

The term "seniority area" means the area covered by the operating division district or administrative or geographic unit used by the Employer as said Employer's unit may be organized from time to time, and falling within the cities and counties in which the Employer has recognized the Union Locals. The Employer shall notify the Union in writing of the areas comprising its seniority areas as modified from time to time. Seniority areas for layoff/ recall will be Company-wide.

It is mutually agreed that for the term of this Agreement there shall be no inclassification transfers of employees from one "seniority area" to another "seniority area" as defined above in the instances where there are employees on layoff status in that particular classification in the area in which an employee from another area is sought to be transferred.

## Section 10.3 - Promotion to Supervision

If an employee is promoted from a job within the bargaining unit to a supervisory position with the Employer and is returned to the collective bargaining unit within one year, he/she shall commence work with the seniority rank he/she had at the time of his/her promotion.

## Section 10.4 - Seniority of Employees on Leaves of Absence

The seniority rights of an employee who, either by voluntary action or draft, entered the Armed Forces of the United States shall continue as though he/she had not been absent, and he/she shall have the right to be reinstated to his/her employment as provided by law and regulation thereunder.

The seniority of an employee on an extended leave of absence, which is hereby defined as any leave of absence, other than military leave of absence, in excess of ninety (90) days, shall be protected to the expiration of said leave of absence but not in excess of one year, but such seniority shall not accumulate during any period of absence in excess of one year.

## ARTICLE XI
## GRIEVANCES AND ARBITRATION

### Section 11.1 - No Strike; No Lockout

The Union and the Employer agree on the need for the continuance of their service to the public without interruption. Both recognize this objective as necessary to the security of the Employer and its people. Both, therefore, specifically pledge themselves to help assure that security by using the procedures agreed upon between them for the adjustment of disputes and grievances in all cases where there is any difference of opinion concerning the rights of either under this contract or the interpretation or application of any provision of it. Therefore, subject to the exceptions stated herein, during the term of this Agreement there shall be no strike, work stoppage, diminution or suspension of work of any kind whatsoever on the part of the Union or its membership, nor shall there be any lockout on the part of the Employer. No officer or representative of the Union shall authorize, instigate, aid or condone any strike, work stoppage, diminution or suspension of work of any kind whatsoever prohibited by the provisions of this paragraph. No employee shall participate in any such prohibited activities.

The Union reserves the right to strike and/or picket the market or markets involved in the grievance in the event the Employer shall fail or refuse to comply with any decision of a Board of Arbitration issued pursuant to the proceeding under Section 11.3 of this Article within ten (10) days after notice thereof. The Employer reserves the right to declare a lockout should the Union fail or refuse to comply with any decision of a Board of Arbitration within ten (10) days after notice thereof.

The Union reserves the right to file a grievance wherein the Employer sells meat products under the Union's jurisdiction not specifically authorized for sale under the terms of this Agreement.

The Union further reserves the right to strike any Employer who is required by this contract to make contributions to the Health and Welfare Trust Fund or the Pension Trust Fund who remains delinquent in the payment of a contribution for a period of fourteen (14) calendar days after a written notice is sent to the Employer by the Union; provided, however, that the Union without recourse to arbitration may not strike for this reason if within said fourteen (14) day period the Employer corrects said delinquency or notifies the Union in writing that there is a bona fide dispute as to whether the payment is delinquent or as to the amount of the delinquency and also initiate arbitration with respect to said dispute in accordance with the provisions of this contract.

### Section 11.2 - Time Limit on Grievances

Grievances of any nature must be made within thirty (30) calendar days after the cause giving rise to the grievance becomes evident; and wage claims shall not be valid and collectible for a period earlier than ninety (90) days prior to the date of filing the grievance or the date the grievance arose, whichever date is most recent.

The above provision notwithstanding, in the event of an employee's termination, quit or retirement, no grievance shall be discussed or considered except for such grievance which must be presented within fourteen (14) days of such termination and which relate solely to the instance of termination, quit or retirement.

## Section 11.3 - Grievances and Arbitration

Should any dispute or grievance arise between the Employer and the Union or between the Employer and employees concerning the application and/or construction of this Contract, the parties agree that such matter shall be adjusted, if possible, by negotiations. In the event the dispute or grievance cannot be resolved by negotiations within fifteen (15) days after the inception of the matter in dispute, then it shall be submitted immediately to a Board of Arbitration, consisting of three (3) persons, for final and binding decision. Either party may institute said arbitration proceedings by giving the other party notice thereof, in writing, naming one person to act on his/her behalf on said Arbitration Board; and the other party shall, within five (5) days after receipt of such written notice name one person to act on his/her behalf on said Arbitration Board. These two so selected shall designate the third member or referee of the board. In the event these two so selected shall be unable, within fifteen (15) days, to agree upon the third member or referee, then the third member of the Board shall forthwith be designated under the rules and procedures of the Federal Mediation and Conciliation Service. The Board shall hold hearings and render its decision in writing within thirty (30) days with respect to a dispute under Article I, Section 1.2 (d) and within ninety (90) days with respect to any other dispute. The Board's decision shall be final and binding upon the grievant employee, the Union and the Employer. The decision of any two members of the Board shall be the decision of the Board. If the parties shall agree upon one person to act as Arbitrator, his/her decision shall be as binding as that of a Board of Arbitration. The compensation and expense, if any, of witnesses and the cost of other evidence shall be borne by the party on whose behalf witnesses are called or the evidence is introduced. Each party shall pay for the compensation and expenses of the Arbitrator appointed by it. The compensation and expenses of the third Arbitrator and all other costs incurred in conducting the arbitration proceedings shall be borne equally by the parties hereto.

The arbitrator shall have no power to add to, subtract from, modify, or amend any provision of this Agreement, nor to substitute his/her discretion over the intent of the Parties as set forth in this Agreement.

## ARTICLE XII
## SEVERANCE PAY

## Section 12.1 - Severance Pay

For Employers operating twenty-five (25) stores or less within the jurisdiction of Local Union 1546 as of July 25, 1982, advance notice of store closing or sale shall be given in lieu of severance pay. The Employer agrees to give its employees as much advance notice as possible and practical.

## ARTICLE XIII
## TERM

### Section 13.1 - Initial Term

This Agreement shall become effective at 12:01 AM September 8, 2006, and shall expire at 12:00 midnight September 7, 2009.

### Section 13.2 - Renewal Term

If either party wishes to modify this Agreement at its expiration, it shall serve notice in writing of such request upon the other party not less than sixty (60) days prior to the expiration date. In the absence of the service of such notice, this Contract shall automatically renew itself for a period of one year and from year to year thereafter.

### Section 13.3 - Retroactivity

This Contract shall remain in full force and effect until a new agreement is negotiated, but not beyond an additional sixty (60) days beyond the Contract expiration date. Any increases in wages set out in Article III resulting from the negotiations following the Contract expiration date shall be retroactive to the date of expiration, but not exceeding ninety (90) calendar days, whichever period shall be shorter. There shall be no retroactivity with respect to other contract changes, such as changes in working hours or premium or overtime pay.

SIGNED THIS _13th_ DAY OF _November_ , 20 _07_ .

**DON'S FINEST FOODS (MEAT)**

_____
Signature

_____
Print Name/Title
John Riffol

**UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 1546**

_____
Kenneth R. Boyd, President
International Vice President

Contract #006225



RECEIVED
AUG 2 1 2006
ADMINISTRATOR
UFCW MIDWEST BENIFITS



COPY

# AGREEMENT

## Between

## UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 1546

## And

## DON'S FINEST FOODS, INC.
## (GROCERY DEPARTMENT)

BILLING DEPT.

AUG 2 1 2006

DEBRA

January 2, 2006 - March 28, 2009

08CV3342
JUDGE HIBBLER
MAGISTRATE JUDGE COLE

AEE



EXHIBIT
B

INDEX

**DON'S FINEST FOODS, INC.**
**(GROCERY CONTRACT)**

Page

| | | | |
|---|---|---|---|
| ARTICLE | I | INTENT AND PURPOSE | 1 |
| ARTICLE | II | COVERAGE | 1 |
| ARTICLE | III | UNION AFFILIATION | 2 |
| ARTICLE | IV | UNION SHOP | 2 |
| ARTICLE | V | MANAGEMENT RIGHTS | 3 |
| ARTICLE | VI | CLERKS WORK CLAUSE | 3 |
| ARTICLE | VII | SENIORITY | 4 |
| ARTICLE | VIII | WORKING HOURS AND OVERTIME | 8 |
| ARTICLE | IX | WAGES | 13 |
| ARTICLE | X | HOLIDAYS | 15 |
| ARTICLE | XI | VACATION | 18 |
| ARTICLE | XII | JURY SERVICE/FUNERAL PAY/MILITARY RESERVE | 19 |
| ARTICLE | XIII | LEAVE OF ABSENCE | 20 |
| ARTICLE | XIV | DISCHARGE OR SUSPENSION | 21 |
| ARTICLE | XV | GRIEVANCE AND ARBITRATION | 21 |
| ARTICLE | XVI | UNION ACCESS TO STORES | 22 |
| ARTICLE | XVII | NEW STORE OPENING - STORE CLOSING | 22 |
| ARTICLE | XVIII | GENERAL | 24 |
| ARTICLE | XIX | TECHNOLOGICAL CHANGE | 25 |
| ARTICLE | XX | HEALTH AND WELFARE | 26 |
| ARTICLE | XXI | PENSION | 28 |
| ARTICLE | XXII | COLLECTION OF DELINQUENT CONTRIBUTIONS | 29 |
| ARTICLE | XXIII | CONFORMITY TO LAW | 30 |
| ARTICLE | XXIV | TERM OF AGREEMENT | 31 |

WAGE SCHEDULE ......................................................................32-36

LETTER OF UNDERSTANDING ..........................................................37

# AGREEMENT

This Agreement, mutually entered into by and between the UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 1546, chartered by the United Food and Commercial Workers International Union, as party of the first part and hereinafter referred to as the "Union", and DON'S FINEST FOODS, INC., and hereafter referred to as the "Employer".

The parties to this Agreement agree that they will not discriminate against any employee or prospective employee because of age, race, sex, disability, creed, color, national origin or Union affiliation.

## ARTICLE I - INTENT AND PURPOSE

1.1   The Employer and the Union each represent that the purpose and intent of this Agreement is to promote cooperation and harmony, to recognize mutual interests, to provide a channel through which information and problems may be transmitted from one to the other, to formulate rules to govern the relationship between the Union and the Employer, to promote efficiency and service and so set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment.

1.2   The Employer recognizes the Union as the sole collective bargaining agency for all of the employees, as hereinafter set forth, employed in the retail store of Don's Finest Foods, Inc., in the geographical jurisdiction of the Union.

## ARTICLE II - COVERAGE

2.1   The term "Employer", as used in this Agreement, shall refer and relate to all retail food stores now owned and/or operated by the Employer located within the geographical jurisdiction of the Local Union, and such new retail food stores as the Employer shall operate during the term of this Agreement. Leased and/or licensed departments shall be part of the bargaining unit. However, the ownership of the leased/licensed department shall have the right to negotiate the terms and conditions which shall be applicable in such leased/licensed department.

2.2   The term "employees", as used in this Agreement, shall include all employees working in the retail food stores of the Employer, including employees working in leased and/or licensed departments, and all concession departments within the store, EXCEPT its employees in the Meat Department, and one (1) Store Manager. In stores having an average volume of $100,000 Dollars per week, the Employer may appoint one (1) Co-manager, who shall also be excluded from the definition of employees.

2.3   It is agreed that in stores where the volume is $150,000 Dollars per week or more, only unit employees covered by the Collective Bargaining Agreement shall perform all work, services, and handling or selling of merchandise in the Employer's store.

EXCLUDED from this clause are the Store Manager and Co-manager, the store owners and their immediate family, which shall be defined as "husband, wife and their children and parents". In the event of a violation of this Section, and after one written warning from the Union regarding a

1

violation, the most senior employee working in the store at the time of the violation shall receive straight-time pay for the amount of time spent in such violation, provided, however, there is no violation when the cause is an emergency or unforeseen circumstances. Prohibited work performed by more than one (1) supervisory employee shall be treated as separate violations, and payment will be made accordingly. Any pay due under this paragraph shall be reflected on the employee's time record at the time the violation is reported, and the payment shall be incorporated in the next paycheck due the employee.

## ARTICLE III - UNION AFFILIATION

3.1　The Employer agrees that there shall be no discrimination against any employee because of Union affiliation or activity.

3.2　It is agreed that an employee of the Employer, upon being elected or appointed to office in the Union, shall be granted a leave of absence for a period up to three (3) years, and upon expiration of such leave shall be reinstated in a similar position as that held when granted the leave of absence.

## ARTICLE IV - UNION SHOP

4.1　The following shop condition shall be effective:

It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the execution date of this Agreement shall remain members in good standing, and those who are not members on the execution date of this Agreement shall, on the thirty-first (31st) day following the execution date of this Agreement, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its execution date shall, on the thirty-first (31st) day following the beginning of such employment become and remain members in good standing in the Union.

The Employer may secure new employees from any source whatsoever. During the first ninety (90) days of employment a new employee shall be on a trial basis and may be discharged at the discretion of the Employer.

4.2　The Employer shall have new hires fill out a Union Membership application at the time the new employee completes other employment forms required by the Employer. The Employer assumes no liability, financial or otherwise, by providing this service to the Union, and all questions, disputes or obligations pertaining to Union membership remain the responsibility of the Union and the involved employee.

At the end of each month the Employer shall transmit all such applications to the appropriate Local Union. However, the Employer agrees that upon receipt of a written request from the Union, to suspend from employment any employee who has failed to become or maintain their membership after proper notification from the Union.

4.3　Check-off: The following provision shall become effective for the United Food and Commercial Workers Union, Local 1546 if, and when such Local Union desires to institute such check-off

2

procedure. Upon sixty (60) days notice to the Employer involved, the following shall become applicable:

The Employer agrees to deduct Union dues and fees upon written authorization by an employee, in accordance with the provisions of the Labor Management Relations Act of 1947, and remit the same to the Union along with a list of individuals for whom the deductions were made. Dues will be checked off on a monthly basis in advance. The Employer agrees to notify the Union when new employees are hired.

4.4    **Indemnification:** The Union agrees to defend, protect, indemnify and save the Employer harmless against any claim, demand, suit or liability that shall arise out or by reason of any action taken by the Employer in reliance upon a request made by the Union to discharge an employee for failure to maintain his/her membership in good standing or upon payroll deduction authorization cards or Active Ballot Cards, submitted by the Union to the Employer.

4.5    **Active Ballot Club (A.B.C.):** The Employer agrees to honor and transmit to the Union, contribution deductions to the United Food & Commercial Workers International Union Active Ballot Club from employees who are union members and who sign deduction authorization cards. The deductions shall be in the amounts and with the frequency specified on the political contribution authorization cards; however, such deductions shall be remitted in conjunction with regular monthly dues deductions. While the deductions will be remitted at the same time of the regular monthly dues deductions, such payment shall be in the form of a separate check from the regular monthly dues deductions. When the Employer remits the deduction to the United Food & Commercial Workers International Union Active Ballot Club the Employer shall include a list of individuals for whom the deductions were made.

## ARTICLE V - MANAGEMENT RIGHTS

Subject to the provisions of this Agreement, the management of the business, including the right to plan, determine, direct and control store operations and hours; the right to study and introduce new methods, facilities and products; the right to direct and control the work force, including the determination of its size and composition; the scheduling and assignment of work, and also including the right to hire, assign, demote, promote and transfer; to lay off or reduce the hours of work because of lack of work; to discipline, suspend or discharge for proper cause; and to establish and maintain reasonable rules and regulations covering the operation of the store, a violation of which shall be among the causes for discharge, is vested in the Employer. Provided, however, that these rights shall be exercised with due regard for the rights of the employees. The listing of specific rights in this Agreement is not intended to be nor shall it be considered restrictive, or a waiver of any rights of management not listed and not specifically surrendered herein, whether or not such rights have been exercised by the Employer in the past.

## ARTICLE VI - CLERKS WORK CLAUSE

6.1    No salesman shall handle or stock any merchandise in the store, EXCLUDING the Meat Department, except rack jobbers and driver-salesmen engaged in servicing the retail stores under prevailing practices with merchandise directly from a delivery vehicle at the point of delivery. It is understood that the above shall not apply in new stores during the first week after the store is opened. In the event of violation of this Section, the most senior employee working in that store at the time of the violation shall receive four (4) hours straight-time pay, or straight-time pay in

3

the amount of actual time spent in such violation. If more than one (1) person is involved in the violation, the two (2) most senior clerks shall receive the violation pay.

6.2 Any General Merchandise clerk who is directed to perform Regular clerk duties for one (1) hour or more shall be paid the appropriate Regular clerk rate of pay for all hours worked on the day or days the violation occurred.

6.3 It shall be a violation of this Agreement for Utility clerks to be directed to perform any duties other than those set forth in Section 7.4 (d). In order to insure compliance with this provision, the parties agree as follows:

a) The Employer shall post in each of its stores a notice to the employees, signed by an authorized Employer representative, instructing all employees of the duties of Utility clerks and instructing all employees that the performance of any other duties constitutes a violation of the Contract.

b) Upon the first violation of this Section by the Employer, the Union will issue a written warning to the Employer.

c) Upon the second violation of this section by the Employer in the same store within six (6) months of the first violation, the utility clerk in the store involved shall be paid the applicable part-time rate for all hours worked in the week or weeks in which the violation occurred, including hours worked in performance of utility clerk's duties.

d) Upon a third violation by the Employer in the same store within six (6) months of the last violation, all utility clerks in the store involved shall be paid the applicable part-time rate for all hours worked in the week or weeks in which the violation occurred, including hours worked in performance of utility clerk's duties.

e) Upon a fourth violation by the Employer in the same store within six (6) months of the last violation, all utility clerks in the store involved shall be paid double the respective rates for all hours worked in the week or weeks in which the violation occurred, including hours worked in performance of utility clerk's duties.

## ARTICLE VII - SENIORITY

7.1 "Seniority" shall be defined as, the length or continuous employment with the Employer within the bargaining unit and shall begin with the employee's last date of employment. For seniority purposes, a "date of employment" shall mean a date the employee actually works. Seniority ranking for employees commencing employment on the same date shall be determined by the day and month of birth. The employee whose date and month of birth is closest to January 1 within the calendar year shall have the greatest seniority. Employees transferred into the bargaining unit from an Employers' store covered by Contract with United Food and Commercial Workers Union, Local 1546, shall maintain their previously acquired seniority. Supervisors transferred back into the bargaining unit shall be credited for all seniority earned prior to the supervisor's promotion out of the bargaining unit.

7.2 All employees shall acquire seniority rights after they have been employed by the Employer for at least ninety (90) days, provided that after completion of the probationary period, the seniority shall revert to the last date of hire.

4

The Utility clerks' probationary period shall not be counted for the purpose of wage progression.

7.3    Seniority may be broken only by: quit, justifiable discharge, layoff for six (6) continuous months, employment with the Employer outside the bargaining unit for six (6) continuous months, or failure to return to work in accordance with the terms of a leave of absence or recall from layoff.

7.4    In the application of the principles of seniority, there shall be four (4) seniority groups ranked in the following order:

1.    Classified Employees;
2.    Regular Clerks;
3.    General Merchandise Clerks, Bakery Clerks, Deli Clerks, Salad/Bulk Clerks, Floral Clerks, Produce Scale Clerks;
4.    Utility Clerks.

The seniority groups are defined as follows:

a)    Classified Employees: Assistant Manager, Produce Manager, Cashier/ Bookkeeper, Dairy/Frozen Food Department Head, Deli Department Head and Bakery Department Head are classified employees. Each group of classified employees shall constitute a separate seniority listing.

b)    Regular Clerks are all other employees not listed in a), c) or d) of this Section 7.4.

c)    General Merchandise Clerks are all employees who exclusively handle non-food items such as housewares, soft goods, pet supplies, light bulbs and supplies, greeting cards, drugs and health and beauty aids. Bakery, Deli, Salad/Bulk, Floral and Produce Scale Clerks are all employees working exclusively within these Departments.

d)    Utility Clerks are all employees whose duties are limited to sorting, bagging and packaging sold merchandise; carrying and loading sold merchandise; price checking of merchandise at check-out lanes; sweeping floors anywhere in the store; cleaning the parking lot and other adjacent areas outside the store; snow shoveling of common customer areas, (appropriate outergear shall be provided); filling bag racks; cleaning areas around and in front of the checker lanes; returning shopping carts to the store; cleaning restrooms; collecting and sorting containers; disposing of trash and rubbish; minor maintenance and repairs, small painting jobs; washing and cleaning of shelves and fronts of cases with pulling and replacing existing merchandise; washing windows, posting of window signs; returning merchandise left by customers from check stands to shelves or displays; mopping of floors anywhere in the store, blocking of shelves at any time, and front-door greeter and the "May I Help You" clerk.

7.5    The transfer of an employee to a seniority group having a higher wage schedule shall be deemed a promotion. Such employees shall have two (2) seniority dates, to wit; the date of hire and date of promotion. Within the employee's new seniority group the date of promotion shall apply. In the event the employee is returned to a lower seniority group, the date of hire shall apply.

7.6     Upon written request from the Union, the Employer shall prepare seniority lists as follows:

For each group of classified employees the Employer shall prepare a single list for all stores covered by the Contract. For all other seniority groups, the Employer shall prepare a master list for all stores covered by the Contract, and a separate list for each store. The lists shall include the employees' name, rate of pay, date of hire, classification and promotion date, where applicable. No employee shall be bound by a seniority date appearing on a list if, in fact, the seniority date is incorrect.

7.7     In order to maximize the opportunity for employees to exercise seniority rights in a manner which will allow employees to work in stores convenient to their store of last employment, the parties agree that there shall be mutually agreed upon geographical groupings of stores. Employees' seniority rights shall be exercised on a store basis, geographical grouping basis, as well as a Local Union basis, as more specifically set forth below.

By mutual agreement, the geographic grouping may include stores located within the jurisdiction of two (2) or more Locals. In the event of a new store opening, the parties agree to meet prior to the date of posting the new store opening to discuss the geographic grouping, and revise the same if necessary.

In the event of a store closing, the parties agree to meet within seven (7) days following the store closing to discuss the geographic grouping, and revise the same if necessary.

The geographical grouping is defined as being Company wide within each Local Union's jurisdiction.

7.8     Layoffs: Layoffs within the store shall be on a strict seniority basis within the affected seniority classification. The Employer shall offer employees a reasonable period of training, not less than thirty (30) days, if necessary, to comply with this seniority requirement.

Layoffs shall be effected as follows:

a)     In the event of a layoff within a specific store, the affected employee must accept a transfer to another store within the geographical grouping where a comparable vacancy exists. When no such comparable vacancy exists, the laid-off employee may elect to transfer within his/her seniority classification to any store in the geographical grouping, provided that in the store selected by the laid-off employee there is at least one (1) less senior employee working in the same classification. If the transfer involves work which the employee has not previously performed, then the Employer shall offer the employee a reasonable period of training, not less than thirty (30) days.

During the thirty (30) day training period, the employee may be reduced by one (1) wage bracket, after which the employee will be reinstated to their previous rate of pay and continue to progress through the wage brackets as per the Contract provisions.

b)     In the event the laid-off employee's seniority does not permit a transfer within the geographical grouping, then the laid-off employee shall be transferred to any store within the jurisdiction of the Local Union in accordance with the employee's seniority, on the same basis and under the same conditions as set forth in paragraph a) above.

c)    In the event the laid-off employee's seniority does not permit transfer within the Local Union's jurisdiction, then the laid-off employee may elect to transfer in accordance with the employee's seniority to a store of the Employer within the jurisdiction of any one of the Local Unions listed in Section 7.1 provided, however, that such transfer will displace the least senior employee only working in said Local Union's jurisdiction.

d)    A laid-off employee may elect to take a demotion to a lower seniority grouping within their store (a seniority grouping with a lower wage schedule). The employee will then be placed upon the applicable seniority list, based upon the employee's last date of hire.

e)    Lateral transfers will be allowed between equal wage structure seniority groups within the store.

f)    It is specifically understood and agreed that each employee who is subject to layoff must exercise each step as specified in this Section 7.8, except for c) and d) above. Should the employee's seniority prove insufficient to entitle the employee to remain employed in any manner outlined above, then the employee will be laid off. Before hiring any new employee or promoting an employee to a job within the laid-off employee's seniority classification, the Employer will first offer recall rights to employees on the layoff list in accordance with seniority. An employee may decline to accept a recall to any store other than to one within the same geographic grouping from which the layoff occurred without forfeiting their recall rights.

7.9    All employees shall have recall rights up to six (6) months from layoff.

7.10   An employee who is reduced in hours by more than six (6) hours per week for four (4) consecutive weeks will be eligible to transfer as set forth above. The base period used to determine the six (6) hour reduction will be the average number of hours worked during the preceding four (4) weeks. Employees who wish to transfer under this provision must notify their store manager in writing, with a copy to the Union. The transfer will be made in accordance with Section 7.8 above, and will be effective the beginning of the second week following receipt of such notice.

7.11   Any employee laid off as a result of a store closing or any employee laid off as a result of transfer pursuant to the aforesaid provisions, including a layoff occasioned by the transfer of an employee from a closed store, shall have the same transfer rights as set forth above.

7.12   Promotions and Demotions: Promotions and demotions shall be handled in the following manner:

a)    When a job opening occurs within a store, it shall first be posted for five (5) calendar days. If no employee has requested the opening, it shall then be filled either by a voluntary transfer in accordance with Section 7.13, or by an employee from the lowest seniority group within the store in accordance with strict seniority, provided the employee has the skill and ability to perform the required work.  During the period of posting, the Employer may assign, for a period of up to ten (10) calendar days, an employee to fill the vacancy.

b)    Promotions to classified jobs shall be within the sole discretion of the Employer provided, however, that all classified jobs shall be first offered to any qualified unit employee who has shown an interest, prior to the hiring of a new employee from an outside source.

c)      The Employer shall afford every promoted employee a reasonable period of training in the position, not less than thirty (30) days.

d)      An employee promoted to a classified job must perform the duties of the classified job.

e)      No employee shall be demoted from any seniority group or any premium pay position without just cause.

7.13    Involuntary and Voluntary Transfers: The Employer may transfer employees to meet the necessities of the business with the following limitations and under the following conditions:

a)      No employee shall be involuntarily transferred outside of their geographical grouping.

b)      In the event a transfer is required outside of the geographic grouping, the Employer will first seek volunteers. In the event no volunteers apply for a transfer, the Employer will make the transfer in accordance with inverse seniority.

c)      No involuntary transfer will be made which will result in a reduction of hours for the transferred employee.

d)      Should the regular employee be temporarily transferred from their regularly assigned store to another store, and such transfer results in additional transportation expense, the employee will be reimbursed by the Employer for such additional transportation expense. Transportation costs shall be computed on the basis of the Federal Travel Expense Standards in effect at the time.

e)      An employee desiring a transfer to a store closer to home shall notify the Employer in writing of their desire to transfer to a specific store. In the event of a job opening in the specific store involving a comparable number of hours, the Employer will transfer the employee to the specific store. The employee requesting the transfer must have greater seniority than other employees in the store who have requested to fill the job opening.

## ARTICLE VIII - WORKING HOURS AND OVERTIME

8.1    The basic workweek shall be forty (40) hours to be worked in five (5) days, eight (8) hours per day, not necessarily consecutive, between Monday through Saturday. The basic workweek for utility clerks hired after July 2, 2001, shall be Monday through Sunday. During the life of this Agreement there shall be no change in the basic workweek without first obtaining the approval of the Union. This provision shall not be construed as a guarantee of forty (40) hours of work.

8.2    Employees will be paid time and one-half (1½) at their regular rate of pay for work performed on the sixth (6th) day of any week, regardless of total weekly hours, except in a case where an employee accepts a call-in that results in a sixth (6th) day of work or agrees prior to posting of the schedule to work a six (6) day workweek. Utility clerks who average less than thirty-five (35) hours per week shall not be covered by this provision.

8.3    Employees will be paid time and one-half (1½) their regular straight-time rate of pay for work in excess of forty (40) hours per week.

8.4    Employees will be paid time and one-half (1½) their regular straight-time rate of pay for work in excess of eight (8) hours per day provided, however, that full-time employees scheduled for four ten (10) hour days shall receive time and one-half (1½) for work in excess of ten (10) hours.

8.5    Time and one-half (1½) shall be paid on a daily basis or weekly basis, whichever is the greater, but in no case on both.

8.6    No regular full-time employee (as defined in Section 9.1B hereof shall be scheduled for less than four (4) hours of work on any day of the week. Regular full-time (32 hours or more) employees shall be guaranteed the number of hours of work as indicated on the work schedule for that day, or shall receive pay in lieu of such hours worked, except in cases of emergency due to Acts of God, civil disorder, power failure, strikes or boycotts. No part-time employee (less than 32 hours) shall be scheduled for less than four (4) hours of work on any day of the week. Part-time employees following completion of four (4) hours of work on any day of the week may be relieved from work, without penalty, should insufficient work exist within their seniority group.

Part-time employees will be relieved from duty by inverse seniority, provided that the senior employee is available to work the additional hours, if any, and that the additional hours required will not place the senior employee into an overtime schedule. All regular full-time employees (as defined in Section 9.1B hereof) called into work on an unscheduled day shall receive a minimum of four (4) hours work or four (4) hours pay in lieu thereof. All part-time employees (less than 32 hours) called into work on an unscheduled day shall receive a minimum of four (4) hours work or four (4) hours pay in lieu thereof. No employee shall have their workweek reduced or be required to take time off as a result of this paragraph of the Agreement.

This does not apply to employees who have restricted their availability to less than four (4) hours per day, or to employees whose hours are claimed pursuant to Section 8.13, and the result of such claim leaves the employee with less than four (4) hours per day. In which case, the employee whose hours were claimed will work whatever hours remain after the claim.

8.7    a)    Except as provided by Section 8.7 b) and Section 8.7 c), all work performed by employees on Sundays and holidays shall be considered as premium work, and such work shall be paid at the rate of time and one-half (1½) the employee's regular rate of hourly pay. Except as provided by Section 8.1, Sunday work shall not be considered as part of the basic workweek for employees or counted toward the average of thirty-two (32) hours or more required for progression to full-time wages. Sunday and holiday work shall be scheduled by the Employer and shall be rotated by seniority among all employees who volunteer for Sunday work. Should an insufficient number of employees volunteer, the Employer shall have the right to schedule from the least senior employee in inverse order. Employees scheduled to work on Sunday or holidays shall have the right to the schedule with the greatest number of hours scheduled for the day in question by seniority.

Within the third week of the month the Employer shall post a notice next to the weekly work schedule requesting volunteers for Sunday work and holidays, if any, during the following month. Once posted and scheduled an employee who fails to meet their commitment will forfeit their right to rotation for the month. Employees requesting Sunday or holiday work shall have the right of the greatest number of hours scheduled for the day in question by seniority.

b)      All employees working at least eighteen (18) hours a week and excluding utility clerks shall be paid a premium of Two Dollars ($2.00) per hour in addition to their regular hourly rate of pay for all hours worked on Sunday.

Utility clerks working at least eighteen (18) hours a week shall be paid a premium of One Dollar ($1.00) per hour in addition to their hourly rate for all hours worked on Sunday.

Employees hired prior to July 2, 2001, shall be paid Sunday premium of time and one-half upon the completion of three (3) years of service. Further, the above eighteen (18) hour requirements shall not be applicable to employees hired prior to July 2, 2001, unless such an employee reduces her/his hours below eighteen (18) after July 2, 2001.

8.8      The Employer shall post in ink or other permanent means in each store the current work schedule for all employees working in the store. The schedule shall be posted by no later than Thursday, 4:00 p.m. of the week preceding the scheduled workweek. The schedule shall list the names of the employees in accordance with seniority and classification. All hours for the week shall be posted on the schedule.

All regular full-time employees (as defined in Section 9.1B hereof) shall have the right in regularly available in the store for their Job classification. The employee shall notify the store manager of their preference in writing. Once so notified, the employee shall be regularly scheduled for the preferred day off. Where Saturday is a scheduled day off, the day shall be rotated among all thirty-two (32) hour employees and scheduled off in lieu of their regular day off. Work schedules shall be maintained in the store for a three (3) month period of time and shall be made available to an authorized representative of the Union for examination upon request. No employee who is called into work out of the posted work schedule shall be required to take compensatory time off from the posted work schedule. Schedules must be posted in an area that is accessible to all employees.

8.9      Senior regular full-time employees, or employees with five (5) years or more of seniority, will indicate their continuing preference for day shift or night shift within job functions. Day shift is any shift starting after 6:00 a.m. and scheduled to end at 6:00 p.m. or earlier. Night shift is any shift scheduled to end after 6:00 p.m. After such employees have notified the store manager of such continuing preference, such employee will be scheduled by seniority for the available shifts; provided, however, that such employees may be scheduled until 8:00 p.m. one (1) night a week (excluding holidays) on an inverse seniority rotating basis.

8.10      An employee scheduled to work during any week shall receive a minimum of eighteen (18) hours work or eighteen (18) hours pay. This does not apply to employees who have restricted their availability to less than eighteen (18) hours per week, or to employees whose hours are claimed pursuant to Section 8.13, and the result or such claim leaves the employee with less than eighteen (18) hours per week. In which case, the employee whose hours were claimed will work whatever hours remain after the claim.

8.11      Employees shall not be scheduled to work a split shift. A "split shift" is defined as two (2) shifts of more than one (1) hour apart.

8.12    CALL-IN HOURS AND ADDITIONAL HOURS:

a)    "Call-in" hours are defined as replacement hours occasioned by the absence of an employee. The Employer will make a reasonable effort to call in employees in accordance with seniority. Employees will have the right to refuse a call-in. The Employer shall not be obligated to call an employee in accordance with seniority if the replacement hours would result in overtime for the called-in employee.

b)    "Additional" hours are defined as hours added to the posted schedule due to business needs through the call-in of additional employees, or through the assignment of additional hours to employees at work.

c)    In the event additional hours are occasioned by the need for additional employees, the Employer will call in employees in accordance with paragraph a) above.

d)    In the event additional hours are occasioned by the need to assign additional hours to employees at work, such hours shall be offered to employees at work in order of seniority. Failure to obtain sufficient volunteers, the hours shall be assigned in reverse order of seniority.

8.13    Claiming Of Hours: Employees within their seniority group and job classification (Cashier, Stock clerk, Produce clerk, Bakery clerk, Deli clerk, etc.), shall be eligible to claim available hours up to and including eight (8) hours per day, and up to and including forty (40) hours per week in a regular workweek, including any portion of a less senior employee's hours, in accordance with seniority. It is understood and agreed that Sunday and/or holiday hours may not be claimed pursuant to this Section. Hours claimed under the provisions of Section 8.2 of this Agreement on the sixth (6th) day in a workweek, or in excess of thirty-two (32) hours in a holiday week, shall be paid for at straight-time.

However, any clerk who is subject to layoff or whose hours have been reduced as outlined in Section 7.10 of this Agreement, and cannot claim hours within their job classification, may claim the hours of less senior employees in another job classification in an equal or lower seniority grouping. The claiming employee must, however, claim the weekly schedule and work all their hours within the claimed job classification.

An employee's right to claim available hours shall include the right to claim all or any portion of a junior employee's schedule, commencing prior to or upon termination of the senior employee's schedule, or within four (4) hours thereof, so long as the result of the claim permits the junior employee to work a minimum of three (3) unclaimed hours. A claim within such time period shall not be construed as a split shift.

An employee shall not be required to make the same available-hours claim each week. Once an employee has claimed hours, the schedule shall be adjusted consistent with the employee's claim for future weeks. Failure to do so shall be a violation of this Agreement, and the employee shall be entitled to pay for the hours in question.

Employees who regularly worked forty (40) hours under the preceding Agreement shall not have their hours claimed.

Once the work schedule has been posted, pursuant to the provisions of Section 8.8 hereof, employees wishing to claim additional available hours must make their wishes known to the store

manager, or the store manager's designee, within twenty-four (24) hours of such posting or waive their right to claim additional hours for the balance of the work schedule as posted.

Employees hired on or after December 4, 1988, shall be eligible to claim available hours up to a maximum of twenty-eight (28) hours per week only in a regular workweek.

8.14   All employees shall receive an unpaid lunch period during each eight (8) hour shift. The lunch period shall be either one-half (½) hour or one (1) hour by mutual agreement. Employees working six (6) hours or more but less than eight (8) hours per day, who request a lunch period, shall be granted a one-half (½) hour lunch period. In the case of an eight (8) hour shift the lunch break shall be scheduled no later than three (3) hours prior to termination of the shift, and no earlier than three (3) hours after the start of the shift. In the case of a shift less than eight (8) hours, the lunch break shall be scheduled no later than two (2) hours prior to the termination of the shift and no earlier than two (2) hours after the start of the shift.

8.15   Employees shall receive two (2) fifteen (15) minute uninterrupted rest periods, without loss of pay, in any one (1) workday. The rest periods shall be scheduled approximately within one-half hour of the employee's half shifts. Employees working three and one-half (3 ½) hours but less than seven (7) hours shall be entitled to one (1) rest period. Employees shall be compensated at their straight-time hourly rate of pay for rest periods not taken in violation of the rest period provision herein.

8.16   NIGHT CREW EMPLOYEES:

   a)   Night crew employees are defined as forty (40) hour per week employees who work a majority of their scheduled hours after 9:00 p.m. or before 6:00 a.m.

   b)   Night crew employees shall receive forty (.40) cents per hour premium pay, and effective 3/15/98, fifty (.50) cents per hour premium pay, for all hours worked. This premium shall be computed into vacation, holiday and sick pay.

8.17   Night crew work shall be assigned by inverse seniority, or at the employee's request. After twelve (12) months of employment on the night crew a night crew employee may request, in writing, a transfer from the night crew. A copy of such request shall be sent to the Personnel Office of the Employer and to the Union. When openings occur for day jobs within the employee's geographical grouping, night crew employees shall be offered the day Jobs by seniority among themselves, requesting the transfers in writing in accordance with Section 7.13 e).

8.18   With the exception of night crew employees, all employees shall receive forty (.40) cents per hour premium pay, for all hours worked between 12:00 midnight to 7:00 a.m. Effective 3/15/98, all employees shall receive fifty (.50) cents per hour premium pay, for all hours worked between 12:00 midnight to 6:00 a.m.

8.19   Whenever overtime hours also involve premium pay, the overtime rate shall be time and one-half (1½) the regular hourly rate of pay and the premium pay shall be added thereto. Premium pay, based on the job (Key Carrier, Office-Clerical, General Merchandise clerk, Receiver clerks and Night Crew leader), shall be paid in addition to any premium pay based on hours (Sunday hours, night hours). Premium pay based on Sunday hours shall be paid in addition to premium pay based on night hours on Sunday.

8.20    No employee shall be scheduled without at least ten (10) hours rest between shifts or less by mutual agreement.

8.21    Night crew employees scheduled to start work before 6:00 a.m. on the day following Thanksgiving Day, Christmas Day and New Year's Day shall be paid time and one-half (1 ½) for all hours worked within the scheduled shift.


## ARTICLE IX - WAGES

9.1    **WAGE SCHEDULE  (See Appendix "A", attached)**

9.2    In addition to Section 9.1, Appendix "A", the following shall receive premium pay of thirty-five (.35¢) cents per hour, in addition to their base rate for all hours worked during the workweek when premium work is actually performed.  Premium pay shall not be pyramided if, during the course of the workweek, the employee works at more than one (1) premium job.

   a)    Night Crew Leader;

   b)    Key Carrier;

   c)    Store-Office Clerical employees, other than Cashier-Bookkeeper (as defined in Section 9.3, paragraph (i) below).

9.3    **DEFINITIONS:**

   a)    An Assistant Manager is defined as one who assists the Manager in the operation of the store.

   b)    A Produce Department Head is defined as one who operates the Produce Department under the direction of the Store Manager.

   c)    A Cashier-Bookkeeper shall be defined for purposes of this Agreement as an employee who is appointed and trained by the Employer to handle the cash and the necessary reports to the General Office, and such other work as is required in supermarkets.

   d)    A Dairy/Frozen Food Department Head is defined as the employee who is responsible for the operation of the Dairy/Frozen Food Departments under the direction of the Store Manager. Such employees will work within the Department and will perform ordering, stock and inventory duties normally performed by a Department Head.

   e)    A Bakery Department Head is defined as the employee who operates the Bakery Department under the direction of the Store Manager.

   f)    A Deli Department head is defined as the employee who operates the Deli Department under the direction of the Store Manager.

   g)    Night Crew Leader:  Each night crew having four (4) or more employees shall have a "lead member" known as the Night Crew Leader, appointed from among the four (4) or more employees.

13

h)    A Key Carrier is an employee who has been assigned the responsibility for opening and closing the store.

i)    Store-Office Clerical employees are defined as all employees who, in addition to the Cashier-Bookkeeper, perform office-clerical work for a majority of their work schedule. Employees not eligible for the premium shall have the right to refuse to work in the office/clerical department.

9.4    There shall be an Assistant Manager, Produce Department Head, Cashier-Bookkeeper and Dairy/Frozen Department Head in all stores. Where the Employer operates a Deli Department, and/or a Bakery Department, there shall be a Department Head for each department except in those operations where a Deli and Bakery are a combined operation, then there shall be only one (1) Department Head.

9.5    Employees who are "over-the-scale" shall be frozen at their current hourly rate of pay until the Contract rate for their job classification equals or exceeds their "over-the-scale" hourly rate of pay.

9.6    **DEFINITIONS OF "SERVICE IN THE INDUSTRY"**

a)    Proven comparable experience not terminating more than one (1) year prior to date of application, and shown on application for employment, shall be the basis for determination of a new employee's rate of pay. Such experience prior to one (1) year before date of application and ending within the one (1) year period must be continuous to be counted. The United Food and Commercial Workers International Union, Union Card, showing experience, will be recognized as initial proof of experience.

b)    Claims for rate adjustment based on previous "service in the industry" must be filed in writing within ninety (90) days from date of employment, otherwise the employee forfeits any claim under this provision, except where such experience is shown on the initial application for employment, in which event said ninety (90) days should not apply.

c)    **Service in the Industry Formula:** In the application of service in the industry, rehired or new employees shall receive experience credit on the following basis:

Employees hired shall receive full credit for each month of service up to a maximum of twelve (12) months.

9.7    Wages shall be paid each week by check to all employees and the Employer shall post on stubs the following information:

Straight-time, overtime and holiday hours paid for, plus the employee's straight-time hourly rate of pay. In lieu of such information on the stubs, the Employer will make available a payroll worksheet containing such information to the Union Representative at the store.

9.8    The Employer has the right to assign a classified employee the responsibilities of a Store Manager or Co-manager. The employee has the right to refuse such assignment.

9.9    Whenever an employee is assigned to and assumes the responsibilities of a duly-appointed Department Head for five (5) working days or more they shall receive the appropriate Contract rate for such time worked, or their regular rate of pay, whichever is greater.

14

9.10    In the event the Employer creates a new job classification which involves new job duties, responsibilities or skills, the Employer agrees to negotiate with the Union the rate of pay for the new job or classification.

9.11    Current employees making over the Contract rate of pay and working thirty-two (32) hours or more per week, who request to be reduced to part-time employment (working less than thirty-two (32) hours per week), shall have their hourly rate of pay reduced to the then current top rate of Pay Level 11.

### ARTICLE X - HOLIDAYS

10.1    All employees hired on or before March 28, 2006 who have completed their probationary period shall be entitled to the following paid holidays:  New Year's Day; Memorial Day, Independence Day; Labor Day; Thanksgiving Day; and Christmas Day or days legally celebrated in lieu thereof.

All employees hired after March 28, 2006 shall have the following holiday entitlement schedule:

First six (6) months of employment ........................................................................ None

7-12 months of employment ......................................................... Total of two (2) legal holidays;
(Thanksgiving Day & Christmas Day)

13-24 months of employment ....................................................... Total of four (4) legal holidays;
(Independence Day, Labor Day, Thanksgiving Day and Christmas Day)

Over 24 months of employment...................................................... Total of six (6) legal holidays;
(New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day)

10.2    All employees hired on or before July 2, 2001 will be entitled to a birthday holiday after one (1) year of employment. The birthday holiday shall be taken during the week in which the birthday falls. If an employee's birthday falls during a holiday week, the birthday holiday shall be scheduled the following regular workweek.

Employees hired after July 2, 2001, will be entitled to a birthday holiday after two (2) years of employment.

Utility Clerks hired after March 28, 2006 shall not be eligible for a birthday holiday as described herein until they have completed forty-eight (48) months of service.  All other employees hired after March 28, 2006 shall not be eligible for a birthday holiday as described herein until they have completed thirty-six (36) months of service.

10.3    a)    All employees hired on or before March 28, 2006 shall earn and be entitled to Personal/Sick Days as follows:

During the second (2nd) calendar year of employment .......... Two (2) personal/Sick Days;

During the third (3rd) calendar year of employment ............Three (3) Personal/Sick Days:

15

During the fourth (4th) calendar year of employment ........... Four (4) Personal/Sick Days;

During the fifth (5th) calendar year of employment ...............Five (5) Personal/Sick Days;

Thereafter, employees shall be entitled to five (5) Personal/Sick Days as of January 1st of each succeeding year.

Employees hired after July 2, 2001, shall be limited to two (2) Personal/Sick Days on the above schedule.
Employees hired after March 28, 2006 (excluding Utility Clerks) shall earn Personal/Sick Days as follows:

After two (2) years of service...................................................One (1) Personal/Sick Day

After three (3) years of service................................................. Two (2) Personal/Sick Day

Utility Clerks will not earn any Personal/Sick Days

b)    Personal/Sick Days shall be taken on mutually agreeable days, except that they may be used as sick days, for genuine illness, by proper notice prior to the beginning of the shift.

c)    A request for a personal holiday may be denied for business reasons provided, however, that no such request may be denied more than twice.

d)    Effective January 1, 1998, Personal/Sick Days used during the calendar year shall be paid in accordance with the holiday pay schedule as per Section 10.4 below. Personal/sick days must be taken within the calendar year they were earned and will not carry over from year to year. Earned unused personal/sick days shall be paid to the employee upon layoff, extended leave of absence or who quits with one week's notice which may be worked absent mutual agreement.

Utility clerks who average less than thirty-five (35) hours per week shall not be entitled to receive a birthday holiday or personal holidays, as otherwise provided in this Article X.

10.4    Holiday pay shall be determined by the number of hours which an eligible employee averages during the normal workweek as follows:

| Average Hours Per Week | Holiday Pay in Hours |
|---|---|
| Less than 26 hours ................................................................ | 4 hours at regular rate of pay |
| 26 to 32 hours.................................................................... | 6 hours at regular rate of pay |
| 32 hours or more ................................................................ | 8 hours at regular rate of pay |

The average number of hours per workweek, for the purpose of this Article, shall be computed in accordance with vacation pay computation, Section 11.2.

10.5    During the week in which a holiday occurs, other than personal holidays, employees shall receive time and one-half (1½) their regular rate of pay after thirty-two (32) hours work.

16

By mutual agreement between the employee and the Employer, clerks may be scheduled in excess of thirty-two (32) hours in a week in which a holiday falls, in which case the time and one-half (1½) provision of this paragraph shall not apply. Any such agreement must be in writing.

10.6    Employees hired on or before March 28, 2006 (excluding Utility clerks) who work on legal holidays, as specified in Section 10.1 of this Article, shall receive time and one-half (1 ½) for all hours worked on the holiday, in addition to their holiday pay. Full-time (40 hour employees) working on a holiday shall be scheduled for their regular basic workweek of four (4) days, in addition to the holiday worked.

All employees hired after March 28, 2006 (excluding Utility clerks) shall receive the following hourly premium pay for Holiday work:

0-12 months..................................................................................................... $1.25 per hour
13-24 months.................................................................................................. $2.00 per hour
Thereafter ...................................................................................................Time and one-half (1½)

Utility clerks hired on or before March 28, 2006 shall be paid a premium of $1.00 per hour in addition to their regular hourly rate for all hours worked on holidays. Upon completion of one (1) year of service, utility clerks shall be paid at the rate of time and one-half (1½) for all hours worked on holidays.

Utility Clerks hired after March 28, 2006 shall be paid Holiday premium as follows:

0-6 months............................................................................................regular to straight time pay
7-18 months..................................................................................................... $1.00 per hour
19-30 months...................................................................................................$1.50
Thereafter .....................................................................................................Time and one-half (1½)

10.7    In order to be entitled to unworked holiday pay, as set forth in this Article, employees must work their scheduled day before the holiday, the holiday (if scheduled), and their scheduled day after the holiday, unless the absence is excused by the Employer or the employee presents a valid doctor's statement confirming the employee's illness.

10.8    Where a majority of an employee's total weekly hours worked during the holiday week are at a premium paid job classification, the employee's holiday pay will include premium pay.

10.9    No employee shall be required to work after 5:00 p.m. on Christmas Eve or after 5:00 p.m. on New Year's Eve and New Year's Day. No employee shall be required to work on Christmas Day. Only volunteers shall work after 5:00 p.m. on Christmas Eve or 5:00 p.m. on New Year's Eve and New Year's Day and only volunteers on Christmas Day. If an insufficient number of employees volunteer to work on Christmas Eve, New Year's Eve and New Year's Day, then the Employer will schedule the required employees on the basis of reverse seniority.

## ARTICLE XI - VACATION

11.1    All employees shall be eligible to receive a paid vacation as of the anniversary date of their continuous employment with the Employer on the following basis:

One (1) week after one (1) year of continuous employment
*Two (2) weeks after three (3) years of continuous employment
Three (3) weeks after eight (8) years of continuous employment
Four (4) weeks after fifteen (15) years of continuous employment

(*note - employees hired prior to July 2, 2001, continue to qualify for two (2) weeks of vacation after two (2) years of continuous employment).

Employees who were entitled to receive five weeks vacation pursuant to the modification in the 1985 - 1988 contract shall continue to be so eligible.

Employees hired after March 28, 2006 shall qualify for vacation benefits based on the current contract formula, but not to exceed three (3) weeks of vacation.

11.2    Vacation pay shall be paid at the Contract rate in effect at the time of the vacation and shall be based on the total number of hours worked for the twelve (12) month period preceding the anniversary date, divided by fifty-two (52). Employees working scheduled overtime hours and/or premium pay jobs as part of the normal weekly schedule shall receive vacation pay computed on the basis of such overtime and/or premium pay. "Normal weekly schedule" shall be defined as fifty percent (50%) or more of time worked in a premium job classification or as regularly scheduled overtime. Employees regularly scheduled forty (40) hours per week shall be paid their vacation based on forty (40) hours per week.

11.3    Medical leaves of seventeen (17) weeks or less shall be counted as time worked for the purpose of computing vacation benefits. For medical leaves in excess of seventeen (17) weeks, the divisor in Section 11.2 shall be reduced to thirty-five (35).

11.4    An employee who has qualified for his or her first vacation and is subsequently laid off, discharged or quits (except discharge for dishonesty), shall receive a pro-rata vacation for each full month of service completed since his/her last anniversary date of employment.

11.5    If a holiday occurs during an employee's vacation, they shall be paid an additional day's pay or receive an extra day off in addition to the vacation pay.

11.6    Vacations shall be scheduled on a Departmental seniority basis and may be taken any time during the year. No employee shall be compelled to take a vacation at a time not mutually agreed upon. An employee with three (3) weeks or less vacation shall not be required to split their vacation time.

11.7    Any person who enters military service shall be paid their pro-rata vacation pay for that which they have earned up to the time of their entering military service.

Any veteran returning to work after military service shall receive their pro-rata vacation pay for time worked during the time from their return to the anniversary date of their original hiring date.

Vacation allowed shall be in compliance with the terms of the existing Agreement.

18

11.8    An employee with more than six (6) months of service but less than one (1) year of service shall be allowed to receive up to one (1) week's unpaid vacation leave during their first year of employment, provided that a replacement employee is available.

11.9    Employees shall request vacation weeks for the calendar year prior to April 1st of each year. Vacation schedules shall be posted in all stores by April 1st of each year. Once posted, employees requesting vacation weeks may not bump less senior employees already posted.

## ARTICLE XII - JURY SERVICE/FUNERAL PAY/MILITARY RESERVE

12.1    Jury Service: All employees who are subpoenaed for jury service and actually report shall receive the difference in pay for the time lost and the amount received as jury pay, but in no case shall the total pay exceed forty (40) hours pay at the employee's regular straight-time rate of pay. Jury pay shall be limited to a maximum of thirty (30) days pay per calendar year.

The employee shall notify the Store Manager that they have been subpoenaed for jury service on the employee's first workday following receipt of such subpoena. When an employee is released for a day or a part of a day they shall report to their store for work.

Any employee who reports for jury service for five (5) days, Monday through Friday, shall not be scheduled to work on Saturday during that week. If, however, an employee volunteers to work on Saturday at the request of the Employer, the employee shall receive the appropriate hourly rate of pay for said days, which pay shall not be set off against or deducted from the forty (40) hours jury pay; provided further, that hours worked on Saturday shall not be considered as hours in excess of forty (40) hours for overtime purposes.

12.2    Funeral Pay: The Employer agrees to pay all employees (excluding Utility clerks) for necessary absence on account of death in the immediate family up to and including a maximum of three (3) scheduled workdays at straight-time, provided the employee attends the funeral. The term "immediate family" shall mean: spouse, parents, stepparents, child, stepchildren, grandchildren, brother or sister.

Utility clerks with one (1) year or more of service shall receive up to and including a maximum of three (3) scheduled workdays at straight-time for necessary absence on account of death in the immediate family. The term "immediate family" shall mean; spouse, parents, child, brother or sister.

The Employer agrees to pay all employees (excluding Utility clerks) for the necessary absence on account of death of their father-in-law, mother-in-law, grandparents, great-grandparents, grandparents-in-law, or any relative residing with the employee or with whom the employee is residing, a maximum of one (1) scheduled workday at straight-time provided the employee attends the funeral.

Utility clerks shall receive one (1) day at straight time for funeral leave to attend the funeral occurring on their scheduled workday for all of the above relations.

12.3    Military Reserve: Any employee who serves in the National Guard or Military Reserve Units which require annual training shall be granted the necessary leave, without pay, to fulfill the annual training requirements of the Unit in which they serve. Such employees shall give the

19

Employer two (2) weeks prior notice. An employee shall not be required to take military training duties as their earned vacation.

The Employer will comply with the applicable laws of the United States concerning the reemployment of persons leaving the military service of the United States.

## ARTICLE XIII - LEAVE OF ABSENCE

13.1    All employees after three (3) months employment shall be granted a leave of absence not exceeding one (1) year for injury or certified illness, including pregnancy, provided that the disability continues during that period. Leaves of absence in excess of one (1) year may be granted by the Employer provided, however, that the employee shall not accumulate seniority in excess of one (1) year. All employees after three (3) months of service may be granted a personal leave of absence not exceeding thirty (30) days, upon the Employer's permission, without loss of seniority.

13.2    Family Leave: Employees with one (1) or more years of continuous service may request a personal leave of absence, not to exceed ninety (90) days, in connection with the birth or adoption of a child, or for a catastrophic or terminal illness of a family member requiring full time care.

The employee shall make the request as soon as possible, but at least ten (10) days before the proposed effective date, except in the case of an emergency. A "family member" is limited to an employee's legal spouse, mother, father, son or daughter (including stepfather, stepmother or stepchildren, when they, immediately prior to the illness, have lived with the employee in a family relationship). Such leave shall not be unreasonably denied.

The employee shall provide documentation satisfactory to the Employer of the existence and nature of the illness, and the need for such leave. Such leave of absence shall not constitute a break in the employee's length of continuous service, except for wage progression purposes.

Employers who are covered under the "Family and Medical Leave Act" shall continue contributions to the Health and Welfare Fund on behalf of eligible employees with one (1) or more years of continuous service, and who have worked at least 1250 hours during the preceding year. Contributions during such leaves will be for a maximum of twelve (12) weeks in a twelve (12) month period.

The Employer shall not be required to continue Health and Welfare contributions on behalf of employees who do not qualify, as provided above.

Employees shall be required to use any unused sick or personal time but not vacation time before beginning such leave of absence.

13.3    All leaves of absence must be in writing by the employee to the Store Owner, and the Store Owner will send a written approval or disapproval to the employee.

13.4    Any employee who is granted a leave of absence and while on such leave of absence accepts employment with another employer, or who goes into business for themselves, is subject to discharge.

13.5    Upon return to work from a leave of absence the employee shall be restored to the job previously held, or to a comparable job with regard to work and rate of pay. Time spent on a leave of absence in excess of thirty (30) days shall not count toward wage progression. Upon notice to the Store Owner of availability for work by no later than noon Wednesday, the employee shall be restored to the work schedule for the following week. If notice is given after noon on Wednesday, the employee shall be restored to the work schedule for the second week following notice.

13.6    Employees returning to work from a leave of absence due to sickness, accident or pregnancy, may be required by the Employer to pass a physical examination before returning to work. Such physical examination shall be at the expense of the Employer.

13.7    Employees injured on the job and unable to work as certified by the Employer's physician, shall receive their regular hourly rate of pay, as scheduled, up to three (3) calendar days. The Employer shall maintain accident report forms in the store office.


## ARTICLE XIV - DISCHARGE OR SUSPENSION

No employee shall be discharged or suspended without just cause.


## ARTICLE XV - GRIEVANCE AND ARBITRATION

15.1    The properly accredited officers or representatives of both parties to the Agreement shall be authorized to settle any dispute, disagreement, difference or grievance arising out of the terms, application or interpretation of this Agreement.

15.2    The Union shall submit all grievances in writing within the following time limitations:

a)    Grievances involving discharge or suspension shall be submitted within ten (10) days from the date the Union receives notification of the discharge or suspension.

b)    Grievances involving vacation pay shall be submitted within fifteen (15) days following the termination of the vacation.

c)    Grievances involving hourly wage rates, wage brackets or premium pay shall be submitted in writing within fifteen (15) days from the date of the last occurrence of the grievance. The Employer's liability for such grievance shall not, under any circumstances, exceed one hundred twenty (120) days from the date of the filing of the grievance.

d)    All other grievances shall be submitted in writing within fifteen (15) days of the date of the occurrence of the grievance.

Grievances not filed within the time limits set forth above shall be nullified and of no force and effect.

15.3    Representatives of the parties shall attempt to resolve all grievances as promptly as possible. For this purpose, either party may call a grievance meeting. The Employer shall reply in writing to the Union's written grievance within fifteen (15) days following receipt of the written grievance.

Should the Union wish to pursue the grievance they will respond in writing to the Employer's written answer within fifteen (15) days after receipt of the Employer's answer.

15.4 When in the judgment of either party arbitration is necessary, either party may initiate same by notifying the other party in writing that they have invoked the arbitration provisions of the Contract and that they have requested the Federal Mediation and Conciliation Service to submit a panel of arbitrators to the parties. In no event shall arbitration be initiated earlier than seven (7) days following the mailing of the written grievance. The parties shall promptly proceed to select an arbitrator from the panel and proceed to arbitrate the grievance all in accordance with the rules of the Federal Mediation and Conciliation Service. The decision of the arbitrator shall be final and binding on the parties.

Either party shall have the right to reject a panel and request a second panel. The rejecting party shall pay all fees related to the second panel request.

The arbitrator will issue his decision within sixty (60) calendar days after the close of the proceeding or his receipt of both parties' post-hearing briefs, whichever is the later.

15.5 Expenses incurred in connection with the arbitration, to wit; fees of the Federal Mediation and Conciliation Service, the arbitrator's fees and expenses and rental of a hearing room, if necessary, shall be shared equally by the parties.

15.6 The failure of the Union to protest any constructive action notice or other written warning issued an employee shall not be deemed as an admission on the part of the Union or the employee as to the truth of the content of such written notice, or the propriety of its issuance.

15.7 Except as otherwise specifically set forth in this Agreement, it is agreed between the parties hereto that there shall be no strikes, cessation of work, picketing, boycotts or lockouts pending the final decision of any dispute submitted to arbitration in accordance with the provisions of this Agreement.

15.8 It shall not be a violation of this Agreement for any employee to refuse to cross a legal, primary labor picket line which has been authorized by the United Food and Commercial Workers International Union. The Employer shall be notified in writing when any picket line has been sanctioned by the Union.

## ARTICLE XVI - UNION ACCESS TO STORES

The Employer agrees to permit an authorized representative or officer of the Union to have access to the stores at all hours when said stores are open for business for the sole purpose of communicating with the employees employed therein, but such representative or officers shall not interfere with the duties of said employees or the business of the Employer.

## ARTICLE XVII - NEW STORE OPENING/STORE CLOSING

17.1 New Store Opening: In the event the Employer opens a new store, the new store will be staffed by employees in accordance with the following procedures:

a)   The Employer will post in each of the Employer's stores notice of the new store opening at least four (4) weeks prior to the store opening date. The notice shall remain posted for at least ten (10) days, including the date of posting, and give a brief description of each position to be filled and the number of anticipated forty (40) hour and less than forty (40) hour jobs for each position. Further, the posted notice shall advise the employees that they may bid on the positions at the new store by signing the notice for the posted positions.

b)   All non-classified positions will be filled in accordance with the seniority of the bidding employees. All positions not filled shall be offered to employees on layoff status in accordance with seniority.

c)   The Employer will not hire new employees for the new store until the above procedures have been complied with.

d)   Employees transferred from existing stores to a new store that is opened shall, if subject to layoff within a period of ninety (90) days after the store is opened, have the right to return to the store from which transferred and assume the job that their seniority warrants.

17.2   Store Closings: In the event the Employer closes or sells a store and employees are terminated as a result thereof, pay equal to one (1) week's pay for each year of continuous service, commencing with the third year for employees who regularly worked forty (40) hours per week, and the fifth year for employees who regularly worked less than forty (40) hours per week, up to but not to exceed eight (8) weeks pay at their regular rate. However, those employees who have an incomplete year of continuous service as an employee will receive pro-rata severance pay for that year as follows:

0-3 months equals.......................................................... twenty-five percent (25%) of a week's pay;

3-6 months equals.......................................................... fifty percent (50%) of a week's pay;

6-9 months equals.......................................................... seventy-five percent (75%) of a week's pay;

Over 9 months equals.......................................................... one (1) week's pay.

Severance pay shall be computed as vacation pay in Section 11.2 of this Agreement.

17.3   If a store is sold and the successor employer offers employment to an employee who is otherwise eligible for severance pay under the terms of this Article, and the new job is comparable, then the employee shall have the option of accepting the job or the severance pay.

17.4   In the event of a store closing, employees who are offered comparable jobs within the agreed upon geographical grouping area shall not be entitled to severance pay. Employees who are laid off or are not offered comparable jobs within the geographical grouping area shall be entitled to severance pay, as set forth above. In the event the store is sold, the store closing date shall be the last date the Employer operates the store.

17.5   An employee who is displaced by the transfer of an employee from a closed or sold store shall, if otherwise eligible, be entitled to severance pay benefits applicable to eligible employees at the closed store.

17.6    The Employer shall continue contributions to the Health and Welfare Trust Fund for three (3) months following termination for those employees who receive severance pay, except those employees who secure employment with a contributing employer in the Health and Welfare Trust Fund.

17.7    Employees who are eligible for severance pay shall also be entitled to holiday pay for holidays that fall within thirty (30) days after termination.

17.8    Severance pay shall be due and payable two (2) weeks prior to the store closing date. All other monies due employees shall be paid in a lump sum upon termination or layoff.

17.9    An employee who is terminated or laid off and who is eligible for severance pay, and accepts severance pay, shall not retain seniority or recall rights.

17.10    The Employer agrees to give the employees and the Union thirty (30) days notice in advance of a store closing or sale.

17.11    Employees who are eligible for severance pay and accept a transfer to a lower rated job will maintain their present rate or the rate of the Contract covering the area to which they are transferred, whichever is greater.

17.12    Letters of recommendation will be given to all laid off employees at the time of layoff.

17.13    The Employer agrees to recall any laid off employees in any new locations opened under the jurisdiction of the Local Union covered by this Agreement.

17.14    Utility clerks who average less than thirty-five (35) hours per week shall not be entitled to severance pay.

17.15    Payment of unused Personal/Sick Days (Article X, Section 10.3) will be paid to employees laid off resulting from store closings.

17.16    Vacation and holiday pay shall be based on the highest rate paid to an employee during the one (1) year period to the employee receiving said vacation and holiday pay.


### ARTICLE XVIII - GENERAL

18.1    The Union Store Card must be displayed in all places where members of the Union are employed. The Store Card shall not be removed in case of a dispute, unless the dispute is taken up with proper officials of the Employer first.

18.2    The Union shall use its best effort as a labor organization to enhance the interests of the Employer as an employer of Union labor.

18.3    Members of the Union may wear their Union buttons when on duty.

18.4    The Employer shall provide a bulletin board on which the Union may post notices.

18.5    Any uniform deemed necessary by the Employer for its employees shall be furnished and laundered at the expense of the Employer. Where the Employer desires to furnish Dacron or

similar type of uniforms to female employees and the female employees in such store are unanimously in favor of such uniforms, such uniforms shall be laundered by the employee and shall be returned to the Employer upon termination of employment, if so requested.

18.6    The Employer agrees to provide a suitable rest area in the store.

18.7    Where time clocks are not provided, the Employer shall institute adequate payroll procedures to ensure that all hours worked are properly recorded.

18.8    Except where otherwise mutually agreed, no employee covered by this Agreement shall be required by any representative of the Employer to be subject of a lie detector test for any reason whatsoever.

18.9    The Employer shall provide a first aid kit containing bandages.

18.10   If a physical examination or health permit is required by the Employer, the medical fee for such examination shall be borne by the Employer.

18.11   Any time spent away from the store on the legal business of the Employer, either at the request of the Employer or pursuant to a legal subpoena, shall be compensated by the Employer at the employee's regular rate of pay.  Such hours shall not be considered as time worked in the computation of daily or weekly overtime unless it is part of the regularly scheduled workweek.

18.12   For store meetings, minimum call-in compensation shall be one (1) hour's pay or pay for actual time spent at the meeting, whichever is greater. There shall be no more than one (1) meeting per calendar quarter which requires employee attendance. There shall be a ten (10) day prior posting of notices of all meetings which require employee attendance.


## ARTICLE XIX - TECHNOLOGICAL CHANGE

19.1    The parties recognize that automated equipment and technology is now available for the retail food industry. The Employer recognizes that there is a desire to protect and preserve work opportunities. At the same time, the Union recognizes that the Employer has a right to avail itself of modern technology. With this common objective, the parties agree as follows:

In the event the Employer introduces major technological changes which, for the purpose of this Article are defined as price marking and electronic scanners, which would have a direct material impact affecting bargaining unit work, sixty (60) days advance notice of such change will be given to the Union.

In addition, the Employer agrees:

a)      Any retraining necessary will be furnished by the Employer at no expense to the employees;

b)      Where retraining is not applicable, the Employer will make every effort to effect a transfer to another store;

c)      In the event an employee is not retrained or transferred and is permanently displaced as a direct result of major technological changes, as defined above, the employee will be eligible for severance pay in accordance with the following provisions:

25

1.  All employees with two (2) or more years of continuous service will be eligible for one (1) week's severance pay for each year of continuous service. Maximum severance pay for all employees shall not exceed eight (8) week's pay.

2.  An employee shall be disqualified for severance pay in the event the employee:

    a) Refuses training;

    b) Refuses a transfer within a geographical grouping; or

    c) Voluntarily terminates employment.

19.2    Utility clerks who average less than thirty-five (35) hours per week shall not be covered under the provisions of this Article.

## ARTICLE XX - HEALTH AND WELFARE

20.1    The Employer shall contribute by no later than the tenth (10th) day of each month into the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund on all straight-time hours for eligible employees excluding Service Clerks covered by this Agreement. The contribution shall also be made on hours for which employees receive holiday pay, personal days, sick days, funeral days, jury service, and vacation pay, and hours worked on Sunday, except that no contribution shall be made on hours in excess of eight (8) per day or forty (40) per week.

For all employees, excluding Utility Clerks, hired on or after March 9, 1998, Health and Welfare contributions shall commence on the first Sunday following completion of six (6) months of continuous service after completion of the probation period.

For Utility Clerks hired on or after March 9, 1998, Health and Welfare contributions shall commence on the first (1st) Sunday following completion of twelve (12) months of continuous service after completion of the probation period.

New eligibility rules for employees hired after July 2, 2001 and before March 28, 2006 are as follows (does not affect above eligibility rules for employees hired prior to July 2, 2001):

For full-time employees, excluding full-time utility clerks, hired or promoted on or after July 2, 2001, contributions shall commence on the first Sunday following completion of ninety (90) days of continuous service.

For all other employees, hired or promoted on or after July 2, 2001 or before March 28, 2006, contributions shall commence on the first Sunday following; 1.) completion of twelve (12) months of continuous service, and; 2.) attaining the age of nineteen (19).

Employees, except Utility Clerks, hired on or after March 28, 2006 shall become eligible for Employer contributions to the Fund for Plan B benefits the Sunday after fifteen (15) months service from their date of hire. Utility Clerks hired on or after March 28, 2006 shall become eligible for Employer contributions to the Fund for Plan B benefits; 1.) the Sunday after eighteen (18) months service from their date of hire, and; 2.) attaining the age of nineteen (19).

Contribution rates for employees hired prior to March 28, 2006 who are or become eligible for Plan A contributions to the Fund shall be as follows:

Effective (the first Sunday following March 28, 2006) ............ $3.63 per eligible contribution hour
Effective October 1, 2006 ...................................................... $3.99 per eligible contribution hour
Effective October 1, 2007 ...................................................... $4.39 per eligible contribution hour

Effective October 1, 2008, the Company's contributions shall be determined by the Trustees to fund the affected benefit level established by the Trustees in accordance with the Trustee's Policy Statement or to the rate at which the Employer contributing on behalf of the majority of participants in the D-O5 Hourly or Part-Time Monthly Plan is contributing, whichever is less.

Contribution rates for employees hired on or after March 28, 2006 who become eligible for Plan B contributions to the Fund shall be seventy-five percent (75%) of the Plan A contribution rates specified above from the date an employee becomes eligible for contributions as set forth above until the conclusion of sixty (60) months of service from the employee's date of hire, after which employees shall become eligible for Plan A contributions and for Plan A benefits, subject to the eligibility requirements of the Fund.

Effective (approximately 2 months after March 28, 2006, all employees who are eligible for benefits from the Fund, or who become eligible for benefits from the Fund, shall make Employee Contributions to a Section 125 Plan ("the Plan") established by the Employer in order to become and remain eligible for benefit coverage from the Fund. The contributions received by the Plan shall be remitted to the Employer to offset the Employer Contributions set forth in Section 20.1 above as follows:

Single Coverage ................................................................................................... $5.00 per week
Dependent Coverage ........................................................................................... $15.00 per week

An employee who fails to elect single or dependent coverage and to pay the above Employee Contributions in accordance with the rules of the Fund shall not receive benefits from the Fund.

The Employer Contributions required to be made by this Section 20.1 shall be made for all employees who are eligible for contributions to the Fund under the terms of this Section 20.1, regardless of whether an employee pays the Employee Contribution specified in Section 20.1 above and receives benefits from the Fund, or does not make the Employee Contribution so specified and does not receive benefits from the Fund.

20.2   The Trust Fund shall be jointly administered by a Board of Trustees, with an equal number of Trustees representing the Union and an equal number of Trustees representing the Employers.

20.3   When an eligible employee covered by the Health and Welfare Plan changes employment from one participating employer to another participating employer within a thirty-one (31) day period the new Employer shall immediately pay the same contribution rate previously paid on behalf of said employee. Thereafter, eligibility and rate of contribution shall be determined in accordance with all provisions of this Article.

20.4   The Employer shall contribute to the Health and Welfare Fund for all employees who are off work due to injury on the job for a period of one (1) month following the month in which the injury occurred. The contribution shall be based on the employee's previous month's hours.

## ARTICLE XXI - PENSION

21.1     Except as provided in this Section, the Employer agrees to continue to make a contribution of fifty-seven cents ($.57) per hour, by the tenth (10th) day of the month, on all straight-time hours worked by employees covered by this Agreement. Contributions shall be made effective the first of the month following one (1) year of employment and shall be made to the United Food & Commercial Workers Unions and Employers Midwest Pension Fund. The contribution shall be made on hours for which employees receive holiday and vacation pay, and hours worked on Sunday, except that no contributions shall be made on hours in excess of eight (8) per day or forty (40) per week. Pension contributions shall also be made on personal days, funeral days, jury service, and wellness days.

All employees shall be eligible for Pension contributions on the above basis effective the first Sunday following (1) the completion of one (1) year of continuous employment and (2) attaining the age of twenty (20).

Employees in positions other than utility clerk on July 2, 2001, shall not be required to attain the age of twenty (20). Pension contributions for utility clerks will be initiated following ratification for utility clerks (1) completing one (1) year of continuous employment and (2) attaining the age of twenty (20).

The foregoing fifty-seven cents ($.57) per hour contribution rate shall be increased as follows for employees hired prior to March 28, 2006.

Effective December 1, 2006, the contribution rate shall be sixty-seven cents ($.67) per hour for each eligible hour.

Effective December 1, 2007, the contribution rate shall be seventy-two cents ($.72) per hour for each eligible hour.

Eligibilities for contributions and contribution rates for employees hired on or after March 28, 2006, except Utility Clerks, shall be as follows:

From date of hire through (twelve) (12) months of continuous service - no contributions.

Thirteen (13) months through thirty-six (36) months of continuous service - thirty-two cents ($.32) per hour for each eligible hour.

Thirty-seven (37) months through sixty (60) months of continuous service - forty-seven cents ($.47) per hour for each eligible hour.

After sixty (60) months of continuous service - fifty-seven cents ($.57) per hour for each eligible hour.

The contribution rate for Utility Clerks hired on or after March 28, 2006 shall be thirty-two cents ($.32) per hour for each eligible hour beginning after; 1.) twelve (12) months of continuous service, and; 2.) attaining the age of twenty (20).

21.2     Contributions shall be made to a jointly administered Pension Trust Fund, to be trusteed and administered in accordance with existing law and in accordance with the Pension Plan and Trust

Agreement existing between the parties. Said contributions shall be for the sole purpose of providing pension for eligible employees, as defined in such Pension Plan.

## LETTER OF UNDERSTANDING

For those employees hired prior to March 30, 1993, the following eligibility requirements shall govern:

> "Eligible employee" shall be defined as any employee who has completed four (4) weeks of employment with the Employer. Contributions shall commence with the beginning of the fifth (5th) week of employment.

> Effective the first Sunday following completion of one (1) year of continuous service, Pension contributions will be made for all hours worked by Utility clerks on the above basis.

All employees hired after December 4, 1988 (excluding Utility clerks), shall be eligible for Pension contributions on the above basis effective the first Sunday following completion of one (1) year of continuous service, or the attainment of age twenty-one (21), whichever is earlier.

## ARTICLE XXII - COLLECTION OF DELINQUENT CONTRIBUTIONS

22.1    Any Employer who is sixty (60) days delinquent in the payment of any or all of the contributions required of it by the above Articles XX and XXI shall pay, as liquidated damages, the sum of Twenty Dollars ($20.00) or ten percent (10%) of the amount delinquent, whichever is greater. Such damages shall be computed monthly and on a separate basis for the Health and Welfare Fund and the Pension Fund. The amount of liquidated damages shall be added to the cumulative total of delinquent contributions and shall be included in the computation of damages.

22.2    In addition to the foregoing, an Employer delinquent sixty (60) days or more shall be liable for the payment of any benefits paid or otherwise payable to an employee or their dependents from the Health and Welfare Trust Fund, as a result of any claim incurred during the period of delinquency. Said liability shall not be waived by payment of the amount delinquent, including liquidated damages or by payment of the claim by the Health and Welfare Trust Fund.

The above paragraphs shall not be applicable when, in the judgment of the Trustees, the delinquency results from a clerical error or a bona fide difference or dispute concerning eligibility.

The Employer agrees that applicable payroll records shall be made available for audit to employees of the Health and Welfare and/or Pension Fund as directed by action of the Board of Trustees of these Funds.

## ARTICLE XXIII - CONFORMITY TO LAW

Nothing contained in this Agreement is intended to violate any Federal Law, rule or regulation made pursuant thereto, if any part of this Agreement is construed to be in such violation, then that part shall be made null and void and the parties agree that they will, within thirty (30) days, begin negotiations to replace such void part with a valid provision.

## ARTICLE XXIV - TERM OF AGREEMENT

24.1    This Agreement shall be effective from January 2, 2006, through March 28, 2009, at which time it shall automatically renew itself from year to year provided, however, that either party may give to the other party not less than sixty (60) days notice in writing, prior to the expiration date or to annual renewal date, of its intention to change or terminate said Contract.

24.2    By the execution of this Collective Bargaining Agreement the Employer does hereby adopt, ratify and become a party to the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund Agreement and Declaration of Trust, and the United Food and Commercial Workers Unions and Employers Midwest Pension Fund Agreement and Declaration of Trust, and said Agreements and Declarations of Trust are hereby incorporated herein and made a part hereof. Further, the Employer reaffirms and ratifies all acts of the Trustees performed pursuant to said Agreements and Declarations of Trust.


SIGNED THIS _11_ DAY OF _July_, 20_06_.


DON'S FINEST FOODS, INC.
(GROCERY DEPARTMENT)

UNITED FOOD & COMMERCIAL
WORKERS INTERNATIONAL UNION,
LOCAL 1546


_____
Signature

Kenneth R. Boyd, President
International Vice President

_____
John Ruffin
Print Name & Title


Contract #032324

31

## WAGE SCHEDULE - APPENDIX "A"

| A. DEPARTMENT HEADS | Current | 01/02/06 | 01/14/07 | 02/02/08 |
|---|---|---|---|---|
| Assistant Manager | $16.00 | $16.20 | $16.40 | $16.55 |
| Produce Manager | $15.80 | $16.00 | $16.20 | $16.35 |
| Head Cashier | $15.00 | $15.20 | $15.40 | $15.55 |
| Dairy/Frozen | $14.85 | $15.05 | $15.25 | $15.40 |
| Bakery Manager | $13.20 | $13.40 | $13.60 | $13.75 |
| Delicatessen Manager | $13.20 | $13.40 | $13.60 | $13.75 |
| Red Circled | | $.20 | $.20 | $.15 |

| B. REGULAR CLERKS, BAKERY & DELI | | | | | |
|---|---|---|---|---|---|
| Pay Level | Months | Current | 01/02/06 | 01/14/07 | 02/02/08 |
| 1 | 0-6 | $5.95 | $6.50 | $6.50 | $6.50 |
| 2 | 7-12 | $6.45 | $6.55 | $6.55 | $6.55 |
| 3 | 13-18 | $6.95 | $7.05 | $7.05 | $7.05 |
| 4 | 19-24 | $7.45 | $7.55 | $7.55 | $7.55 |
| 5 | 25-30 | $8.00 | $8.10 | $8.10 | $8.10 |
| 6** | 31-36 | $9.15 | $9.30 | $9.30 | $9.30 |
| 7 | 37-42 | $9.70 | $9.80 | $9.80 | $9.80 |
| 8* | 43-48 | $10.85 | $11.00 | $11.00 | $11.00 |
| 9 | 49-54 | $11.05 | $11.15 | $11.15 | $11.15 |
| 10*** | 55-60 | $11.55 | $11.65 | $11.65 | $11.65 |
| 11 | Over 60 | $12.50 | $12.65 | $12.65 | $12.65 |
| Red Circled | | | $.15 | $.15 | $.15 |

*      Part-time CAP for employees hired before 4/26/96.
**    Part-time CAP for employees hired after 4/26/96.
***   Full-Time cap for employees hired after March 28, 2006.
      All employees who are capped, will receive the Red Circle, increase On 01/14/07, and again on 02/02/08.

| C. GENERAL MERCHANDISE, FLORAL, SALAD/BULK & SCALE CLERKS | | | | | |
|---|---|---|---|---|---|
| Pay Level | Months | Current | 01/02/06 | 01/14/07 | 02/02/08 |
| 1 | 0-6 | $5.95 | $6.50 | $6.50 | $6.50 |
| 2 | 7-12 | $6.45 | $6.55 | $6.55 | $6.55 |
| 3 | 13-18 | $6.95 | $7.05 | $7.05 | $7.05 |
| 4 | 19-24 | $7.45 | $7.55 | $7.55 | $7.55 |
| 5 | 25-30 | $8.00 | $8.10 | $8.10 | $8.10 |
| 6** | 31-36 | $9.15 | $9.30 | $9.30 | $9.30 |
| 7* | 37-42 | $10.60 | $10.75 | $10.75 | $10.75 |
| 8 | 43-48 | $10.65 | $10.80 | $10.80 | $10.80 |
| 9 | 49-54 | $11.55 | $11.70 | $11.70 | $11.70 |
| Red Circled | | | $.15 | $.15 | $.10 |

| * | Part-time CAP for employees hired before 4/26/96. |
| ** | Part-time CAP for employees hired after 4/26/96. |
| *** | Full-Time cap for employees hired after 03/28/06. |

All employees who are capped, will receive the Red Circle increase on 01/14/07 and again on 02/02/08.

| D. UTILITY CLERKS | | | | |
|---|---|---|---|---|
| Months | Current | 01/02/06 | 01/14/07 | 02/02/08 |
| 0-6 | $6.00 | $6.50 | $6.50 | $6.60 |
| 7-12 | $6.30 | $6.60 | $6.60 | $6.70 |
| Over 12 | $6.55 | $6.65 | $6.75 | $6.85 |
| Red Circled | | $.10 | $.10 | $.15 |

| CLERKS AND UC'S UNDER AGE 18 YEARS OF AGE | | | |
|---|---|---|---|
| Months | 01/02/06 | 01/14/07 | 02/02/08 |
| 0-6 | $5.50 | $5.50 | $5.60 |
| 7-12 | $5.60 | $5.60 | $5.70 |
| 13-18 | $5.75 | $5.75 | $5.85 |
| 18-24 | $6.00 | $6.00 | $6.10 |

After attaining the age of 18 years old, the employee will be placed on one of the above scales, in accordance with their classification. The employee will then progress in accordance with the time limits of those brackets.

Effective March 28, 2006: For all employees on the schedule (employed) as of March 28, 2006.

All Department heads, except Utility Clerks, who are at the capped rate of pay or above, or who are frozen, and that have been working for 48 months or more shall receive a one (1) time lump sum bonus of $150.00.

All full-time employees, except Utility Clerks, who are at the capped rate of pay or above, or who are frozen, and that have been working for 48 months or more shall receive a one (1) time lump sum bonus of $100.00.

All part-time employees, except Utility Clerks, who are at the capped rate of pay or above, or who are frozen, and that have been working for 48 months or more shall receive a one (1) time lump sum bonus of $75.00.

All Utility Clerks will who are at the capped rate of pay or above, or who are frozen, and that have been working for 48 months or more shall receive a one (1) time lump sum bonus of $50.00.

These bonuses are to be paid within two pay periods of March 28, 2006.

FOR EMPLOYEES HIRED BEFORE APRIL 26, 1996

<u>ALL STORES</u>

(1)    Current Regular clerks hired before April 26, 1996 and, effective July 24, 2001, Bakery/Deli clerks hired before April 26, 1996, shall progress in accordance with classification seniority to Pay Level 8 only, except as provided below:

    a)    Employees who reach Pay Level 8, and average thirty-two (32) hours or more during months 46, 47 and 48, shall progress in accordance with classification seniority to Pay Level 11.

    b)    Employees CAPPED at Pay Level 8 with more than 48 months classification seniority, who average thirty-two (32) hours or more during any three (3) consecutive calendar month period shall, beginning with the first pay period of the fourth month, again progress in accordance with classification seniority to Pay Level 11.

    c)    (1)    Employees who progress beyond Pay Level 8 because of the provisions of a) or b) above will become frozen in their then present pay level on the first pay period of the fourth month if they average less than thirty-two (32) hours per week during any preceding three (3) calendar month period.

        (2)    Any employee frozen in accordance with the provisions of c) (1) shall again progress to Pay Level 11 if, and when that employee again meets the requirements of b) above.

(2)    General Merchandise, Floral, Salad/Bulk and Scale clerks shall progress in accordance with classification seniority to Pay Level 7 only, except as provided below:

    a)    Employees who reach Pay Level 7 and average thirty-two (32) hours or more during months 40, 41 and 42 shall progress in accordance with classification seniority to Pay Level 9.

    b)    Employees CAPPED at Pay Level 7 with more than 42 months classification, seniority, who average thirty-two (32) hours or more during any three (3) consecutive calendar month period shall,  beginning with the first pay period of the fourth month, again progress in accordance with classification seniority to Pay Level 9.

    c)    (1)    Employees who progress beyond Pay Level 7 because of the provisions of a) or b) above will become frozen in their then present pay level on the first pay period of the fourth month if they average less than thirty-two (32) hours per week during any preceding three (3) calendar month period.

        (2)    Any employee frozen in accordance with the provisions of c) (1) shall again progress to Pay Level 9 if, and when that employee again meets the requirements of b) above.

PART-TIME TO FULL-TIME PROGRESSION FOR EMPLOYEES HIRED
AFTER APRIL 26, 1996

ALL STORES

(1)    New hires (clerks hired after April 26, 1996) and, effective July 24, 2001, Bakery/Deli clerks hired after April 26, 1996, shall progress in accordance with classification seniority to Pay Level 6 only, except as provided below:

    a)    Employees who reach Pay Level 6, and average thirty-two (32) hours or more during months 34, 35 and 36, shall progress in accordance with classification seniority to Pay Level 11.

    b)    Employees CAPPED at Pay Level 6 with more than 36 months classification seniority, who average thirty-two (32) hours or more during any three (3) consecutive calendar month period shall, beginning with the first pay period of the fourth month, again progress in accordance with classification seniority to Pay Level 11.

    c)    (1) Employees who progress beyond Pay Level 6 because of the provisions of a) or b) above will become frozen in their then present pay level on the first pay period of the fourth month if they average less than thirty-two (32) hours per week during any preceding three (3) calendar month period.

(2)    Any employee frozen in accordance with the provisions of c) (1) shall again progress to Pay Level 11 if, and when that employee again meets the requirements of b) above.

(3)    General Merchandise, Floral, Salad/Bulk and Scale clerks shall progress in accordance with classification seniority to Pay Level 6 only, except as provided below:

    a)    Employees who reach Pay Level 6 and average thirty-two (32) hours or more during months 34, 35 and 36 shall progress in accordance with classification seniority to Pay Level 9.

    b)    Employees CAPPED at Pay Level 6 with more than 36 months classification seniority, who average thirty-two (32) hours or more during any three (3) consecutive calendar month period shall, beginning with the first pay period of the fourth month, again progress in accordance with classification seniority to Pay Level 9.

    c)    (1)    Employees who progress beyond Pay Level 6 because of the provisions of a) or b) above will become frozen in their then present pay level on the first pay period of the fourth month if they average less than thirty-two (32) hours per week during any preceding three (3) calendar month period.

         (2)    Any employee frozen in accordance with the provisions of c) (1) shall again progress to Pay Level 9 if, and when that employee again meets the requirements of b) above.

36

# UNITED FOOD AND COMMERCIAL WORKERS UNIONS
# AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND

## AGREEMENT AND DECLARATION OF TRUST
## (Amended and Restated as of July 1, 2000)

This Agreement and Declaration of Trust is made as of _____

_____, 20_____, by and between

_____, Employer,

and Local _____, affiliated with United Food and

Commercial Workers International Union, AFL-CIO & CLC.

### WITNESSETH:

WHEREAS, the Employer has entered into a Collective Bargaining Agreement with the Union Local listed above, which Agreement is effective from

_____ through

_____, and

WHEREAS, said Agreement is part of a series of similar agreements heretofore entered into between certain Employers and Local Unions as defined herein, each of which contemplates the creation or continuance of a Trust Fund for the purpose of providing health benefits for eligible Employees and their dependents as hereinafter described.

NOW, THEREFORE, in consideration of the premises and mutual promises and covenants herein contained, the parties hereto agree as follows:

### ARTICLE I—Definitions

SECTION 1—The term "Collective Bargaining Agreement" shall mean any written contract between an Employer and a Union which recognizes the Union as exclusive bargaining agent of a bargaining unit of the Employer's Employees affecting such Employees' wages, hours, and other conditions of employment, which written contract shall include provisions for Contributions to the Fund.

SEC. 2—The term "Union" shall include any Local Union which is or may become a party to this Agreement and which is affiliated with United Food and Commercial Workers International Union, AFL-CIO, CLC ("UFCW").

SEC. 3—The term "Employer" shall mean each Employer who has been accepted for participation under the Plan by action of the Trustees and who executed or shall hereinafter execute a Collective Bargaining Agreement requiring periodic payments to this Fund and who has executed this Trust Agreement, or a duplicate copy thereof, or has otherwise indicated its intent to be bound by this Trust Agreement. This Trust Fund, the Illinois Food Retailers Association, a Union as defined in Article I, Section 2, and a Union participating pursuant to Article VIII, Section 7, shall also be considered an Employer for the purpose of providing benefits as hereinafter set forth provided that they sign a copy of this Agreement and Declaration of Trust as Employer becoming bound by its terms and obligate themselves to make Contributions to the Fund pursuant to a Participation Agreement upon such terms and conditions unanimously acceptable to the Trustees. Acceptance as an Employer by the Trustees may be based on such terms and conditions acceptable to the Trustees.

SEC. 4—The term "Employee" as used herein shall mean all Employees of the Employer within the Bargaining Unit for whom Contributions are required as set forth in the Collective Bargaining Agreement. The term "Employee" shall also mean Employees employed by the trust fund administering the Fund and the United Food and Commercial Workers Unions and Employers Midwest Pension Fund, Employees employed by the Illinois Food Retailers Association, and Employees employed by the Union; and, in addition, the term "Employee" shall include retirees for such periods of time as they may exercise an option to pay contributions directly to the Trust Fund under a Plan and rules adopted by the Trustees.

The term "Employee" shall also include a person on a disability status, approved leave of absence and an Employee whose employment has been terminated, provided that such Employee may continue in the status of an Employee for a period not to exceed a period permitted under rules adopted by the Trustees, and provided further that such Employee shall pay contributions directly to the Fund in the amount and on the date or dates determined under rules adopted by the Trustees.

The term "Employee" shall also mean an owner-operator or other employee to the extent that such inclusion is permitted by law; provided however that there shall have been created an obligation to make Contributions on their behalf to the Fund pursuant to a Participation Agreement upon such terms and conditions acceptable to the Trustees. Such Participation Agreement shall include such provisions as may from time to time be adopted by the Trustees. Effective July 1, 2001, only owner-operators who are employed by incorporated entities may qualify as an Employee who may participate in the Trust Fund.

SEC. 5—The term "Eligible Employee" shall mean all Employees as defined in Section 4, whom the Trustees under the powers conferred upon them by this Agreement shall make eligible for the benefits provided hereunder.

SEC. 6—The term "Contributions" shall mean payments to the Fund pursuant to a Collective Bargaining Agreement requiring contributions to the Fund or a Participation Agreement, and self-payments made by Employees pursuant to any self-payment rules adopted by the Trustees. Contributions specifically required from an Employer pursuant to a Collective Bargaining Agreement may, from time to time, be referred to herein as "Employer Contributions."

SEC. 7—The term "Trustees" shall mean those persons who are named according to the provisions of Article III hereof and who have authority to control and manage the operation and administration of the Fund and also have authority to control and manage the Fund's assets. The terms "Trustees," "Board of Trustees," or "Trustee," as used herein, shall mean the Trustees or some of the Trustees, as the context may require and shall include an Alternate Trustee when acting in the place and stead of a regular Trustee. The Trustees shall serve as the "Administrator" and "Plan Sponsor" of the Fund, and the plan of benefits provided by the Fund, as those terms are defined in Title I, section 3 of ERISA.

SEC. 8—The term "Fund," "Trust Fund," or "Health Benefits Fund" shall mean the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund which is the Trust Fund established pursuant to Article II of this Agreement and includes the Plan and Trust.

SEC. 9—The term "Plan" shall refer to the plan of benefits which is established and maintained by the Trustees pursuant to the terms of this Trust Agreement.

SEC. 10—The term "Participation Agreement" means an agreement in form and content acceptable to the Trustees which evidences the commitment of the signatory thereto to be bound by the adoption of the Plan and the Trust Agreement.

SEC. 11—The term "Trust Agreement" or "Agreement" shall refer to the agreement set forth herein, as amended from time to time.

SEC. 12—The term "Trust" shall refer to the assets of the Fund, held in trust by the Trustees.

SEC. 13—The term "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

### ARTICLE II—Creation and Name of Trust Fund

SECTION 1—The Union and the Employer hereby create and establish with the Trustees hereinafter designated a Trust to be known as "United Food

EXHIBIT
C

and Commercial Workers Unions and Employers Midwest Health Benefits Fund," which shall comprise the entire assets derived from Employer Contributions hereafter made to, or for the account of this Trust Fund, together with all other assets, investments, and monies received from, and all other property, funds, assets and monies received and held by the Trustees for the use, purposes and trusts as set forth in this Agreement.

## ARTICLE III—Designation of Trustees

SECTION 1—The Fund shall be administered by a Board of Trustees made up of six Trustees, three of whom shall be representatives of the Employer, and three of whom shall be representatives of the Union. All of the assets of the Fund shall be held, managed, and controlled by the Board of Trustees. The Trustees shall be the named fiduciary for the Plan and the Trust within the meaning of ERISA and shall have the authority to, and responsibility for, the operation and administration of the Plan and shall have the power to manage and control the Trust. The Trustees shall constitute the "Plan Administrator" and the "Plan Sponsor" for the Plan and Trust, as those terms are defined in Title I, section 3 of ERISA.

SEC. 2—One Employer Trustee and one Alternate Employer Trustee shall be selected by Employers operating 25 or more stores in the area covered by the Trust, and one Employer Trustee and one Alternate Employer Trustee shall be selected by Employers operating less than 25 stores in the same area; a third Employer Trustee and a third Alternate Employer Trustee shall be selected by mutual consent of the Employer Trustee selected by Employers operating 25 or more stores and the Employer Trustee selected by Employers operating less than 25 stores in the area covered by the Trust. The Employer Trustees and Alternate Employer Trustees so designated or selected shall be mutually acceptable to both Employer groups and shall represent and act for and on behalf of all Employers. The three Employer Trustees shall select a fourth Alternate Employer Trustee from either Employer group. Three (3) Union Trustees and four (4) Alternate Union Trustees shall be selected by the Union. The three (3) Union Trustees shall be one (1) each from UFCW Locals 546, 881, and 1540. The four (4) Alternate Union Trustees shall be one (1) each from UFCW Locals 1540 and 546, and two (2) from UFCW Local 881. Alternate Trustees shall have the duties and responsibilities of Trustees when acting in place of Trustees, pursuant to Article IV, Section 2.

SEC. 3—An individual Trustee shall not be paid any compensation from the Fund for serving as a Trustee, but the Trustees may prescribe rules and policies for reimbursement of reasonable, proper and necessary expenses actually incurred on behalf of the Fund or in connection with the performance of duties hereunder.

SEC. 4—Each Trustee shall continue to serve during the existence of this Trust until his death, incapacity, resignation or removal.

SEC. 5— A Trustee or Alternate Trustee may resign at any time by giving a 30-day notice in writing to the remaining Trustees, and a successor shall be appointed as provided in Section 2 of Article III above. At any time and for any reason, a Union Trustee or Alternate Union Trustee may be removed and replaced by the Local Union for which such Union Trustee or Alternate Union Trustee was appointed. Similarly, either group of Employers as defined in Article III, Section 2, shall have the right to remove their respective designated Employer Trustee and Alternate Employer Trustee. The two Employer Trustees shall have the right to remove the third Alternate Employer Trustee. In such event, the party removing a Trustee shall give the other Trustees five (5) days written notice of such action and shall designate in such notice the successor Trustee.

In no event shall this Trust Fund or the operation of the Board of Trustees be impaired by the death, incapacity, resignation or removal of a Trustee and in the event of a vacancy on the Board of Trustees, the remaining Trustees shall have full power to act until the designation of a successor Trustee.

SEC. 6—In the event of the death, incapacity or resignation of a Trustee or Alternate Trustee, a successor Trustee or Alternate Trustee shall be appointed within 30 days by the party responsible for appointment pursuant to Section 2 of Article III above. The written instrument of appointment shall state the date the appointment shall take effect and shall be delivered to the other Trustees.

Any successor Trustee shall immediately upon his designation as a successor Trustee and his acceptance thereof in writing, become vested with all the property, rights, powers and duties of a Trustee.

## ARTICLE IV—Administration of Trust Fund

SECTION 1—The Trustees shall meet whenever required for the orderly and timely administration of the Fund at such location as may be acceptable to the Trustees. Any two Trustees may call a special meeting of the Board of Trustees by giving the other Trustees five (5) days notice in writing of such meeting.

SEC. 2—At any meeting of the Trustees, two Trustees representing the Employer and two Trustees representing the Union shall constitute a quorum. If the Employer Trustee and Alternate Employer Trustee selected by Employers either operating 25 or more stores, or Employers operating less than 25 stores are absent, the Employer Trustee or Alternate Employer Trustees present at such meeting shall act only upon the written authorization of the absent Employer Trustee or Alternate Employer Trustee selected by Employers operating 25 or more stores, or Employers operating less than 25 stores, as the case may be; provided, however, that such Employer Trustee or Alternate Employer Trustees who are present may act if their action is ratified in writing by such absent Employer Trustee or Alternate Employer Trustee. The Union Trustees shall designate the order in which the Alternate Union Trustees shall act in the absence of two or more Union Trustees.

SEC. 3—All decisions of the Board of Trustees except as provided in Article V, Section 1, shall be by majority of votes cast. Action under Article V, Section 1, shall be by unanimous agreement of the Trustees. Each Trustee shall have one vote, except that an Alternate cannot vote if his regular Trustee is present. Each Trustee shall have one vote; provided, however, that at any meeting at which there is a lesser number of Employer Trustees than Union Trustees present, the Employer Trustees shall, in the aggregate, have the number of votes which equal the number of Union Trustees present, and vice versa. An Alternate Trustee shall only be authorized to vote when that Alternate Trustee is authorized to act in the place and stead of a regular Trustee on a particular matter, as set forth in this Agreement. Action may be taken by the Board of Trustees without a meeting by a written consent resolution which is signed by the required number of Trustees for such action.

SEC. 4—At the commencement of each fiscal year of the Trust, the Trustees shall select from among them a chairman and a secretary who shall each serve for a period of one year. One officer shall be a Union Trustee and one officer shall be an Employer Trustee. The secretary shall keep an accurate record of the proceedings at all meetings of the Trustees, and of any action taken. The minutes of all meetings and a record of action taken shall be transcribed and retained by the Trustees.

SEC. 5—In the event that a majority of the Trustees are unable to agree upon any matter in connection with the administration of this Trust or if the Trustees are unable to reach a unanimous decision required under Article V, Section 1, then the Trustees shall select a neutral person as an impartial arbitrator who is willing to act in the determination of such dispute. Where a majority vote is necessary, in the event that a majority of the Trustees fail to agree upon the selection of an impartial arbitrator, then any one or more of said Trustees may petition the U.S. District Court, Northern District of Illinois, Eastern Division for the appointment of an impartial umpire to decide such dispute. Where a unanimous vote is necessary, in the event that the Trustees cannot unanimously agree upon the selection of an impartial arbitrator, then any one or more of said Trustees may petition the U.S. District Court, Northern District of Illinois, Eastern Division for the appointment of an impartial umpire to decide such dispute. The Trustees shall attempt to agree on the joint submission of a statement of the issue in dispute. However, if the Trustees cannot jointly agree upon such a statement, each group of Trustees shall submit to the impartial arbitrator or umpire, in writing, its version of the issue in dispute. The impartial arbitrator or umpire shall have the authority to render a discretionary decision in the same manner and to the same extent as the Trustees, as well as to interpret the Trust Agreement and Plan. As part of his decision, the impartial arbitrator or umpire shall state his determination as to the exact issue.

The decision of the arbitrator or umpire shall be final and binding upon the Trustees and upon all parties whose interests are affected thereby. The authority of the impartial arbitrator shall only extend to matters in connection with the administration or operation of the Plan or Trust.

The procedure specified in this Section shall be the sole and exclusive procedure for the resolutions of deadlock issues. Any costs and attorneys' fees in connection with the foregoing shall be paid out of the Trust Fund, including any reasonable compensation to the impartial arbitrator or umpire. Differences arising as to the interpretation or application of the provisions of this Trust Agreement, or relating to Employee benefits provided for hereunder, shall not be subject to the grievance or arbitration procedures established in the Collective Bargaining Agreement.

### ARTICLE V—Powers and Duties of Trustees

Section 1—The Trustees are expressly authorized and empowered to determine, adopt and put into effect a health benefit plan or plans for Employees which may include, but shall not be limited to, life, accident, salary indemnity, hospitalization, medical, surgical, dental, vision and prescription insurance or benefits, and all other related health care benefits and protection. The Trustees shall determine all eligibility and participation requirements as the Trustees deem proper and advisable. The Trustees may establish, maintain and administer such plan or plans through an insurance carrier of their choice or a self-insured or self-funded program, or a combination of an insured or self-insured or self-funded program. The Trustees are also expressly authorized and empowered, within the limitation specified above, to change any insurance carriers from time to time, or to change from an insured to a self-insured program or vice versa, and to make any and all other plan changes as they, the Trustees, determine proper to effectuate the purposes of this Trust. All action under this Section shall be by unanimous agreement of the Trustees.

Sec. 2—To effectuate the aforesaid purpose of the Trust Fund herein the Trustees are hereby authorized and empowered to apply for, accept delivery of and act as policy holder under the group insurance policies.

Sec. 3—The Trustees are expressly authorized and empowered to cancel any policy or policies of insurance which they have caused to be issued and may purchase in lieu thereof other like insurance from other insurance carrier or carriers.

Sec. 4—The Trustees shall be empowered to agree with each insurance carrier upon all of the provisions to be contained in each policy.

Sec. 5—The Trustees, from Trust funds available, shall pay the premium or premiums on the group insurance policy or policies obtained by them and/or shall pay benefits self-insured by the Trust Fund. Under any plan or program, the Trustees shall establish administrative procedures whereby participating Employees or their beneficiaries whose claims for benefits are denied are notified, in writing, of the reasons for such denial and which afford such a participating Employee or beneficiary a reasonable opportunity for a full and fair review, as required by Section 503 of the Employee Retirement Income Security Act of 1974.

Sec. 6—The Trustees shall maintain complete records of all transactions of the Trust, including complete and up-to-date lists furnished by the Employers of Employees for whom Contributions have been made.

The Trustees shall provide for a certified audit to be made annually. The records of the Trust, including statement of results of the annual certified audit, shall be available for the inspection of interested parties at the principal office of the Trust.

Sec. 7—The Trustees may prescribe such rules and regulations as may, in their discretion, be proper or necessary for the sound and efficient administration of this Trust, provided the rules and regulations shall not be inconsistent with the provisions of this Agreement.

Sec. 8—The Trustees shall have the power to lease such premises and equipment and to purchase such materials, supplies and equipment and to hire such legal counsel, investment managers, medical consultants, field auditors, ERISA-qualified certified public accountants, enrolled actuaries, administrative, accounting and other assistants or employees as, in their discretion, they may find necessary or appropriate in carrying out the purposes of this Trust and benefit plans thereunder and the performance of their duties.

Sec. 9—The Trustees shall deposit all monies received pursuant to this Trust in such bank or banks as the Trustees may select for that purpose.

All withdrawals of funds from such bank or banks shall be by check signed by one Trustee representing the Union and countersigned by one Trustee representing the Employer.

For the purpose of paying the salaries of office clerical employees hired by the Trustees pursuant to Article V, Section 8, and for the purpose of paying ordinary and customary office expenses, there shall be established separate bank accounts known as "Administrative Bank Account" and "Payroll Account." These shall be imprest funds of an amount the Trustees may from time to time designate and said funds shall be reimbursed as required out of the General Account upon submission of a detailed report of the expenditures made herefrom supported by appropriate paid bills and receipts. Withdrawals from said funds shall be by check signed by one of the Trustees or by any one person designated by the Trustees.

Sec. 10—The Trustees shall purchase such insurance as they deem advisable for the protection of the assets of this Trust and of its plans, as well as insurance of the type described in Section 410(b) of ERISA, and to pay the premiums therefor out of the assets of this Trust. In addition, they are authorized to obtain the bonding required by Section 412 of ERISA, and to pay the premiums thereof out of the assets of this Trust.

Sec. 11—The Trustees shall have the power, in their sole discretion, to invest and reinvest the Trust funds in any type of investments that are permissible and legal for Trustees in the State of Illinois and under ERISA, and may sell or otherwise dispose of such investments at any time and from time to time as they so see fit

The Trustees may, in their discretion, appoint one or more "Investment Managers" and extend to such Investment Managers the right to make such investments and reinvestments to the same extent permitted to the Trustees. The term "Investment Manager" is defined pursuant to Title I, Section 3(38) of ERISA, and any such Investment Manager appointed by the Trustees shall be qualified to act as such under the aforesaid provisions of ERISA and shall acknowledge in writing that he or it is a Fiduciary with respect to the Trust Fund. The Trustees shall not be liable for the acts or omissions of such Investment Manager or under any obligation to invest or otherwise manage any assets of the Fund which is subject to the management of such Investment Manager.

Sec. 12—The Trustees shall have the power to establish and accumulate such reserve funds that may be necessary to provide for administration expenses and other proper applications of the Trust.

Sec. 13—The Trustees shall have the power to construe the provisions of this Trust Agreement and any construction adopted by them in good faith shall be binding upon the Union, Employer and Employees.

Sec. 14—Insofar as permitted by the Employee Retirement Income Security Act of 1974, no Trustee shall be liable for any act or action pursuant to this Trust in good faith taken, performed or omitted, nor for any act or action taken, performed or omitted by any person or firm with whom the Trustees contract for benefits hereunder (except that this shall not relieve the Trustees from their obligation to enforce any duties or obligations of such person or firm at the expense of the Trust), nor for any act or action taken, performed or omitted by an agent, employee, co-Trustee, actuary, certified public accountant, attorney or other professional consultant, without reasonable care, or for any act or action taken, performed or omitted by any other Trustee, nor for any act or failure to act, only for his own gross negligence or willful misconduct.

Insofar as permitted by the Employee Retirement Income Security Act of 1974, in the exercise of their discretionary powers, the Trustees may act solely upon their own best judgement upon the facts brought to their attention without liability for errors of judgement and with complete immunity from liability for losses, damages or liability sustained by the Trust, the Employers, or by any Employee or his beneficiary, so long as the Trustees act in good faith.

Sec. 15—The receipt given by the Trustees for any money or other properties received by them shall effectually discharge the person or persons paying or transferring the same, and such person or persons shall not thereafter be responsible for the use to which same is put or for the loss or misapplication thereof.

Sec. 16—In connection with any matter relating to the administration and execution of this Trust and the Fund, the Trustees shall have the right to assume that any paper, record, instrument or other document submitted to them is genuine and to have been made, executed and delivered by the person, firm or corporation purporting to have made, executed and delivered the same, and the Trustees shall suffer no liability in the event that such assumption should therefore be determined to be inaccurate or erroneous; in like manner the Trustees shall have the right to rely and act upon in accordance with the opinion and advice of legal counsel, and shall suffer no liability in the event such opinion and advice thereafter be determined to be unsound or incorrect.

Sec. 17—The costs and expenses, including legal fees for any action, suit, or proceeding relating to the Trust which is brought against the Trustees,

shall be paid as a general expense of the administration, provided, however, that such costs or expenses shall not be paid from the Trust Fund if it is adjudged in the action, suit or proceeding that the Trustees were guilty of gross negligence or willful misconduct.

SEC. 18—In addition to the duties, authority, and responsibilities imposed upon or given to the Trustees elsewhere in this Trust Agreement, said Trustees shall have the authority by motion or resolution, duly adopted at a meeting thereof in accordance with this Trust Agreement to:

(a) Allocate to one or more of said Trustees specific Trustee responsibilities, obligations or duties, as well as designated fiduciary responsibilities other than Trustee responsibilities. Such allocation of specific Trustee responsibilities may be made pursuant to the formulation of Trustee committees. Trustee committees shall consist of one (1) Employer Trustee and one (1) Union Trustee.

(b) Designate one or more persons, other than Trustees, to carry out any part of their fiduciary responsibilities but may not delegate to any person who is not a Trustee or Investment Manager (as permitted by Article V, Section 11) any "trustee responsibility," as defined in Title IV, section 405(c)(3), of ERISA.

(c) All decisions of the Trustee committees shall be by unanimous vote. In the event of a deadlock, the matter voted upon by the committee shall be referred to the full Board of Trustees for decision. If the vote remains deadlocked, the provisions of Article IV, Section 5, shall apply.

SEC. 19—The Trustees may authorize the attendance and participation by the Trustees, Alternate Trustees and Trust Fund office employees in conferences, seminars, programs or similar educational meetings, which the Trustees deem helpful in the operation, administration, control or management of the Plan or Trust and to cause the payment of reasonable expenses actually incurred in conjunction with such attendance in accordance with the expense reimbursement policy adopted by the Trustees for such expenses.

SEC. 20—The Trustees shall have the authority to compromise, settle, arbitrate, adjust and release claims or demands in favor of or against the Trust or Trustees on such terms and conditions as the Trustees deem advisable.

SEC. 21—The Trustees or their delegates, pursuant to Article V, Section 18 above, have, and shall exercise, complete discretionary authority to construe, interpret and apply all of the terms of this Agreement and the Plans adopted pursuant to the authority under this Agreement, including all matters relating to eligibility for benefits; amount, time or form of benefits; and disputed or alleged doubtful terms. All decisions of the Trustees or their delegates, pursuant to Article V, Section 18 above, in the exercise of their authority under this Agreement and the Plan adopted pursuant thereto shall be final and binding on the Fund, the Plan, Trustees, Employers, Unions, and all participants and beneficiaries.

### ARTICLE VI—Contributions and Defaults of Employer

SECTION 1—Each Employer shall make continuing and proper reports and Contributions to the Trust Fund in accordance with this Agreement and Declaration of Trust and the Collective Bargaining Agreement.

A participating Employer shall be considered to be delinquent in the payment of Contributions if he (a) fails to submit a proper and detailed contribution reporting form, and the Contributions detailed therein, by the close of business on the due date, or (b) fails to submit Contributions on behalf of all the Employees for whom Contributions are required by the Collective Bargaining Agreement or special agreement, or (c) fails to compute properly the Contributions according to the required Contribution formula specified in the Collective Bargaining Agreement or special agreement.

SEC. 2—(a) The Trustees shall establish a uniform system among the Employers for the timely transmission of reports and Contributions and establish a periodic date on which such reports and Contributions shall be due.

(b) The Trustees shall notify any Employer of an apparent delinquency, mistake, or discrepancy in a report or Contribution.

(c) An Employer shall remain liable for the full amount of Contributions due during the period in default. The Trustees shall have the power to take any action necessary for the recovery of such Contributions and the

enforcement of the Employer's obligations hereunder. However, nothing contained herein shall be deemed to modify or limit, in any way, rights the Union may have under the terms of a Collective Bargaining Agreement to enforce collection of any amounts due to the Trust.

(d) The parties recognize and acknowledge that the regular and prompt payment of Employer Contributions to the Trust is essential to the continued efficient administration of the Trust, and that it would be extremely difficult, if not impracticable, to fix the actual expense and damage to the Trust which would result from the failure of an individual Employer to pay such monthly Contributions in full within the period established by the Trustees.

Therefore, the amount of damage to the Trust from such failure shall be presumed to be, for each month of delinquency, 10% of the amount of the Contribution or Contributions due for the first month of the delinquency and, in addition thereto, 1½% per month for each additional month said delinquency remains uncured. Liquidated damages for subsequent delinquent monthly Contributions, if any, shall be separately calculated for each separate month on the same basis as the first month and the total liquidated damages for all delinquent Contributions shall be cumulative and arrived at by adding the total of the liquidated damages calculated separately for each month of delinquent Contributions.

If the Trustees bring suit against any Employer to collect any delinquent Contribution or Contributions, the Employer also shall be liable for costs of filing said suit and reasonable attorneys' fees.

(e) The Employer, by appropriate action of the Trustees in the event of any previous defaults in his obligations to make timely reports and Contributions, may be required to keep on deposit with the Trustees an amount estimated to be equal to three (3) months' Contributions. The Trustees, by appropriate action, may require a new Employer, who hereafter becomes a party to this Agreement and Declaration of Trust, to keep on deposit with the Trustees an amount estimated to be equal to three (3) months' Contributions for the number of Employees which the new Employer expects to employ, but such deposit shall, in no event, be less than two hundred dollars ($200.00).

(f) In the event the Collective Bargaining Agreement contains provisions relating to delinquencies that specify additional remedies, or obligate the delinquent Employer to greater amounts of liquidated damages, interest, or attorneys' fees than those set forth herein, the Trustees, at their option, may pursue the additional remedies or impose the greater charges.

The Trustees shall not be obligated, however, to pursue the collection of delinquent accounts through the grievance-arbitration procedures (if any) provided for in the Collective Bargaining Agreement.

SEC. 3—The Trustees shall have the authority, at the expense of the Trust Fund, to audit the payroll books and records of a participating Employer, either directly or through a qualified public accountant, as they may deem necessary in the administration of the Trust Fund. Such payroll audit may be undertaken pursuant to a routine payroll audit program or on an individual basis.

Whenever a payroll audit is authorized, the participating Employer involved shall make available to the Trustees, or the qualified public accountant designated by them, its payroll books and records. Such books and records shall include (a) all records which the Employer may be required to maintain under Section 209(a)(1) of the Employee Retirement Income Security Act of 1974, and (b) time cards, payroll journals, payroll check registers, cancelled payroll checks, copies of the Employer's federal, state and local payroll tax reports, and all other documents and reports that reflect the hours and wages, or other compensation, of the Employees or from which such can be verified.

In the event the payroll audit discloses that the participating Employer has not paid Contributions as required by the Collective Bargaining Agreement or special agreement, the Employer shall be liable for the costs of the audit. The Trustees shall have the authority, however, to waive all or part of such costs for good cause shown.

### ARTICLE VII—Ownership In and Rights to Fund

SECTION 1—Title to the Fund shall be vested in and remain exclusively in the Trustees, and no Employer, the Union, or any Employee or any benefici-

ary under the Plan shall have any right, title or interest in the funds, nor any right to the Contributions to be made thereto. No Contributions to be made hereunder shall be deemed wages due to any Employee.

SEC. 2—This Trust shall be irrevocable, and the Fund shall be administered for the sole purpose as provided hereunder. The Fund shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge by any person other than the Trustees and their duly authorized representatives, and by such Trustees or representatives only to the extent and for the purposes as herein specifically provided.

### ARTICLE VIII—Miscellaneous Provisions

SECTION 1—No person, firm or corporation dealing with the Trustees shall be obligated to see to the application of any monies or properties of the Fund or to see that the terms of this Trust Agreement have been complied with, or be obliged to inquire into the necessity or expediency of any act of the Trustees, and with regard to every instrument executed by the Trustees, every such person, firm or corporation relying thereon shall be entitled conclusively to assume that:

(a) At the time of the delivery of said instrument the Trust herein created was in full force and effect; and

(b) Said instrument was executed in accordance with the terms and conditions of this Agreement; and

(c) The Trustees were duly authorized and empowered to execute such instrument.

SEC. 2—This Agreement may be amended in writing at any time as follows: A majority of the Trustees shall first concur in the amendment and thereafter submit same in writing to all signatories. Within thirty (30) days after date of mailing of said amendment any signatory may present in writing to the Trustees his objection thereto. If a majority of the signatories, or the Employers of a majority of Employees covered by this Trust Agreement present such objection, then the amendment shall not become effective.

If, however, within the aforesaid time period a majority of the signatories or the Employers of a majority of Employees covered by this Trust Agreement do not present such objection, then the amendment shall become effective at the expiration of such time period. In no event shall this Agreement be amended so as to change the purposes herein stated or permit the diversion or application of any of the Trust Fund for any other purpose.

SEC. 3—This Trust is accepted by the Trustees in the State of Illinois and all questions pertaining to its validity, construction and administration shall be determined in accordance with the laws of such State.

SEC. 4—This Trust shall continue during the term of such Collective Bargaining Agreements as referred to in Article I, Section 1, and during the term of any renewal or extension of such Collective Bargaining Agreements, or any succeeding Collective Bargaining Agreements, which provide for the continuation of such Trust.

SEC. 5—Upon termination of the Trust, the Trustees shall continue in such capacity for the purpose of dissolution with full powers as herein provided and may execute any and all instruments which may be required.

SEC. 6—In the event of termination of the Trust the remaining funds will be used until exhausted to provide benefits in such manner and upon such terms as deemed by the Trustees to be in the best interest of the Employees. In no event shall any of the funds revert to the Employers or the Union.

SEC. 7—The Trustees are authorized to extend the coverage of this Trust Agreement to Employees of other Employers and to other Local Unions who would otherwise qualify under the terms of the Trust Agreement, but who are currently not participating under such terms and conditions as the Trustees consider necessary to preserve the soundness of the Fund and to preserve an equitable relationship between the Contributions made by other Employers then participating in the Fund and the benefits payable to the Employees of such other Employers.

Extension of coverage may be effected by executing a Subscription and/or Participation Agreement in the form unanimously adopted by the Trustees.

### ARTICLE IX—Mergerr

SECTION 1—The Trustees shall have the authority to merge this Trust Fund into another employee benefit trust fund, or to accept the merger of another employee benefit trust fund into this Trust Fund. Resolution of the Board of Trustees shall authorize such merger.

SEC. 2—The Trustees shall have the authority to investigate, evaluate and negotiate any such merger and to enter into appropriate agreements to consummate the same.

SEC. 3—If this Trust Fund should be merged into another employee benefit trust fund, the Trustees shall have the authority to terminate this Trust Fund and to transfer the remaining assets or liabilities to the other fund. If another employee benefit trust fund is merged into this Trust Fund, the Trustees shall have the authority to accept a transfer of assets or liabilities from the other trust. Such other employee benefit trust shall be a qualified trust under Section 501(c)(9) of the Internal Revenue Code.

SEC. 4—Each participant in this Fund will be entitled to benefits immediately after such merger, consolidation or transfer which are equal to or greater than the benefits he would have been entitled to immediately before the merger, consolidation or transfer.

### ARTICLE X—Unclaimed Benefits

SECTION 1—If a participant or his beneficiary who is entitled to receive benefits under the Plan fails to accept such benefits and/or fails to demonstrate an interest in such benefits, in person or in writing, then any and all benefits for such participant or beneficiary will be held under the Plan to prevent escheat unless prohibited by law.

For the purposes of this Article, it will be sufficient proof of a person's failure to demonstrate interest in his benefit if it can be shown that notices sent by registered or certified mail to the last known address of the person, his designated beneficiary, or his executor or administrator could not be delivered.

### ARTICLE XI—Employer Withdrawal

SECTION 1—Any employer voluntarily withdrawing from the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund must give three (3) months notice to the Fund Administrator prior to the date of withdrawal (i.e., cessation of contribution). The eligibility provisions of the Plan shall provide that claims incurred after said notice and during and after the three (3) month period prior to withdrawal shall not be covered by the Fund.

Contributions collected from withdrawing employers during the three (3) month period prior to the date of withdrawal shall be used for the purpose of paying claims from employees, and dependents of employees, working for withdrawing employers incurred prior to the three (3) month period prior to withdrawal but not filed until during or after the three (3) month period prior to withdrawal.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this _____ day of

_____, 20 _____.

**EMPLOYER:**                             **UNION:**

_____            _____

_____            _____

_____            _____

The undersigned have been duly designated as Trustees in accordance with the foregoing Agreement and Declaration of Trust and do hereby accept the Trust herein imposed upon all terms and conditions set forth herein.

## APPROVED AND ACCEPTED

### Regular Trustees

**Employer:**                             **Union:**

_____            _____

_____            _____

_____            _____

### Alternate Trustees

**Employer:**                             **Union:**

_____            _____

_____            _____

_____            _____

_____            _____

® 458                                                    158-0501001

# UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST PENSION FUND

## AGREEMENT AND DECLARATION OF TRUST

This Agreement and Declaration of Trust is made as of _____ _____, 19____, by and between _____, Employer, and Local _____, affiliated with United Food and Commercial Workers International Union, AFL-CIO & CLC.

### WITNESSETH:

WHEREAS, the Employer has entered into a Collective Bargaining Agreement with the Union Local listed above, which Agreement is effective from _____ through _____, and

WHEREAS, said Agreement is part of a series of similar agreements heretofore entered into between certain Employers and Local Unions as defined herein, each of which contemplates the creation of a Trust Fund for the purpose of providing retirement benefits for Employees and the payment of contributions by Employers for the purpose of financing the costs of the retirement benefits (it being understood that Employers having a plan for retirement benefits presently in effect may terminate said plan).

NOW, THEREFORE, in consideration of the premises and mutual promises and covenants herein contained, the parties hereto agree as follows:

### ARTICLE I—*Definitions*

SECTION 1—The term "Collective Bargaining Agreement" shall mean any written contract between an Employer and a Union which recognizes the Union as exclusive bargaining agent of a bargaining unit of the Employer's Employees affecting such Employees' wages, hours, and other conditions of employment, which written contract shall include provisions for Contributions to the Fund.

SEC. 2—The term "Union" shall include any Local Union which is or may become a party to this Agreement and which is affiliated with United Food and Commercial Workers International Union, AFL-CIO, CLC.

SEC. 3—The term "Employer" shall mean any Employer who:

(1) On or after the Effective Date, has a Collective Bargaining Agreement with a Union requiring periodic Contributions to be made to the Pension Fund;

(2) Signs a copy of the Trust Agreement or in some other manner indicates consent to be bound by the terms of the Trust Agreement which is then filed at the administration office of the Pension Fund;

(3) Is accepted for participation in the Pension Fund by the Trustees in accordance with the provisions of the Plan; and

(4) Makes Contributions to the Pension Fund as required by the Collective Bargaining Agreement.

If an Employer has more than one place of business, the term "Employer" shall only apply to the place or places of business covered by the Collective Bargaining Agreement requiring Contributions to the Pension Fund.

The term "Employer" shall also mean the United Food and Commercial Workers Unions and Employers Midwest Pension Fund, the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, the Union, United Food and Commercial Workers Union State Council and the Illinois Food Retailers Association, provided that they sign a copy of the Trust Agreement as Employer becoming bound by its terms and agree to make Contributions to the Pension Fund, pursuant to a Participation Agreement upon such terms and conditions necessary to preserve the actuarial soundness of the Fund and to preserve an equitable relationship between the Contributions made by the other Employers participating in the Plan and the benefits payable to the Employees of such other Employers and the said Participation Agreement be unanimously acceptable to the Trustees.

SEC. 4—The term "Employee" shall mean any Employee on whose behalf payments are required to be made to the Pension Fund by an Employer pursuant to a Collective Bargaining Agreement with a Union and any Employee employed by the Pension Fund, the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, the Union, the United Food and Commercial Workers Union State Council and the Illinois Food Retailers Association, on whose behalf such Employers are making Contributions to

the Pension Fund pursuant to a Participation Agreement but not including any person who is prohibited by law from being covered under the Plan or whose inclusion would adversely affect the tax qualified or exempt status of the Plan or Trust.

SEC. 5—The terms "Trust," "Trust Fund," "Fund," or "Pension Fund" shall mean the Trust Fund established pursuant to Article II hereof.

SEC. 6—The term "Employer Contributions" shall mean payments required of an Employer by the Collective Bargaining Agreement to the Trust Fund herein created and payments made by the United Food and Commercial Workers Unions and Employers Midwest Pension Fund, the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, the Union, the United Food and Commercial Workers Union State Council and the Illinois Food Retailers Association, pursuant to a Participation Agreement.

SEC. 7—The term "Plan" shall mean the Plan formulated in accordance with the provisions of Article VIII.

SEC. 8—The term "Trustees" shall mean those persons who are selected according to the provisions of Article III hereof, together with their successors selected in the manner prescribed by Article III and, who by virtue of their designation as Trustees shall also be "Named Fiduciaries" and "Plan Administrator" as defined under ERISA. The term "Trustee" shall also include an Alternate Trustee when acting in the place and stead of the regular Trustee.

SEC. 9—The term "ERISA" shall mean the Employee Retirement Income Security Act of 1974 as amended from time to time.

SEC. 10—The term "Participation Agreement" shall mean an agreement in form and content acceptable to the Trustees which evidence the commitment of the signatory thereto to be bound by the Trust Agreement and Plan.

SEC. 11—The term "Fund" shall mean the Trust and Plan maintained pursuant to this Trust Agreement and shall constitute the "Plan" for purposes of complying with Section 402 of ERISA and such other references in ERISA to a Plan.

### ARTICLE II—*Creation and Name of Trust Fund*

SECTION 1—The Union and the Employer hereby create and establish with the Trustees hereinafter designated a Trust to be known as "United Food and Commercial Workers Unions and Employers Midwest Pension Fund," which shall comprise the entire assets derived from Employer Contributions hereafter made to or for the account of this Trust Fund, together with all other assets, investments, and monies received from all other property, funds, assets, and monies received and held by the Trustees for the use, purposes, and trusts as set forth in this Agreement.

### ARTICLE III—*Designation of Trustees*

SECTION 1—The Fund shall be administered by a Board of Trustees made up of six Trustees, three of whom shall be representatives of the Employer, and three of whom shall be representatives of the Union. All of the assets of the Fund shall be held, managed, and controlled by the Board of Trustees. Each Trustee shall also be a Named Fiduciary within the meaning of ERISA and shall have the authority to control and manage the operation and administration of the Fund and Plan created thereunder. The Board of Trustees shall also constitute the "Plan Administrator" of this Trust and Plan established and maintained under the authority of this Trust Agreement and shall constitute the "Plan Sponsor," both terms being used as defined in Title I, Section 3 of ERISA.

SEC. 2—One Employer Trustee and one Alternate Employer Trustee shall be selected by Employers operating 25 or more stores in the area covered by the Trust, and one Employer Trustee and one Alternate Employer Trustee shall be selected by Employers operating less than 25 stores in the same area; a third Employer Trustee and a third Alternate Employer Trustee shall be selected by mutual consent of the Employer Trustee selected by Employers operating 25 or more stores and the Employer Trustee selected by Employers operating less than 25 stores in the area covered by the Trust. The Employer Trustees and Alternate Employer Trustees so designated or selected shall be mutually acceptable to both Employer groups and shall represent and act for and on behalf of all Employers. The three Employer Trustees shall select a fourth Alternate Employer Trustee from either Employer group. Three Union Trustees and four Alternate Union Trustees shall be selected by the Union. Alternate

EXHIBIT
D

Trustees shall have the duties and responsibilities of Trustees when acting in place of Trustees, pursuant to Article IV, Section 3.

SEC. 3—Trustees shall serve without compensation from the Trust Fund, provided, however, that Trustees may be reimbursed by the Trust Fund for reasonable and necessary expenses incurred by them in the performance of their duties as Trustees.

SEC. 4—Each Trustee shall continue to serve during the existence of this Trust until his death, incapacity, resignation or removal.

SEC. 5—A Trustee may resign at any time by giving a thirty (30) day notice in writing to the remaining Trustees. At any time and for any reason, the Local Unions, who are parties to this Trust Agreement and who represent a majority of the Employees, shall have the right to remove and replace either or both of the Union Trustees and any or all of the Alternate Union Trustees. Similarly, either group of Employers as defined in Article III, Section 2, shall have the right to remove their respective designated Employer Trustee and Alternate Employer Trustee. The two Employer Trustees shall have the right to remove the third Alternate Employer Trustee. In such event, the party removing a Trustee shall give the other Trustees five (5) days written notice of such action and shall designate in such notice the successor Trustee.

In no event shall this Trust Fund or the operation of the Board of Trustees be impaired by the death, incapacity, resignation or removal of a Trustee and, in the event of a vacancy on the Board of Trustees, the remaining Trustees shall have full power to act until the designation of a successor Trustee.

SEC. 6—In the event of the death, incapacity, removal or resignation of an Employer Trustee or Alternate Employer Trustee, a successor shall be appointed within thirty (30) days by the party responsible therefor. In the event of the death, incapacity, removal or resignation of a Union Trustee, a successor shall be appointed within thirty (30) days by the Local Unions, who are parties to this Trust Agreement and who represent a majority of the Employees. Written notice of the appointment shall be served upon the other Trustees and parties within said time.

Any successor Trustee shall, immediately upon his designation as a successor Trustee and his acceptance thereof in writing, become vested with all the property, rights, powers and duties of a Trustee.

## ARTICLE IV—*Administration of Trust Fund*

SECTION 1—The funds shall be administered, controlled and supervised in accordance with this Trust Agreement, solely by the Board of Trustees.

SEC. 2—The Trustees shall meet whenever required for the orderly and timely administration of the business of the Fund at such location as may be acceptable to the Trustees. Any two Trustees may call a special meeting of the Board of Trustees by giving the other Trustees five (5) days' notice in writing of such meeting.

SEC. 3—At any meeting of the Trustees, two Trustees representing the Employer and two Trustees representing the Union shall constitute a quorum. If the Employer Trustee and Alternate Employer Trustee selected by Employers either operating 25 or more stores, or Employers operating less than 25 stores are absent, the Employer Trustee or Alternate Employer Trustees present at such meeting shall act only upon the written authorization of the absent Employer Trustee or Alternate Employer Trustee selected by Employers operating 25 or more stores, or Employers operating less than 25 stores, as the case may be; provided, however, that such Employer Trustee or Alternate Employer Trustees who are present may act if their action is ratified in writing by such absent Employer Trustee or Alternate Employer Trustee. The Union Trustees shall designate the order in which the Alternate Union Trustees shall act in the absence of two or more Union Trustees.

SEC. 4—(a) All decisions of the Board of Trustees pertaining solely to the administrative functions shall be by a majority of the votes cast.

(b) All decisions of the Board of Trustees regarding substantive issues such as those pertaining to Employee eligibility, retirement benefits, and actuarial assumptions, or to matters which affect the actuarial soundness of the Plan shall be by unanimous vote.

(c) Each Trustee shall have one vote, except that an Alternate cannot vote if his regular Trustee is present.

SEC. 5—At the commencement of each fiscal year of the Trust, the Trustees shall select from among them a chairman and a secretary who shall each serve for a period of one year. One officer shall be a Union Trustee and one officer shall be an Employer Trustee. The secretary shall keep an accurate record of the proceedings at all meetings of the Trustees, and of any action taken. The minutes of all meetings and a record of action taken shall be transcribed and retained by the Trustees.

SEC. 6—In the event that a majority of Trustees are unable to agree upon any matter in connection with the administrative functions of this Trust or if the Trustees are unable to reach a unanimous decision on a substantive issue, then the Trustees shall select a neutral person as an impartial arbitrator who is willing to act in the determination of such dispute. Where a majority vote is necessary, in the event that a majority of the Trustees fail to agree upon the selection of an impartial arbitrator, then any one or more of said Trustees may petition the U.S. District Court, Northern District of Illinois, Eastern Division for the appointment of an impartial umpire to decide such dispute.

Where a unanimous vote is necessary, in the event that the Trustees cannot unanimously agree upon the selection of an impartial arbitrator, then any one or more of said Trustees may petition the U.S. District Court, Northern District of Illinois, Eastern Division for the appointment of an impartial umpire to decide such dispute. The Trustees shall attempt to agree on the joint submission of a statement of the issue in dispute. However, if the Trustees cannot jointly agree upon such a statement, each group of Trustees shall submit to the impartial arbitrator or umpire, in writing, its version of the issue in dispute. The impartial arbitrator or umpire shall have the authority to render a discretionary decision in the same manner and to the same extent as the Trustees, as well as to interpret the Trust Agreement and Plan. As part of his decision, the impartial arbitrator or umpire shall state his determination as to the exact issue.

The decision of the arbitrator or umpire shall be final and binding upon the Trustees and upon all parties whose interests are affected thereby.

The procedure specified in this Section shall be the sole and exclusive procedure for the resolutions of deadlock issues. Any costs and attorneys' fees in connection with the foregoing shall be paid out of the Trust Fund, including any reasonable compensation to the impartial arbitrator or umpire.

Differences arising as to the interpretation or application of the provisions of this Trust Agreement, or relating to Employee benefits provided for hereunder, shall not be subject to the grievance or arbitration procedures established in the Collective Bargaining Agreement.

SEC. 7—No Union or Union State Council shall have any voice in the selection, election or designation or in the method of selection, election or designation of any Employer Trustee, notwithstanding that such Union or Union State Council may be making Employer Contributions to the Trust.

SEC. 8—In addition to the duties, authority and responsibilities imposed upon or given to the Trustees elsewhere in this Trust Agreement, said Trustees shall have the authority by motion or resolution, duly adopted at a meeting thereof in accordance with this Trust Agreement to:

(a) Allocate to one or more of said Trustees specific Trustee responsibilities, obligations or duties, as well as designated fiduciary responsibilities other than Trustee responsibilities. Such allocation of specific Trustee responsibilities may be made pursuant to the formulation of Trustee committees. Trustee committees shall consist of one (1) Employer Trustee and one (1) Union Trustee.

(b) Designate one or more persons other than Trustees to carry out any part of their fiduciary responsibilities, but may not delegate to any person who is not a Trustee any of their Trustee responsibilities.

SEC. 9—All decisions of a committee of the Board of Trustees, duly designated pursuant to Article IV, Section 8, shall be by unanimous vote. In the event of a deadlock, the matter voted upon by the committee shall be referred to the full Board of Trustees for decision.

## ARTICLE V—*Contributions and Defaults of Employer*

SECTION 1—Each Employer shall make continuing and proper reports and Contributions to the Trust Fund in accordance with this Agreement and Declaration of Trust and the Collective Bargaining Agreement.

A participating Employer shall be considered to be delinquent in the payment of Contributions if he (a) fails to submit a proper and detailed contribution reporting form, and the Contributions detailed therein, by the close of business on the due date, or (b) fails to submit Contributions on behalf of all the Employees for whom Contributions are required by the Collective Bargaining Agreement or special agreement, or (c) fails to compute properly the Contributions according to the required Contribution formula specified in the Collective Bargaining Agreement or special agreement.

SEC. 2—(a) The Trustees shall establish a uniform system among the Employers for the timely transmission of reports and Contributions and establish a periodic date on which such reports and Contributions shall be due.

(b) The Trustees shall notify any Employer of an apparent delinquency, mistake, or discrepancy in a report or Contribution.

(c) An Employer shall remain liable for the full amount of Contributions due during the period in default. The Trustees shall have the power to take any action necessary for the recovery of such Contributions and the enforcement of the Employer's obligations

hereunder. However, nothing contained herein shall be deemed to modify or limit, in any way, rights the Union may have under the terms of a Collective Bargaining Agreement to enforce collection of any amounts due the Trust.

(d) The parties recognize and acknowledge that the regular and prompt payment of Employer Contributions to the Trust is essential to the continued efficient administration of the Trust, and that it would be extremely difficult, if not impracticable, to fix the actual expense and damage to the Trust which would result from the failure of an individual Employer to pay such monthly Contributions in full within the period established by the Trustees.

Therefore, the amount of damage to the Trust from such failure shall be presumed to be, for each month of delinquency, 10% of the amount of the Contribution or Contributions due for the first month of the delinquency and, in addition thereto, 1½% per month for each additional month said delinquency remains uncured. Liquidated damages for subsequent delinquent monthly Contributions, if any, shall be separately calculated for each separate month on the same basis as the first month and the total liquidated damages for all delinquent Contributions shall be cumulative and arrived at by adding the total of the liquidated damages calculated separately for each month of delinquent Contributions.

If the Trustee bring suit against any Employer to collect any delinquent Contribution or Contributions, the Employer also shall be liable for costs of filing said suit and reasonable attorneys' fees.

(e) The Employer, by appropriate action of the Trustees in the event of any previous defaults in his obligations to make timely reports and Contributions, may be required to keep on deposit with the Trustees an amount estimated to be equal to three (3) months' Contributions. The Trustees, by appropriate action, may require a new Employer, who hereafter becomes a party to this Agreement and Declaration of Trust, to keep on deposit with the Trustees an amount estimated to be equal to three (3) months' Contributions for the number of Employees which the new Employer expects to employ, but such deposit shall, in no event, be less than two hundred dollars ($200.00).

(f) In the event the Collective Bargaining Agreement contains provisions relating to delinquencies that specify additional remedies, or obligate the delinquent Employer to greater amounts of liquidated damages, interest, or attorneys' fees than those set forth herein, the Trustees, at their option, may pursue the additional remedies or impose the greater charges.

The Trustees shall not be obligated, however, to pursue the collection of delinquent accounts through the grievance-arbitration procedures (if any) provided for in the Collective Bargaining Agreement.

SEC. 3—The Trustees shall have the authority, at the expense of the Trust Fund, to audit the payroll books and records of a participating Employer, either directly or through a qualified public accountant, as they may deem necessary in the administration of the Trust Fund. Such payroll audit may be undertaken pursuant to a routine payroll audit program or on an individual basis.

Whenever a payroll audit is authorized, the participating Employer involved shall make available to the Trustees, or the qualified public accountant designated by them, its payroll books and records. Such books and records shall include (a) all records which the Employer may be required to maintain under Section 209(a)(1) of the Employee Retirement Income Security Act of 1974, and (b) time cards, payroll journals, payroll check registers, cancelled payroll checks, copies of the Employer's federal, state and local payroll tax reports, and all other documents and reports that reflect the hours and wages, or other compensation of the Employees, or from which such can be verified.

In the event the payroll audit discloses that the participating Employer has not paid Contributions as required by the Collective Bargaining Agreement or special agreement, the Employer shall be liable for the costs of the audit. The Trustees shall have the authority, however, to waive all or part of such costs for good cause shown.

## ARTICLE VI—*Powers and Duties of Trustees*

SECTION 1—The Trustees shall have general supervision of the operation of the Trust and shall conduct the business and activities of the Trust according to this Trust Agreement.

SEC. 2—The Trustees shall hold, manage, care for and protect the Trust Fund and collect the income therefrom and Contributions thereto.

SEC. 3—The Trustees shall have the power, in their sole discretion, to invest and re-invest the principal and income of the Trust Fund in such securities, common and preferred stock, mortgages, notes, real estate, or other property as shall be permissible investments for Trustees in the State of Illinois and under ERISA, and may sell or otherwise dispose of such securities or property at any time and from time to time as they so see fit; provided, however, the Trustees may, in their sole discretion, invest the Trust Fund or any

part thereof in retirement annuity contracts, annuity contracts, retirement income contracts, group contracts, provided all such contracts are issued by legal reserve life insurance companies authorized to do business in the State of Illinois, as may be selected by the Trustees, for the purpose of providing for all or part of the benefits provided under this Trust. The Trustees shall have power (in addition to and not in limitation of common law and statutory authority) to exercise in respect to any stocks, bonds or other property, real or personal, held by them as Trustees, all such rights, powers and privileges as might be lawfully exercised by any person owning similar stocks, bonds or other property in his own right.

SEC. 4—The Trustees may appoint one or more Investment Managers to supervise and direct the investment and re-investment of a portion or all of the Trust in accordance with the provisions of the Trust Agreement in the same manner and with the same powers, duties, obligations, responsibilities and limitations as apply to the Trustees as set forth herein. The term "Investment Manager" is defined pursuant to Title I, Section 3(38) of ERISA, and any such Investment Manager appointed by the Trustees shall be qualified to act as such under the aforesaid provisions of ERISA and as a condition to its appointment shall acknowledge in writing that it is a Fiduciary with respect to the Fund. The Trustees shall not be liable for the acts or omission of such Investment Manager or under any obligation to invest or otherwise manage any assets of the Fund which are subject to the management of such Investment Manager.

If a bank is appointed as the Investment Manager, a fiduciary agreement shall be executed between the bank and the Trustees setting forth the duties and powers of the bank. If an insurance company is selected as the Investment Manager, the Trustees shall execute appropriate contracts with the insurance company. The Investment Manager shall hold, invest and disburse all assets of the Pension Fund in accordance with the fiduciary agreement or the insurance contract and in compliance with the provisions of ERISA.

(a) The Trustees are authorized to deposit any part or all of the funds held under this Trust Agreement to be invested in any common, comingled or collective fund maintained under a trust that has been determined to meet the requirements of Section 401a, and is entitled to exemption from taxation under Section 501a of the Internal Revenue Code of 1954 (or a comparable section or sections of future legislation that amends, supplements or supersedes those sections of the code). The declaration of trust or the agreement under such common, co-mingled or collective fund is maintained, as amended, modified or supplemented, shall be deemed part of this Agreement.

SEC. 5—All Trust funds not invested shall be deposited by the Trustees in such depository or depositories as the Trustees shall from time to time select, and any such deposit or deposits shall be made in the name of the Trust. All such funds shall be disbursed only by check or draft, signed by at least one Trustee representing the Employers and one Trustee representing the Employees. No Trustee shall be liable in any manner for the failure of any depository selected by the Trustees in good faith, and in the exercise of reasonable business judgement.

SEC. 6—The Trustee shall keep true and accurate books of account and a record of all its transactions, meetings, and the actions taken at such meetings or by informal action of the Trustees.

SEC. 7—The Trustees shall procure an audit of the books of the Trust by a Certified Public Accountant not less frequently than once each year, and a copy of each such audit shall be furnished to each Trustee, and a copy of each such audit shall be kept available for inspection by authorized persons during business hours at the office of the Trust.

SEC. 8—A Trustee shall incur no liability in acting upon any instrument, application, notice, request, signed letter, telegram or other paper or document believed by him to be genuine and to contain a true statement of facts and to be signed or sent by the proper person.

SEC. 9—(a) Insofar as permitted by ERISA, no Trustee shall be liable for any act or action pursuant to this Trust in good faith taken, performed or omitted, nor for any act or action taken, performed or omitted by any person or firm with whom the Trustees contract for benefits hereunder (except that this shall not relieve the Trustees from their obligation to enforce any duties or obligations of such person or firm at the expense of the Trust), nor for any act or action taken, performed or omitted by an agent, employee, co-Trustee, actuary, certified public accountant, attorney or other professional consultant, without reasonable care, for any act or action taken, performed or omitted by any other Trustee, nor for any act or failure to act, except only for his own gross negligence or willful misconduct.

(b) Insofar as permitted by ERISA, in the exercise of their discretionary powers, the Trustees may act solely upon their own best judgement upon the facts brought to their attention without liability for errors of judgement and with complete immunity from liability for losses, damages or liability sustained by the Trust, the Employers, or by any Employee or his beneficiary, so long as the Trustees act in good faith.

—3—

Sec. 10—The Trustees are hereby authorized to formulate and promulgate any and all necessary rules and regulations which it deems necessary or desirable to facilitate the proper administration of the Trust, provided the same are not inconsistent with the terms of this Agreement, and the Collective Bargaining Agreement creating the Fund. All rules and regulations adopted by majority action of the Trustees for the administration of the Trust Fund shall be binding upon all parties hereto, all parties dealing with the Trust and all persons claiming any benefits hereunder.

Sec. 11—Any successor Trustee appointed in accordance with the provisions of this Agreement, upon accepting in writing the terms of this Trust, shall be vested with all of the rights, powers and duties of his predecessor.

Sec. 12—No party dealing with the Trustees shall be obligated (a) to see to the application to the Trust purposes, herein stated, of any money or property belonging to the Trust Fund, or (b) to see that the terms of this Agreement have been complied with, or (c) to inquire into the necessity or expediency of any act of the Trustees. Every instrument executed by the Trustees shall be conclusive evidence in favor of every person relying thereon (a) that at the time of the delivery of said instrument the Trust was in full force and effect, (b) that the instrument was executed in accordance with the terms and conditions of this Agreement, and (c) that the Trustees were duly authorized and empowered to execute the instrument.

Sec. 13—The receipt given by the Trustees for any money or other properties received by them shall effectually discharge the person or persons paying or transferring the same, and such person or persons shall not thereafter be responsible for the use to which same is put or for the loss or misapplication thereof.

Sec. 14—The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law:

(a) To enter into any and all contracts and agreements for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Trust Fund, and to do all acts as it, in its discretion, may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the employee involved.

(b) To keep property and securities registered in the name of the Trustees or in the name of a nominee or nominees or in unregistered or bearer form without disclosure of any fiduciary relationship.

(c) To establish and accumulate as part of the Trust Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of such Trust.

(d) To pay out of the funds of the Trust all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Trust Fund, or any money, property or securities forming a part thereof.

(e) To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder.

(f) To enter into reciprocal agreements with other Trust Funds on such terms as the Trustees may deem necessary or advisable provided the same are not inconsistent with the terms of this Agreement and Declaration of Trust.

Sec. 15—The Trustees shall use and apply the Trust Fund for the following purposes:

(a) To pay or provide for

(1) The payment of all reasonable and necessary expenses of collecting the Contributions and administering the affairs of this Trust, including the employment of such legal counsel, investment managers, medical consultants, field auditors, ERISA-qualified public accountants, enrolled actuaries, administrative, accounting and other assistants or employees as the Trustees, in their discretion, may find necessary or appropriate in carrying out the purposes of this Trust;

(2) The leasing of such premises as may be necessary for the operation of the affairs of the Trust; and

(3) The purchase or leasing of such materials, supplies and equipment as the Trustees, in their discretion, find necessary or appropriate to the performance of its duties.

(b) To pay or provide for the payment of benefits to eligible Employees in accordance with the terms, provisions and conditions of the Plan to be formulated and agreed upon hereunder by the Trustees.

Sec. 16—The Trustees, by majority action, shall have the power to construe the provisions of this Agreement and the terms and conditions of the Plan adopted by it; and any construction adopted by the Trustees in good faith shall be binding upon the Union, Employers, Employees, and all other persons.

Sec. 17—The Trustees, by resolution, shall provide for fidelity bonds, in such form and amounts as may be required by statute, for their Employees and for the Trustees who shall be authorized to withdraw moneys from the Trust Fund. If no such statutory

requirement shall exist, such bonds shall be in such form and amounts as the Trustees may determine.

Sec. 18—The costs and expenses, including legal fees for any action, suit, or proceeding relating to the Trust which is brought against the Trustees, shall be paid as a general expense of the administration, provided, however, that such costs or expenses shall not be paid from the Trust Fund if it is adjudged in the action, suit or proceeding that the Trustees were guilty of gross negligence or willful misconduct.

Sec. 19—The Trustees shall have the power to purchase such insurance as they deem advisable for the protection of the assets of this Trust and of its Plans, as well as insurance of the type described in Section 410(b) of ERISA, and to pay the premiums therefor out of the assets of this Trust. In addition, they are authorized to obtain the bonding required by Section 412 of ERISA, and to pay the premiums therefor out of the assets of this Trust.

Sec. 20—The Trustees may sponsor participation of themselves, their alternates, employees and advisors, in educational conferences, seminars, or programs, and may in that regard incur, advance or reimburse reasonable expenses for registration, travel, hotel, food and other expenses.

Sec. 21—It is recognized that at some time or times in the future the Trustees may deem it in the best interest of this Trust Fund and of the participating Employers, Unions and Employees, to merge this Trust Fund into another employee benefit trust fund, or to accept the merger of another employee benefit trust fund into this Trust Fund. The Trustees shall have the authority to investigate, evaluate and negotiate any such merger and to enter into appropriate agreements to consummate the same.

If this Trust Fund should be merged into another employee benefit trust fund, the Trustees shall have the authority to terminate this Trust Fund and to transfer the remaining assets or liabilities to the other fund. If another employee benefit trust fund is merged into this Trust Fund, the Trustees shall have the authority to accept a transfer of assets or liabilities from the other trust.

## ARTICLE VII—*Controversies and Disputes*

Section 1—In any controversy, claim, demand, suit at law, or other proceeding between any Employee, beneficiary, or any other person and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Board, any instruments on file with the Board, with the Union, or with the Employers, any facts certified to the Trustees by the Union, or the Employers, any facts which are of public record, and any other evidence pertinent to the issue involved.

Sec. 2—All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Trust Fund or the operation thereof, whether as to any claim for any benefits preferred by any Employee, or any other persons, or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund, or otherwise, shall be submitted to the Trustees for decision, and the decision of a majority of the Trustees, if made in good faith, shall be binding upon all persons dealing with the Trust Fund or claiming any benefit hereunder.

Sec. 3—The Trustees may, in their sole discretion, compromise or settle any claim or controversy in such manner as they think best, and any majority decision made by the Trustees in compromise or settlement of a claim or controversy, or any compromise or settlement agreement entered into by the Trustees shall be conclusive and binding on all parties interested in this Trust.

## ARTICLE VIII—*Establishment of Plan*

Section 1—Formulation of Plan—The Trustees shall formulate a Plan for the payment of such retirement benefits as may be feasible and shall begin active operation of such Plan as soon as possible. Such Plan shall at all times conform to the applicable sections of the then applicable Internal Revenue Code for purposes of tax deduction and the Collective Bargaining Agreement between the parties. Said Trustees shall draft procedures, regulations and conditions for the operation of the Plan, including by way of illustration and not limitation: conditions of eligibility for covered Employees, procedure for claiming benefits, schedules of type and amount of benefits to be paid, and procedure for the distribution of benefits; provided, however, that all such rules and regulations adopted by the Trustees shall be general in their application and no special or particular treatment shall be accorded to any Employee.

Sec. 2—Assistance for Drafting Plan—The Board may consult with or employ such actuarial and other experts as they deem necessary for the proper formulation and operation of said Plan.

Sec. 3—Copies of Plan and Notices—A copy of such Plan shall be adopted and filed by the Trustees as part of the records and minutes of the Board and copies of such Plan shall be distributed to the Union and to the Employers.

—4—